MICHAEL SAFFER, ESQ. (MAS2997)
JON FALLON, ESQ.  (JF2851)
MANDELBAUM SALSBURG
*ATTORNEYS FOR PLAINTIFF*
155 PROSPECT AVENUE
WEST ORANGE, NEW JERSEY 07052
973.736.4600 (MAIN OFFICE)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

---------------------------------------------------------------X
PTT, LLC, a Delaware Limited Liability
Company d/b/a High 5 Games,

    Plaintiff,

  v.

GIMMIE GAMES, an entity;  DANIEL MARKS,
an individual; JOSEPH MASCI, an individual;
BRIAN KAVANAGH, an individual; JOHN
SMITH(s) 1 - 7, individuals; and XYZ
COMPANIES 1 – 7,

    Defendants.
---------------------------------------------------------------X

**COMPLAINT**

Plaintiff PTT, LLC d/b/a High 5 Games ("H5G"), by way of Complaint against Gimmie Games ("Gimmie"), Daniel Marks ("Marks"), Joseph Masci ("Masci"), Brian Kavanagh ("Kavanagh"), John Smith(s) 1 – 7 and XYZ Companies 1 – 7, state as follows:

## NATURE OF THE ACTION

1. This is an action for (1) Misappropriation under the New Jersey Trade Secret Act, (2) Unfair Competition under 15 U.S.C. § 1125 (a), (3) Unfair Competition under New Jersey Common Law, and (4) Breach of Contract.

## JURISDICTION AND VENUE

2. This Court has subject matter jurisdiction over all causes of actions set forth herein based upon 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1338(a) and 1338(b) and, pursuant to

the supplemental jurisdiction of this Court, for all non-federal causes of action under 28 U.S.C. § 1367.

3.  This Court has personal jurisdiction over defendants by virtue of, *inter alia*, (a) defendants having numerous business relations within the state of New Jersey and conducting regular and continuous business transactions therewith, giving it the requisite minimum contacts with the state required to be subject to jurisdiction therein; (b) the commission of tortious acts by all defendants within the State of New Jersey and within this Judicial District; and (c) regular and continuous transaction of business, including the tortious acts complained of herein, within the State of New Jersey and within this Judicial District.

4.  Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b) and (c).

## IDENTIFICATION OF THE PARTIES TO THE COMPLAINT

5.  Plaintiff H5G is a Delaware Limited Liability Company with a corporate office at 1200 MacArthur Boulevard, Mahwah, New Jersey 07430.

6.  Defendant Gimmie is believed to be a Georgia entity, having an office at 160 Clairemont Avenue, Suite 340, Decatur, GA, 30030.

7.  Defendant Marks is a former employee and member of H5G, and is currently believed to be Gimme's founder and Chief Executive Office, reachable at Gimme's corporate address.

8.  Defendant Masci is a former employee of H5G, and is currently believed to be Gimme's Chief Creative Officer, reachable at Gimme's corporate address, and residing at 8 High Road, Montrose, NY, 10548.

9.   Defendant Kavanagh is a former employee of H5G, and is currently believed to be Gimme's Director of Motion Graphics, reachable at Gimme's corporate address.

10.   Defendant John Smith(s) 1 – 7 are fictitious persons or entities whose present identity and address are unknown, who have also violated Plaintiff's rights as set forth herein, or who assisted, conspired, or otherwise cooperated with the other defendants in the acts complained of herein.

11.   Defendants XYZ Companies 1 – 7 are fictitious entities whose present identity and address is unknown, who have also violated Plaintiff's rights as set forth herein, or who assisted, conspired, or otherwise cooperated with the other defendants in the acts complained of herein.

## BACKGROUND FACTS

**A.**   *Intellectual Property Creations*

**SUBSTITUTION METHOD – SUPER STACKS**

12.   In or around Summer 2009, H5G created a new concept of unique functional experience for the player of a slot machine game. The functional experience involved the appearance of slot machine reels having the identical symbol shown in every symbol position on top of one another into perpetuity.

13.   The concept of putting identical symbols on top of one another in a continuous series has been known in the gaming industry and is generally called "stacks" of symbols. Such a feature is generally achieved by designing a reel having the same symbol fixed on the reel a set number of times in a row (e.g., 25 times), such that when the reels are spinning the player would see the same symbol for a brief instance.

14. H5G's proprietary mathematical models provide a unique method of taking simple stacks and generating an experience-changing function through substituting fixed symbols on the reel with the desired stacked symbol. Thus, the reels themselves do not have to be modified to include fixed stacks as has been known, and H5G's methodology can create the appearance of an infinite symbol stack through mathematical manipulation of the appearance of the reels. H5G named this feature "Super Stacks."

15. A unique aspect of H5G's Super Stacks feature is that the math models (*i.e.,* the algorithms) designed by H5G to create such a unique playing experience also comply with the strict regulatory restrictions utilized in and by various state and international regulatory agencies overseeing gaming laws. This aspect is why H5G has been very selective with whom it discloses its mathematical models. Defendants Marks, Masci and Kavanagh, who were employed by H5G at the time of the creation of these algorithmic formulas, were privy to these otherwise confidential and proprietary formulations.

16. H5G has always considered its method of making games utilizing its proprietary algorithms and software code to create the Super Stacks feature to be a trade secret, and has complied with all lawful requirements to ensure its trade secrets are adequately protected (the "Super Stacks Trade Secret").

**SUPER SYMBOLS**

17. One of H5G's more recent inventions pertains to the concept of oversized symbols occupying multiple positions across multiple rows and/or columns, which H5G has termed "Super Symbols."

18. The concept of Super Symbols was originally conceived as early as the latter part of 2009 and, over the following couple of years after a substantial investment of time and

resources by H5G, the feature was successfully built into a game prototype that would meet the high quality standards of H5G and would satisfy regulatory requirements. Shortly after such achievement was reached, H5G filed United States Provisional Patent Application serial no. 61/522,120, on August 16, 2011, and within one year, filed United States Patent Application serial no. 13/572,589, covering the Super Symbols feature (the "'589 Application"). H5G is presently prosecuting the '589 Application at the USPTO, and has received favorable feedback towards allowability in recent examiner interview proceedings.

19. H5G has always considered its method of making games utilizing its proprietary algorithms and software code to create the Super Symbols feature to be a trade secret, and has complied with all lawful requirements to ensure its trade secrets are adequately protected (the "Super Symbols Trade Secret").

20. H5G built its first game using the Super Symbols Trade Secret in 2011, entitled "Ocean's Glory," and the Super Symbols feature was a prominent aspect of the game. Masci, as H5G's Art Director at that time, was in charge of creating and/or overseeing all art for the Ocean's Glory game, including the creation of the Super Symbols artwork.

21. H5G subsequently created numerous games incorporating the Super Symbols feature. Many of such games were sold to one of H5G's licensees, Bally Technologies ("Bally"), under the premise that such feature was unique to the games H5G was creating for Bally as such feature was unknown outside of H5G at the time of creation of such games. In fact, prior to publication of the '589 Application in late July 2013, upon information and belief, no one outside of H5G and Bally was aware of the Super Symbols Trade Secret.

22. As H5G and Bally both believed the Super Symbols feature to be a likely industry hit, they agreed to keep the games utilizing that feature confidential until making such games

publicly known at an industry trade show, G2E, which occurred September 24th – 26th, 2013, in Las Vegas, Nevada ("G2E"). Bally and H5G spent significant resource and efforts in promoting its new line of games with such Super Symbols feature at the trade show.

### B.  *Marks, Masci and Kavanagh's Employment with H5G*

23. In or around September 1998, Marks, who possesses considerable technology expertise, became a member of H5G and commenced his employment as H5G's legal counsel. During his tenure at H5G, Marks worked closely under H5G's CEO, Anthony Singer, as well with and under other H5G employees, to devise and develop casino game software, namely, slot machine-type game software. Marks' efforts in game software development, including his efforts toward contributing to the conception of various game feature ideas to be utilized within the game software, were noteworthy during his tenure at H5G. In addition, as an equity member of H5G, Marks had numerous contractual and fiduciary obligations to H5G with regard to preserving confidentiality and trade secrets of the company.

24. After a long relationship with H5G, and for numerous reasons arising from disagreement among management, Marks elected to resign from H5G effective February 4, 2010, on which date H5G and Marks entered into a Separation, Severance and Transition Services Agreement (the "Marks Agreement"). *See Exhibit 1*. The Marks Agreement, *inter alia*, provides that:

    a.    Marks was obligated to return any and all H5G Confidential Information (as defined therein) to H5G (Section 5);

    b.    Marks was required to forever maintain the confidentiality of H5G's Confidential Information and not to use such Confidential Information for any purpose other than to benefit H5G (Section 9); and

    c.    H5G would be entitled to injunctive relief if there is a breach of Sections 5 and 9 (Section 11(a).

25.     The Super Stacks Trades Secrets and the Super Symbols Trade Secrets, separately and collectively, satisfy the definition of Confidential Information in the Marks Agreement.

26.     Masci began his employment at H5G on or around August 1999.  After nearly 13 years with H5G, on June 7, 2012, Masci's employment with H5G was terminated, subject to a Separation Agreement between Masci and H5G, which incorporated several of Masci's other contracts with H5G (the "Masci Agreements").  *See Exhibit 2*, including all relevant agreements.  In exchange for Masci's ongoing obligations related to confidentiality, non-competition, and non-solicitation, Masci was granted a severance payment equal to one-year's salary and his stock appreciation rights, originally granted in November 2011, were accelerated and fully vested upon separation from H5G.  *Id.*

27.     The Super Stacks Trades Secrets and the Super Symbols Trade Secrets, separately and collectively, satisfy the definition of Confidential Information in the Masci Agreements.

28.     Kavanagh began his employment with H5G in or around January 2009 as a Motion Graphics Designer.  As a condition of his employment, Kavanagh executed numerous contracts with H5G regarding confidentiality, noncompetition, assignment of IP, and similar obligations (the "Kavanaugh Agreements").  *See Exhibit 3,* including all relevant agreements.  In August 2010, Kavanagh was promoted to a new position Animation Manager at H5G. Kavanagh's employment with H5G ended in October 2011.

29.     The Super Stacks Trades Secrets and the Super Symbols Trade Secrets, separately and collectively, satisfy the definition of Confidential Information in the Masci Agreements.

30.     During their collective employments at H5G, Marks, Masci and Kavanagh were all privy to many, if not all, of H5G's confidential and proprietary methods of making games, as well as many of H5G's features in development, including the methodologies behind Super

Stacks and Super Symbols.  In fact, Marks, Masci and/or Kavanagh may have contributed to or been involved with the conception, reduction to practice and/or proprietary testing and development of such features.

C.   *Gimmie Games, Aristocrat and G2E*

31.   As early as October 2012, the gaming industry was aware that H5G's former employee, Marks, had entered into an agreement with one of the larger game distributors in the gaming industry, Aristocrat Technologies Inc., an Australian company ("Aristocrat"), as a third party game content provider, under a new entity named "Gimme" with which he was affiliated.

32.   Upon information and belief, shortly after he founded Gimmie, around December 2012, Marks hired Kavanagh as Gimme's Director of Motion Graphics.

33.   Upon information and belief, Masci began discussions with Marks regarding Masci's potential involvement with Gimmie as early as late 2012, during Masci's non-compete period, which did not expire until June 2013.  Masci publicly announced his role at Gimmie in July 2013, as its Chief Creative Officer.

34.   Upon information and belief, since October 2012, Gimmie has attempted to solicit several additional current employees of H5G by virtue of the efforts of Marks, Masci and/or Kavanagh, and has been successful on at least in one instance.

35.   Upon information and belief, Gimme's first games to make a public appearance were featured at Aristocrat's booth at G2E, the themes of which were utilized by Aristocrat as a part of a major marketing program at G2E, including banners, postcards, floor mats, and the like, with such games featured thereon.

36.   Gimmie's games featured at G2E comprised several features, including Mega Symbols and Max Stacks.

37. Upon information and belief, Gimmie's Mega Symbols feature, when embodied within a slot machine game, is a result of misappropriated information derived from H5G's Super Symbols Trade Secrets.

38. Upon information and belief, Gimmie's Max Stacks feature, when embodied within a slot machine game, is a result of misappropriated information derived from H5G's Super Stacks Trade Secrets.

39. Upon information and belief, the following games made by Gimmie incorporate the Mega Symbols feature: Storm Queens: Thunder Queen; Storm Queens: Frost Queen; Storm Queens: Flame Queen; and Storm Queens: Sand Queen.

40. Upon information and belief, the following games made by Gimmie incorporate the Max Stacks feature: Sky Rider: Golden Amulet; Sky Rider: Silver Treasures; Temple of the Tiger: Tiger King; Temple of the Tiger: Tiger Queen; Storm Queens: Thunder Queen; Storm Queens: Frost Queen; Storm Queens: Flame Queen; and Storm Queens: Sand Queen.

41. Upon information and belief, Marks, Masci and Kavanagh worked collectively to create each of the listed games above with the actual knowledge of the origination of such features and trade secrets associated therewith at H5G.

## FIRST CAUSE OF ACTION

## MISAPPROPRIATION UNDER THE NEW JERSEY TRADE SECRET ACT

42. Paragraphs 1 through 41 are realleged and incorporated herein by reference.

43. As discussed above, H5G possesses numerous trade secrets, including many of its methods, techniques, programs, inventions or the like, including those regarding its Super Stacks feature and its Super Symbol feature (collectively, the "H5G Trade Secrets").

44. The H5G Trade Secrets, prior to unlawful disclosure by Defendants, derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other in the slot gaming industry.

45. H5G implements reasonable commercial restrictions to ensure the H5G Trade Secrets would maintain their secrecy by requiring all of those who would access the H5G Trade Secrets be under strict express terms of confidentiality.

46. Marks, Masci and Kavanagh, by working collectively under the guise of Gimmie, have acquired the H5G Trade Secrets with actual or imputed knowledge that such trade secrets were acquired through improper means by way of theft, bribery, misrepresentation, breach or inducement of a breach of an express or implied duty to maintain the secrecy of, or to limit the use or disclosure of, the H5G Trade Secrets.

47. In addition, Marks, Masci and Kavanagh, by working collectively under the guise of Gimmie, have disclosed and/or used H5G's Trade Secrets without express or implied consent of H5G, using improper means to acquire knowledge of the H5G Trade Secrets.

48. Alternatively, at the time of disclosure and use of the H5G Trade Secrets, Marks, Masci and Kavanagh, by working collectively under the guise of Gimmie, knew or had reason to know that the knowledge of the trade secret was derived or acquired through improper means.

49. The aforementioned collective acts of the Defendants constitute misappropriation under the New Jersey Trade Secrets Act.

50. Defendants will, if not preliminary and permanently enjoined by the Court, continue the acts and benefits of the misappropriation, causing Plaintiff immediate and irreparable harm, damage and injury.

51.     As a result of the Defendants' collective actions, Plaintiff have suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein.

## SECOND CAUSE OF ACTION

## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

52. Paragraphs 1 through 51 are realleged and incorporated herein by reference.

53.     Plaintiff has expended significant resources developing, using and benefiting from the H5G Trade Secrets, and the confidential and proprietary nature thereof.  In particular, H5G relied upon the confidential nature of the H5G Trade Secrets in confidentially promoting its capabilities to make games for sale embodying such H5G Trade Secrets, and offering its prospective customers a unique and proprietary feature which is likely to impress and sell well in the gaming industry upon launch.

54.     Defendants' collective actions regarding the use of the H5G Trade Secrets, as described herein, have misled, and will continue to mislead many persons in the slot gaming industry to believe the Defendants have received permission, license, or other consent from Plaintiff to make, use, sell, offer for sale, or otherwise utilize H5G Trade Secrets in their games.

55.     Defendants' use of the games having the Mega Symbols and Max Stacks features, through sale, offering for sale, and the like, is likely to deceive relevant consumers in the slot gaming industry as to the Defendants' affiliation with Plaintiff, or as to a sponsorship or an approval of its games by Plaintiff.

56.     Defendants will, if not preliminarily and permanently enjoined by the Court, continue its acts of unfair competition as set forth in the Lanham Act, thereby deceiving the

public, trading on the confidential and proprietary nature of the H5G Trade Secrets at the time they were misappropriated by Defendants.

57. As a result of the Defendants' collective actions, Plaintiff has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein.

## THIRD CAUSE OF ACTION

## UNFAIR COMPETITION UNDER NEW JERSEY COMMON LAW

58. Paragraphs 1 through 57 are realleged and incorporated herein by reference.

59. The aforementioned collective acts of the Defendants constitute unfair competition and unfair business practices contrary to the common laws of New Jersey.

60. Defendants will, if not preliminarily and permanently enjoined by the Court, continue its acts of unfair competition as defined by the common laws of New Jersey , thereby deceiving the public, trading on the exclusive rights granted in the form of the Split Symbols Patents, and causing Plaintiff immediate and irreparable harm, damage and injury.

61. As a result of the Defendants' collective actions, Plaintiff have suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein.

## FOURTH CAUSE OF ACTION

## BREACH OF CONTRACT

62. Paragraphs 1 through 61 are realleged and incorporated herein by reference.

63. Marks, by virtue of his actions set forth herein, has materially violated his agreements with H5G, and in particular, Sections 5 and 9 of the Marks Agreement.

64.     Masci, by virtue of his actions set forth herein, has materially violated his agreements with H5G, and in particular, Sections 7, 8 and 9 of his Separation Agreement.

65.     Kavanagh, by virtue of his actions set forth herein, has materially violated his agreements with H5G, and in particular, Section 4, of his Confidentiality Agreement.

66.     As a result of the Defendants' collective actions, Plaintiff has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against each of the defendants as follows:

A.     a permanent injunction restraining Defendants, their respective officers, agents, servants, employees, attorneys, and those in active concert or participation with them, or any of them who receive actual notice of the order by personal service or otherwise, from:

1. making, using, selling, offering for sale, or importing into the United States, any game embodying any of the Max Stacks Feature, the Mega Symbols Feature, and any derivative or equivalent functional feature thereof, regardless of how branded; and

2. assisting or inducing others to make, use, sell, offer for sale, or import into the United States, any game embodying any of the Max Stacks Feature, the Mega Symbols Feature, and any derivative or equivalent functional feature thereof, regardless of how branded;

B.     an award of damages inclusive of any actual damages suffered by Plaintiff as a result of Defendants' liability stated hereinabove, including arising out of

Defendants' liability arising out of Counts I – IV, and other Counts that may be added at a later date once additional information is obtained;

C. an award of damages from Defendants for their liability under § 43(a) of the Lanham Act, including any profits made by Defendants in connection with its unlawful activities, any damages sustained by Plaintiff as a result of Defendants' unlawful activities, and any costs incurred with pursuing this Action, including Court costs, attorney's fees, and additional costs related thereto, pursuant to 15 U.S.C. § 1117(a);

D. an award of all damages incurred, directly or indirectly, as a result of Defendants' unlawful acts set forth herein, said damages to be trebled at the discretion of the Court pursuant to N.J.S.A. 56:4-2;

E. an award of all damages under the New Jersey Trade Secrets Act, N.J.S.A 56:15-1, *et seq.* including injunctive relief, monetary damages, twice such monetary damages for the willful acts of Defendants, and all reasonable costs and attorneys' fees;

F. an order requiring specific performance by each Defendant of their respective contracts alleged as breached herein;

G. an order permitting Plaintiff to terminate its obligations under such agreements, including, in part, removal of any equity interests or stock appreciation interests of any of the Defendants, or any outstanding payments remaining on such a prior interest;

H. a determination by the Court that Defendants' unlawful actions set forth herein are exceptional, warranting an award of damages to Plaintiff for all reasonable attorney's fees incurred by Plaintiff, pursuant to 15 U.S.C. § 1117(a);

I. an award of prejudgment and post-judgment interest and costs of suit;

J. an award of punitive damages in an amount to be determined by the Court, but not less than $5,000,000.00, for Defendant's deliberate and willful acts;

K. an award of actual and compensatory damages in an amount not presently known, but to be computed during the pendency of this action; and

L. an award of any such other and further relief as this Court deems just and equitable.

Respectfully submitted,

Date: November 25, 2013                         By:/s/  Jon Fallon                       /
                                                **MICHAEL SAFFER, ESQ. (MAS2997)**
                                                **JON FALLON, ESQ.  (JF2851)**
                                                **MANDELBAUM SALSBURG P.C.**
                                                *ATTORNEYS FOR PLAINTIFF*
                                                155 PROSPECT AVENUE
                                                WEST ORANGE, NEW JERSEY 07052
                                                973.736.4600 (MAIN OFFICE)