Michael A. Saffer, Esq. (MAS2997)
Jon Fallon, Esq. (JF2851)
Khizar A. Sheikh, Esq. (KAS2737)
Mandelbaum Salsburg Lazris & Discenza, P.C.
155 Prospect Avenue
West Orange, NJ 07052
973.736.4600
Fax: 973.325.7467
Attorneys for Plaintiff / Counterclaim Defendant PTT, LLC

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| PTT, LLC, a Delaware Limited Liability Company d/b/a High 5 Games,<br><br>   Plaintiff,<br><br>v.<br><br>GIMMIE GAMES, an entity;  DANIEL MARKS, an individual; JOSEPH MASCI, an individual; BRIAN KAVANAGH, an individual; MARKS STUDIOS, LLC, an entity; ARISTOCRAT TECHNOLOGIES, INC., an entity; JOHN SMITH(s) 1 - 7, individuals; and XYZ COMPANIES 1 – 7,<br><br>   Defendants. | Civil Action No.: 2:13-CV-07161-JLL-JAD<br><br><br><br><br><br><br><br><br><br><br><br>**FIRST AMENDED COMPLAINT AND DEMAND FOR JURY TRIAL** |

   Plaintiff PTT, LLC d/b/a High 5 Games ("H5G"), hereby submits this First Amended Complaint and Demand for Jury Trial against Gimmie Games (hereinafter "Gimmie"), Daniel Marks (hereinafter "Marks"), Joseph Masci (hereinafter "Masci"), Brian Kavanagh (hereinafter "Kavanagh"), Marks Studios, LLC (hereinafter "Marks Studios"), Aristocrat Technologies, Inc. ("Aristocrat"), John Smith(s) 1 – 7 and XYZ Companies 1 – 7, and allege upon knowledge as to itself and otherwise upon information and belief as follows:

## NATURE OF THE ACTION

1.      This is an action for (1) Misappropriation under the New Jersey Trade Secret Act, (2) Unfair Competition under 15 U.S.C. § 1125 (a), (3) Unfair Competition under New Jersey Common Law, (4) Breach of Contract and (5) Direct Patent Infringement and (6) Induced Patent Infringement.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over all causes of actions set forth herein based upon 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1338(a) and 1338(b) and, pursuant to the supplemental jurisdiction of this Court, for all non-federal causes of action under 28 U.S.C. § 1367.

3.      This Court has personal jurisdiction over defendants by virtue of, *inter alia*, (a) defendants having numerous business relations within the state of New Jersey and conducting regular and continuous business transactions therewith, giving it the requisite minimum contacts with the state required to be subject to jurisdiction therein; (b) the commission of tortious acts by all defendants within the State of New Jersey and within this Judicial District; and (c) regular and continuous transaction of business, including the tortious acts complained of herein, within the State of New Jersey and within this Judicial District.

4.      Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b) and (c).

## IDENTIFICATION OF THE PARTIES TO THE COMPLAINT

5.      Plaintiff H5G is a Delaware Limited Liability Company with a corporate office at 1200 MacArthur Boulevard, Mahwah, New Jersey 07430.

6.      Defendant Gimmie is believed to be a Georgia entity and the doing business name for Marks Studios, having an office at 160 Clairemont Avenue, Suite 340, Decatur, GA, 30030.

2

7.      Defendant Marks Studios is believed to be a Georgia entity and the formal corporate identity for Gimmie, having an office at 160 Clairemont Avenue, Suite 340, Decatur, GA, 30030.

8.      Defendant Marks is a former employee and member of H5G, and is currently believed to be Gimme's founder and Chief Executive Office, reachable at Gimme's corporate address.

9.      Defendant Masci is a former employee of H5G, and is currently believed to be Gimme's Chief Creative Officer, reachable at Gimme's corporate address, and residing at 8 High Road, Montrose, NY, 10548.

10.     Defendant Kavanagh is a former employee of H5G, and is currently believed to be Gimme's Director of Motion Graphics, reachable at Gimme's corporate address.

11.     Defendant Aristocrat is believed to be a Nevada corporation, having a business address at 7230 Amigo Street, Las Vegas, NV, 89119.

12.     Defendant John Smith(s) 1 – 7 are fictitious persons or entities whose present identity and address are unknown, who have also violated Plaintiff' rights as set forth herein, or who assisted, conspired, or otherwise cooperated with the other defendants in the acts complained of herein.

13.     Defendants XYZ Companies 1 – 7 are fictitious entities whose present identity and address is unknown, who have also violated Plaintiff' rights as set forth herein, or who assisted, conspired, or otherwise cooperated with the other defendants in the acts complained of herein.

## BACKGROUND FACTS

A.      *Intellectual Property Creations*

## SUBSTITUTION METHOD – SUPER STACKS

14.     In or around Summer 2009, H5G created a new concept of unique functional experience, also called a game play mechanic, for the player of a slot machine game.  The

3

functional experience involved the appearance of slot machine reels having the identical symbol shown in every symbol position on top of one another into perpetuity.

15.     The concept of putting identical symbols on top of one another in a continuous series has been known in the gaming industry and is generally called "stacks" of symbols. Such a feature is generally achieved by designing a reel having the same symbol fixed on the reel a set number of times in a row (*e.g.*, 25 times), such that when the reels are spinning the player would see the same symbol for a brief instance.

16.     H5G's game play mechanic provides a unique method of taking simple stacks and generating an experience-changing function through substituting fixed symbols on the reel with the desired stacked symbol. Thus, using H5G's proprietary methodology, the reels themselves do not have to be modified to include fixed stacks to create the appearance of an infinite symbol stack through mathematical manipulation of the appearance of the reels. H5G named this game play mechanic feature "Super Stacks."

17.     One very unique aspect of H5G's Super Stacks feature is that the math models (*i.e.,* algorithms) designed by H5G to create such a unique playing experience also comply with the strict regulatory restrictions utilized in by various state and international regulatory agencies overseeing gaming laws. This aspect is why H5G has been very selective with whom it discloses its mathematical models, and why it does so under the strictest of confidence. Defendants Marks, Masci and Kavanagh, who were employed by H5G at the time of the creation of this game play mechanic, were privy to the otherwise confidential and proprietary formulations.

18.     H5G has always considered its method of making games utilizing its proprietary methodology to create the Super Stacks feature to be a trade secret, and has complied with all lawful requirements to ensure its trade secrets are adequately protected (the "Super Stacks Trade Secret").

4

**SUPER SYMBOLS**

19.     One of H5G's more recent inventions pertains to the concept of oversized symbols occupying multiple positions across multiple rows and/or columns, which H5G has termed "Super Symbols."

20.     The concept of Super Symbols was originally conceived as early as the latter part of 2009 and, over the following couple of years after a substantial investment of time and resources by H5G, the feature was successfully built into a game prototype that would meet the high quality standards of H5G and would satisfy regulatory requirements.  Shortly after such achievement was reached, H5G filed United States Provisional Patent Application serial no. 61/522,120, on August 16, 2011, and within one year, filed United States Patent Application serial no. 13/572,589, covering the Super Symbols feature (the "'589 Application").  On July 18, 2013 (the "Publication Date"), the '589 Application was published by the United States Patent and Trademark Office as United States Patent Application Publication No. 2013/0184050.  On May 27, 2014, the '589 Application issued as United States Patent No. 8,734,223 (the "'223 Patent").

21.     Prior to the Publication Date, H5G had always considered its method of making games utilizing its methodology to create the Super Symbols feature to be a trade secret, and had complied with all lawful requirements to ensure its trade secrets are adequately protected (the "Super Symbols Trade Secret").

22.     H5G built its first game using the Super Symbols Trade Secret in 2011, entitled "Ocean's Glory," and the Super Symbols feature was a prominent aspect of the game. Masci, as H5G's Art Director at that time, was in charge of creating and/or overseeing all art for the Ocean's Glory game, including the creation of the Super Symbols artwork.

23.     H5G subsequently created numerous games incorporating the Super Symbols feature.  Many of such games were sold to one of H5G's licensees, Bally Technologies

5

("Bally"), under the premise that such feature was unique to the games H5G was creating for Bally as such feature was unknown outside of H5G at the time of creation of such games.

24.    As H5G and Bally both believed the Super Symbols feature to be a likely industry hit, they agreed to keep the games utilizing that feature confidential until making such games publicly known at an industry trade show, G2E, which occurred September $24^{th} - 26^{th,}$ 2013, in Las Vegas, Nevada ("G2E").  Bally and H5G spent significant resource and efforts in promoting its new line of games with such Super Symbols feature at the trade show.

**B.    _Marks, Masci and Kavanagh's Employment with H5G_**

25.    In or around September 1998, Marks, who possesses considerable technology expertise, became a member of H5G and commenced his employment as H5G's legal counsel. During his tenure at H5G, Marks worked closely under H5G's CEO, Anthony Singer, as well with and under other H5G employees, to devise and develop casino game software, namely, slot machine-type game software.  Marks' efforts in game software development, including his efforts toward contributing to the conception of various game feature ideas to be utilized within the game software, were noteworthy during his tenure at H5G.  In addition, as an equity member of H5G, Marks had numerous contractual and fiduciary obligations to H5G with regard to preserving confidentiality and trade secrets of the company.

26.    After a long relationship with H5G, and for numerous reasons arising from disagreement among management, Marks elected to resign from H5G effective February 4, 2010, on which date H5G and Marks entered into a Separation, Severance and Transition Services Agreement (the "Marks Agreement").  See Exhibit 1, including all relevant agreements. The Marks Agreement, inter alia, provides that:

a.    Marks was obligated to return any and all H5G Confidential Information (as defined therein) to H5G (Section 5);

6

b.      Marks was required to forever maintain the confidentiality of H5G's Confidential Information and not to use such Confidential Information for any purpose other than to benefit H5G (Section 9); and

c.      H5G would be entitled to injunctive relief if there is a breach of Sections 5 and 9 (Section 11(a)).

27.     The Super Stacks Trade Secret and the Super Symbols Trade Secret, separately and collectively, satisfy the definition of Confidential Information in the Marks Agreement.

28.     Masci began his employment at H5G on or around August 1999. After nearly 13 years with H5G, on June 7, 2012, Masci's employment with H5G was terminated, subject to a Separation Agreement between Masci and H5G, which incorporated several of Masci's other contracts with H5G (the "Masci Agreements"). See Exhibit 2, including all relevant agreements. In exchange for Masci's ongoing obligations related to confidentiality, non-competition, and non-solicitation, Masci was granted a severance payment equal to one-year's salary and his stock appreciation rights, originally granted in November 2011, were accelerated and fully vested upon separation from H5G. Id.

29.     The Super Stacks Trade Secret and the Super Symbols Trade Secret, separately and collectively, satisfy the definition of Confidential Information in the Masci Agreements.

30.     Kavanagh began his employment with H5G in or around January 2009 as a Motion Graphics Designer. As a condition of his employment, Kavanagh executed numerous contracts with H5G regarding confidentiality, noncompetition, assignment of IP, and similar obligations (the "Kavanaugh Agreements"). See Exhibit 3, including all relevant agreements. In August 2010, Kavanagh was promoted to a new position Animation Manager at H5G. Kavanagh's employment with H5G ended in October 2011.

31.     The Super Stacks Trade Secret and the Super Symbols Trade Secret, separately and collectively, satisfy the definition of Confidential Information in the Masci Agreements.

7

32.     During their collective employments at H5G, Marks, Masci and Kavanagh were all privy to many, if not all, of H5G's confidential and proprietary methods of making games, as well as many of H5G's features in development, including the methodologies behind Super Stacks and Super Symbols.   In fact, Marks, Masci and/or Kavanagh may have contributed to or been involved with the conception, reduction to practice and/or proprietary testing and development of such features.

**C.     *Gimmie Games, Aristocrat and G2E***

33.     As early as October 2012, the gaming industry was aware that H5G's former employee, Marks, had entered into an agreement with one of the larger game distributors in the gaming industry, Aristocrat, as a third party game content provider, under a new entity named "Gimme" and/or "Marks Studios" with which he was affiliated.

34.     Upon information and belief, shortly after he founded Gimmie / Marks Studios, around December 2012, Marks hired Kavanagh as Gimme's Director of Motion Graphics.

35.     Upon information and belief, Masci began discussions with Marks regarding Masci's potential involvement with Gimmie / Marks Studios as early as late 2012, during Masci's non-compete period, which did not expire until June 2013.  Masci publicly announced his role at Gimmie in July 2013, as its Chief Creative Officer.

36.     Upon information and belief, since October 2012, Gimmie / Marks Studios has attempted to solicit several additional current employees of H5G by virtue of the efforts of Marks, Masci and/or Kavanagh, and has been successful on at least in one instance.

37.     Upon information and belief, Gimme's first games to make a public appearance were featured at Aristocrat's booth at G2E, the themes of which were utilized by Aristocrat as a part of a major marketing program at G2E, including banners, postcards, floor mats, and the like, with such games featured thereon.

38.     Gimmie's games featured at G2E comprised several features, including features named Mega Symbols and Max Stacks.

39.     Upon information and belief, Gimmie's Mega Symbols feature, when embodied within a slot machine game, is a result of misappropriated information derived from H5G's Super Symbols Trade Secret.

40.     Upon information and belief, Gimmie's Max Stacks feature, when embodied within a slot machine game, is a result of misappropriated information derived from H5G's Super Stacks Trade Secret.

41.     Upon information and belief, the following games made by Gimmie incorporate the Mega Symbols feature: Storm Queens: Thunder Queen; Storm Queens: Frost Queen; Storm Queens: Flame Queen; and Storm Queens: Sand Queen (collectively "Mega Symbols Games").

42.     Each of the Mega Symbols Games embody "a game comprising: a plurality of reels on a display device, each of the reels including a plurality of symbol positions; a plurality of symbols at the plurality of symbol positions on the reels, the plurality of symbols including at least one statically-positioned, non-expanding oversized symbol occupying at least a plurality of symbol positions over at least a plurality of reels, wherein at least one reel of the plurality of reels has other sized symbols thereon; and a predetermined winning symbol combination of a plurality of winning symbol combinations including the oversized symbol, wherein the predetermined winning symbol combination is associated with an award[;] wherein mixed sized reels contain both regular sized symbols each occupying one symbol position and said oversized symbols and when said mixed sized symbol reels spin said regular sized symbols and oversized symbols rotate on and off the display device at the same rate," as recited by at least Claim 10 of the '223 Patent.

43.     Upon information and belief, Marks, Masci and Kavanagh worked collectively to create each of the Mega Symbols Games with the actual knowledge of the origination of such features and trade secrets associated therewith at H5G, and with knowledge that such games would be covered by a H5G patent, which subsequently issued as the '223 Patent.

9

44.     Upon information and belief, the following games made by Gimmie incorporate the Max Stacks feature: Sky Rider: Golden Amulet; Sky Rider: Silver Treasures; Temple of the Tiger: Tiger King; Temple of the Tiger: Tiger Queen; Storm Queens: Thunder Queen; Storm Queens: Frost Queen; Storm Queens: Flame Queen; and Storm Queens: Sand Queen (collectively "Max Stacks Games").

45.     Upon information and belief, Marks, Masci and Kavanagh worked collectively to create each of the Max Stacks Games with the actual knowledge of the origination of such features and trade secrets associated therewith at H5G.

46.     At G2E, H5G placed Aristocrat on written notice of its intellectual property rights and a demand to cease all promotion and sales of the Max Stacks Games and the Mega Symbols Games, in light thereof.

47.     After no response at G2E, or several weeks thereafter, H5G sent a follow-up letter to Aristocrat, and demand notices to Gimmie, Marks, Masci and Kavanagh, again notifying them of H5G's intellectual property rights.

48.     With actual knowledge of H5G's intellectual property rights, and with willful disregard for the same, Gimmie / Marks Studios and Aristocrat elected to move forward with making, using, offering for sale, selling and potentially importing, the Max Stacks Games and the Mega Symbols Games in the United States.

## FIRST CAUSE OF ACTION

## MISAPPROPRIATION UNDER THE NEW JERSEY TRADE SECRET ACT

49.     Paragraphs 1 through 48 are re-alleged and incorporated herein by reference.

50.     As discussed above, H5G possesses numerous trade secrets, including many of its methods, techniques, programs, inventions or the like, including those regarding its Super Stacks feature and its Super Symbol feature (collectively, hereinafter "H5G Trade Secrets").

10

51.     The H5G Trade Secrets, prior to unlawful disclosure by Defendants, derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by other in the slot gaming industry.

52.     H5G implements reasonable commercial restrictions to ensure the H5G Trade Secrets would maintain their secrecy by requiring all of those who would access the H5G Trade Secrets be under strict express terms of confidentiality.

53.     Marks, Masci and Kavanagh, by working collectively under the guise of Gimmie / Marks Studios, have acquired the H5G Trade Secrets with actual or imputed knowledge that such trade secrets were acquired through improper means by way of theft, bribery, misrepresentation, breach or inducement of a breach of an express or implied duty to maintain the secrecy of, or to limit the use or disclosure of, the H5G Trade Secrets.

54.     In addition, Marks, Masci and Kavanagh, by working collectively under the guise of Gimmie / Marks Studios, have disclosed and/or used H5G's Trade Secrets without express or implied consent of H5G, using improper means to acquire knowledge of the H5G Trade Secrets.

55.     Alternatively, at the time of disclosure and use of the H5G Trade Secrets, Marks, Masci and Kavanagh, by working collectively under the guise of Gimmie / Marks Studios, knew or had reason to know that the knowledge of the trade secret was derived or acquired through improper means.

56.     The aforementioned collective acts of the Defendants constitute misappropriation under the New Jersey Trade Secrets Act.

57.     Defendants will, if not preliminary and permanently enjoined by the Court, continue the acts and benefits of the misappropriation, causing Plaintiff immediate and irreparable harm, damage and injury.

58.     As a result of the Defendants' collective actions, Plaintiff have suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein.

11

**SECOND CAUSE OF ACTION**

**UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)**

59.     Paragraphs 1 through 58 are re-alleged and incorporated herein by reference.

60.     Plaintiff has expended significant resources developing, using and benefiting from the H5G Trade Secrets, and the confidential and proprietary nature thereof.  In particular, H5G relied upon the confidential nature of the H5G Trade Secrets in confidentially promoting its capabilities to make games for sale embodying such H5G Trade Secrets, and offering its prospective customers a unique and proprietary feature which is likely to impress and sell well in the gaming industry upon launch.

61.     Plaintiff has also expended significant resources inventing and protecting the subject matter of the claims of the '223 Patent, and has relied upon the exclusive rights granted by the nature of the '223 Patent in pursuing the manufacture and development of games embodying the same.

62.     Defendants' collective actions regarding the use of the H5G Trade Secrets, as well as the claimed subject matter of the '223 Patent, as described herein, have misled, and will continue to mislead many persons in the slot gaming industry to believe the Defendants have received permission, license, or other consent from Plaintiff to make, use, sell, offer for sale, or otherwise utilize H5G Trade Secrets or patented functionality in their games.

63.     Defendants' use of the games having the Mega Symbols and/or Max Stacks features, through sale, offering for sale, and the like, is likely to deceive relevant consumers in the slot gaming industry as to the Defendants' affiliation with Plaintiff, or as to a sponsorship or an approval of its games by Plaintiff.

64.     Defendants will, if not preliminary and permanently enjoined by the Court, continue its acts of unfair competition as set forth in the Lanham Act, thereby deceiving the public, trading on the confidential and proprietary nature of the H5G Trade Secrets at the time they were misappropriated by Defendants.

12

65.   As a result of the Defendants' collective actions, Plaintiff has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein.

## THIRD CAUSE OF ACTION

## UNFAIR COMPETITION UNDER NEW JERSEY COMMON LAW

66.   Paragraphs 1 through 65 are re-alleged and incorporated herein by reference.

67.   The aforementioned collective acts of the Defendants constitute unfair competition and unfair business practices contrary to the common laws of New Jersey.

68.   Defendants will, if not preliminary and permanently enjoined by the Court, continue its acts of unfair competition as defined by the common laws of New Jersey, thereby deceiving the public, trading on the exclusive rights granted in the form of the Split Symbols Patents, and causing Plaintiff immediate and irreparable harm, damage and injury.

69.   As a result of the Defendants' collective actions, Plaintiff have suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein.

## FOURTH CAUSE OF ACTION

## BREACH OF CONTRACT

70.   Paragraphs 1 through 69 are re-alleged and incorporated herein by reference.

71.   Marks, by virtue of his actions set forth herein, has violated his agreements with H5G, and in particular, Sections 5 and 9 of the Marks Agreement.

72.   Masci, by virtue of his actions set forth herein, has violated his agreements with H5G, and in particular, Sections 7, 8 and 9 of his Separation Agreement.

73.   Kavanagh, by virtue of his actions set forth herein, has violated his agreements with H5G, and in particular, Section 4, of his Confidentiality Agreement.

13

74.     As a result of the Defendants' collective actions, Plaintiff have suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein.

## FIFTH CAUSE OF ACTION

## DIRECT PATENT INFRINGEMENT UNDER 35 U.S.C. § 271(a)

75.     Paragraphs 1 through 74 are re-alleged and incorporated herein by reference.

76.     The claims of the '223 Patent are presumed valid pursuant to 35 U.S.C. § 282, and are valid.

77.     Defendants Gimmie / Marks Studios and Aristocrat, in violation of 35 U.S.C. § 271(a), have infringed and are currently infringing, contributorily infringing and/or inducing a third party to infringe, at least one or more of the claims of the '223 Patent, either literally or under the Doctrine of Equivalents, by causing to be made, using, offering to sell, selling and/or importing into the United States, without license or authority, within this Judicial District and elsewhere, games covered by at least one of the claims of the '223 Patent as set forth herein (the "Infringing Games"), and/or contributing towards and/or inducing a third party to do the same.

78.     Defendants intentionally caused to be made, used, offered to sell, sold and/or imported into the United States the Infringing Games, with actual knowledge, and/or knowledge imputed to it by others, that such products embody at least one of the claims of the '223 Patent.

79.     Defendants have willfully infringed, and upon information and belief, will continue to infringe, the claims of the '223 Patent by the use, manufacture, offer for sale, sale, and/or importation of the Infringing Games.

80.     As a result of Defendants' actions, H5G has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein.

14

## SIXTH CAUSE OF ACTION

### INDUCED PATENT INFRINGEMENT UNDER 35 U.S.C. § 271(b)

81.     Paragraphs 1 through 80 are re-alleged and incorporated herein by reference.

82.     Each of the Defendants, through their respective actual knowledge of the patent claims covering the Infringing Games, and with malice and intent to harm H5G, actively induced various third parties, including, but not limited to, casinos, players, and the like, to make, use, sell, offer for sale and/or import into the United States, the Infringing Games.

83.     As a result of the Defendants' actions, H5G has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against each of the defendants as follows:

A.     a permanent injunction restraining Defendants, their respective officers, agents, servants, employees, attorneys, and those in active concert or participation with them, or any of them who receive actual notice of the order by personal service or otherwise, from:

1.     making, using, selling, offering for sale, or importing into the United States, any game embodying any of the the Max Stacks Feature, the Mega Symbols Feature, and any derivative or equivalent functional feature thereof, regardless of how branded;

2.     assisting or inducing others to make, use, sell, offer for sale, or import into the United States, any game embodying any of the Max Stacks Feature, the Mega Symbols Feature, and any derivative or equivalent functional feature thereof, regardless of how branded;

3.     making, using, selling, offering for sale, or importing into the United States, the Infringing Games; and

4.     assisting or inducing others to make, use, sell, offer for sale, or import into the United States, the Infringing Games.

B.      an award of damages for Defendants' acts of liability under 35 U.S.C. § 271, in accordance 35 U.S.C. § 284, and in particular, an award of damages adequate to compensate for the infringement but in no event less than a reasonable royalty for the use made of the Infringing Products, together with interest and costs as fixed by the Court;

C.      an award of increased damages under 35 U.S.C. § 284, including three times the amount found or assessed in paragraph (B) above;

D.      an award of damages inclusive of any actual damages suffered by Plaintiff as a result of Defendants' liability stated hereinabove, including arising out of Defendants' liability arising out of Counts I –VI, and other Counts that may be added at a later date once additional information is obtained;

E.      an award of damages from Defendants for their liability under § 43(a) of the Lanham Act, including any profits made by Defendants in connection with its unlawful activity, any damages sustained by Plaintiff as a result of Defendants' unlawful activity, and any costs incurred with pursuing this Action, including Court costs, attorney's fees, and additional costs related thereto, pursuant to 15 U.S.C. § 1117(a);

F.      an award of all damages incurred, directly or indirectly, as a result of Defendants' unlawful acts set forth herein, said damages to be trebled at the discretion of the Court pursuant to N.J.S.A. 56:4-2;

G.      an award of all damages under the New Jersey Trade Secrets Act, N.J.S.A 56:15-1, *et seq.* including injunctive relief, monetary damages, twice such monetary damages for the willful acts of Defendants, and all reasonable costs and attorneys' fees;

H.      an order requiring specific performance by each Defendant of their respective contracts alleged as breached herein;

I.      an order permitting Plaintiff to terminate its obligations under such agreements, including, in part, removal of any equity interests or stock appreciation interests of any of the Defendants, or any outstanding payments remaining on such a prior interest;

16

J.      a determination by the Court that Defendants' unlawful actions set forth herein are exceptional, warranting an award of damages to Plaintiff for all reasonable attorney's fees incurred by Plaintiff, pursuant to 15 U.S.C. § 1117(a);

K.      an award of prejudgment and post-judgment interest and costs of suit;

L.      an award of punitive damages in an amount to be determined by the Court, but not less than $10,000,000.00, for Defendants' deliberate and willful acts;

M.      an award of actual and compensatory damages in an amount not presently known, but to be computed during the pendency of this action; and

N.      an award of any such other and further relief as this Court deems just and equitable.


                              Respectfully submitted,

Dated:  July 31, 2014         By:    /s/ Jon Fallon

                              Michael A. Saffer, Esq. (MAS2997)
                              Jon Fallon, Esq. (JF2851)
                              Khizar A. Sheikh, Esq. (KAS2737)
                              Mandelbaum Salsburg Lazris & Discenza, P.C.
                              155 Prospect Avenue
                              West Orange, NJ 07052
                              973.736.4600
                              Fax: 973.325.7467
                              Attorneys for Plaintiff / Counterclaim Defendant
                              PTT, LLC

EXHIBIT 1

## SEPARATION, SEVERANCE AND TRANSITION SERVICES AGREEMENT

THIS SEPARATION, SEVERANCE AND TRANSITION SERVICES AGREEMENT (this "Agreement") is entered into as of February 4, 2010, by and among Daniel Marks ("Marks"), Anthony Singer ("Singer") and PTT, LLC, a New Jersey limited liability company (the "Company").

### Background

A.   Marks is a member and service provider of the Company and has served as the Company's Co-Manager.

B.   Singer is a member and service provider of the Company and has served as the Company's Co-Manager.

C.   Marks has decided to resign as a service provider and Co-Manager of the Company effective as of the date of this Agreement.

D.   In connection with Marks' separation from the Company, the Company has requested, and Marks has agreed to provide, certain transition services.

E.   The purpose of this Agreement is to amicably settle and resolve all issues relating to Marks' employment and separation from the Company.

NOW, THEREFORE, in consideration of the foregoing recitals which are expressly incorporated herein by reference, and the mutual premises contained hereafter, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.   **Resignation.** Marks hereby confirms his resignation as a service provider effective as of the date of this Agreement. Marks hereby further confirms that he will comply with the requirements of Section 8.1 of that certain Third Amended and Restated Operating Agreement of PTT, LLC (the "Operating Agreement") and resign as Co-Manager of the Company within five (5) days of the date of this Agreement.

2.   **Transition Period and Services.**

a.   For a period beginning on the date of this Agreement and continuing for three months thereafter (the "Transition Period"), Marks will consult as reasonably requested from time to time with the Company's Manager and counsel regarding all patent and intellectual property matters of the Company and provide such other transition services as may be reasonably required by the Company (the "Transition Services"). Marks shall be an independent contractor of the Company and not an employee during the Transition Period. Marks shall devote such time to the Transition Services as may be required by the Manager of the Company. During the Transition Period, Marks shall have no authority to bind the Company, and shall not attempt to

02-04-'13 13:27  FROM-                                              T-689  P003/017 F-599

obligate or bind the Company in any way. The Transition Services shall be provided by Marks off-site, and the Company shall provide Marks with remote access to a Company electronic mail account, voice mailbox and such other resources and documents as may be necessary, from time to time, for Marks to perform the Transition Services during the Transition Period.

        b.     During the Transition Period, Marks shall cause to be filed, after the written approval of the same by the Company, any and all regulatory notifications or filings required by regulatory agencies with jurisdiction over the Company or its business in connection with his separation from the Company including without limitation, the New Jersey Casino Control Commission.

        c.     Marks agrees to transition the Transition Services to third parties designated by the Company which may include, but not be limited to, legal counsel retained by the Company, employees and consultants of the Company ("Third Parties"). Marks shall cooperate with the Company and the Third Parties as necessary to ensure the smooth transition of the Transition Services to the Third Parties and, otherwise, to ensure that negative impact to the business of the Company is minimized.

      3.    <u>Transition Payments; Severance Payments; Other Benefits.</u>

        a.     Marks acknowledges and agrees that, except as expressly provided in this Agreement and except as to any and all payments and distributions to which Marks is entitled solely in his capacity as a member of the Company, Marks is not entitled to any payments, benefits or compensation of any kind from the Company, whether or not arising from any employment agreement, or any other agreement, written or oral, between Marks and the Company, or under any policy, plans, program or arrangement. Except as otherwise provided in this Agreement, Marks specifically waives, releases and discharges any right or entitlement he may have to any further wages, salary, incentive compensation, bonuses, commissions, incentive payments or other compensation or payments from the Company.

        b.     During the Transition Period, in consideration of his performance of the Transition Services, Marks shall receive bi-weekly payments (i.e. every 14 days) of $8,659.85 in accordance with the Company's normal payroll practices, on a 1099 basis (the "<u>Transition Payments</u>").

        c.     For a period of eighteen (18) months running from the end of the Transition Period and terminating on November 4, 2011 (the "<u>Severance Period</u>"), Marks shall receive bi-weekly payments (i.e. every 14 days) of $8,659.85 in accordance with the Company's normal payroll practices, on a 1099 basis (the "<u>Severance Payments</u>").

        d.     During both the Transition Period and the Severance Period, Marks and his family shall be permitted to participate in the Company's medical insurance plan, as such plan may be amended, modified or terminated from time to time. The Company and Marks shall share the costs and expenses of such participation in such medical

2

insurance plan in the same manner and allocated percentage, and with substantially the same scope and level of medical coverage, as of the date immediately prior to the start of the Transition Period. Nothing appearing herein shall affect the Company's right to modify, change, terminate or amend the terms of any of its group benefit plans, and Marks' entitlement to any benefits under such medical plan shall be governed solely and exclusively by the terms of the then-current, actual benefit plan documents.

e.      The Company will (i) mail the Transition Payments and the Severance Payments to Marks at his home address, or (ii) deposit the Transition Payments and the Severance Payments directly into Marks' bank account, if Marks participated in the Company's direct deposit program.

f.      The Company will reimburse Marks and Singer for any and all attorneys' fees incurred by them in connection with the negotiation and execution of this Agreement.

4.      **Release Of Claims.**

a.      Release by Marks. In consideration of the obligations undertaken herein by the Company, Marks, for himself and his heirs, assigns, executors, administrators, agents, successors in interest, and legal representatives, hereby expressly releases, acquits and forever discharges the Company and any subsidiaries, affiliates, divisions, successors and related companies, and each and all of their current or former agents, officers, directors, shareholders, members, managers, unitholders, employees, representatives, attorneys, successors, predecessors, assigns and insurers, and all persons acting by, through, under or in concert with any of them, and each of them (referred to collectively as the "Company Releasees"), of and from any and all claims, demands, complaints, liabilities, causes of action, controversies, damages, charges, agreements, promises, obligations, rights, actions, remedies, suits, injuries, debts, expenses, and claims for attorneys' fees, whether at law or in equity, of any kind or nature whatsoever, whether asserted or unasserted, whether known or unknown, and whether suspected or unsuspected, which Marks now has, owns or holds, or claims to have, own or hold, or which Marks at any time had, owned or held or claimed to have had, owned or held against the Company Releasees, and each or any of them, from the beginning of time up to and including the date Marks executes this Agreement, including, but not limited to: (i) any and all claims, losses, injuries or damages of any kind whatsoever resulting from, arising out of or connected directly or indirectly with Marks's employment with the Company or the termination of that employment including, without limitation, any claims under the Company's Operating Agreement; (ii) any and all claims of any kind whatsoever resulting from, arising out of or connected directly or indirectly with any other relationship or dealings between Marks and the Company or any of the Company Releasees; (iii) any and all claims or rights under Title VII of the Civil Rights Act of 1964, as amended, the Civil Rights Act of 1991, the Civil Rights Act of 1866, the Civil Rights Act of 1871, the Equal Pay Act, the Employee Retirement Income Security Act of 1974, the Americans With Disabilities Act, the Rehabilitation Act of 1973, Executive Order 11246, the Age Discrimination in Employment Act, the Older Workers' Benefit

3

Protection Act of 1990, the Family and Medical Leave Act, the Worker Adjustment and Retraining Notification Act of 1988, the National Labor Relations Act, the New Jersey Law Against Discrimination, or any other federal, state or local laws, regulations or ordinances prohibiting employment discrimination, harassment or retaliation; (iv) any and all claims or rights under any federal, state or local laws, regulations or ordinances prohibiting retaliation against whistleblowers; (v) any rights, entitlements, claims or obligations of any kind whatsoever relating to, arising out of or connected directly or indirectly with any employment agreement, or any other agreement Marks entered into with the Company or any of the Company Releasees, including, but not limited to, any employment, compensation, letter, or any amendment to such agreements; (vi) any and all claims or rights under federal, state or local laws, regulations or ordinances relating to the payment of wages and other compensation to employees; (vii) any and all claims or rights arising out of any legal restrictions on a company's right to terminate its employees; and (viii) any other claims or rights under federal, state or local laws or common law, including, but not limited to, any claims for breach of contract express or implied, breach of implied covenant, breach of oral or written promise, wrongful termination, wrongful discharge in violation of public policy, severance pay, pay or benefits in lieu of notice, unpaid wages, infliction of emotional distress, loss of consortium, personal injury arising out of and in the course of work, defamation or other injury resulting from any oral or written statement, interference with contractual relations, interference with professional business advantage or misrepresentation; provided that: (i) this release shall not release or otherwise affect or limit the rights and obligations of the parties arising out of this Agreement; and (ii) this release shall not in anyway modify or alter the Operating Agreement or the provisions thereof or operate as a release of the rights and obligations of Marks and Singer as members thereunder. This release is binding upon the heirs, successors and assigns of Marks and the administrator/executor of his estate.

By signing this Agreement, Marks promises, covenants and agrees, to the fullest extent permitted by law, never to commence, aid in any way, prosecute or cause to be commenced or prosecuted any action or other proceeding based upon any claims, demands, causes of action, obligations, damages or liabilities which are released by this Agreement. Marks promises, covenants and agrees to indemnify and hold harmless the Company and each or any of the Company Releasees from and against any and all claims, obligations or liabilities, including court costs and reasonable attorneys' fees, arising from or incurred in connection with any action or proceeding brought, assisted or prosecuted by Marks contrary to the provisions of this Agreement. Marks acknowledges and agrees that, except as expressly limited in this release, this release releases and precludes any claims of which Marks is not now aware and of which he may only become aware at some later date. Nevertheless, Marks fully and freely intends to and does, by executing this Agreement, release any such claims.

Nothing contained herein shall be construed to alter, limit or release any right to indemnification Marks may have pursuant to applicable law or the Company's governance instruments, or any coverage Marks may have under insurance maintained by

4

Case 2:13-cv-07161-JLL-JAD   Document 25-1 Filed 07/02/14 Page 25 of 67 PageID: 221

the Company, relating to actions by Marks on behalf of the Company within the scope of and during the course of his employment with the Company.

        b.      **Release by Singer and the Company.**  In consideration of the obligations undertaken herein by Marks, each of Singer, for himself and his heirs, assigns, executors, administrators, agents, successors in interest, and legal representatives, and the Company, for itself and its subsidiaries, affiliates, divisions, successors and related companies, hereby expressly releases, acquits and forever discharges Marks and his heirs, assigns, executors, administrators, agents, successors in interest, and legal representatives (referred to collectively as the "Marks Releasees"), of and from any and all claims, demands, complaints, liabilities, causes of action, controversies, damages, charges, agreements, promises, obligations, rights, actions, remedies, suits, injuries, debts, expenses, and claims for attorneys' fees, whether at law or in equity, of any kind or nature whatsoever, whether asserted or unasserted, whether known or unknown, and whether suspected or unsuspected, which the Company or Singer, as applicable, now has, owns or holds, or claims to have, own or hold, or which the Company or Singer, as applicable, at any time had, owned or held or claimed to have had, owned or held against the Marks Releasees, and each or any of them, from the beginning of time up to and including the date of execution of this Agreement, including, but not limited to: (i) any and all claims, losses, injuries or damages of any kind whatsoever resulting from, arising out of or connected directly or indirectly with Marks's employment with the Company or the termination of that employment including, without limitation, any claims under the Company's Operating Agreement; (ii) any and all claims of any kind whatsoever resulting from, arising out of or connected directly or indirectly with any other relationship or dealings between Marks and the Company or any of the Company Releasees; (iii) any rights, entitlements, claims or obligations of any kind whatsoever relating to, arising out of or connected directly or indirectly with any employment agreement, or any other agreement Marks entered into with the Company or any of the Company Releasees, including, but not limited to, any employment, compensation, letter, or any amendment to such agreements; and (iv) any other claims or rights under federal, state or local laws or common law, including, but not limited to, any claims for breach of contract express or implied, breach of implied covenant, breach of oral or written promise, wrongful termination, wrongful discharge in violation of public policy, severance pay, pay or benefits in lieu of notice, unpaid wages, infliction of emotional distress, loss of consortium, personal injury arising out of and in the course of work, defamation or other injury resulting from any oral or written statement, interference with contractual relations, interference with professional business advantage or misrepresentation; **provided that:** (i) this release shall not release or otherwise affect or limit the rights and obligations of the parties arising out of this Agreement; and (ii) this release shall not in anyway modify or alter the Operating Agreement or the provisions thereof or operate as a release of the rights and obligations of Marks and Singer as members thereunder.  This release is binding upon the heirs, successors and assigns of Singer and the administrator/executor of his estate and any successor or assign of the Company.

5

Case 2:13-cv-07161-JLL-JAD   Document 25-1   Filed 07/02/14   Page 27 of 64 PageID: 222

By signing this Agreement, each of Singer and the Company promises, covenants and agrees, to the fullest extent permitted by law, never to commence, aid in any way, prosecute or cause to be commenced or prosecuted any action or other proceeding based upon any claims, demands, causes of action, obligations, damages or liabilities which are released by this Agreement. Each of Singer and the Company promises, covenants and agrees to indemnify and hold harmless Marks and each or any of the Marks Releasees from and against any and all claims, obligations or liabilities, including court costs and reasonable attorneys' fees, arising from or incurred in connection with any action or proceeding brought, assisted or prosecuted by Singer or the Company, as applicable, contrary to the provisions of this Agreement. Each of Singer and the Company acknowledges and agrees that, except as expressly limited in this release, this release releases and precludes any claims of which Singer or the Company, as applicable, is not now aware and of which he or it, as applicable, may only become aware at some later date. Nevertheless, each of Singer and the Company fully and freely intends to and does, by executing this Agreement, release any such claims.

Nothing contained herein shall be construed to alter, limit or release any right to indemnification Singer or the Company may have pursuant to applicable law or the Company's governance instruments, or any coverage Singer or the Company may have under insurance maintained by the Company, relating to actions by Singer on behalf of the Company or the Company on its own behalf within the scope of and during the course of Marks' employment with the Company.

5.      Return Of Property. Marks acknowledges and agrees that all property, materials, equipment, things, documents (both originals and all copies thereof), and stored or recorded communications and information (whether recorded, stored or kept by electronic, photographic, mechanical or other means), which are owned by, in the possession of, or proprietary to, or which belong to, the Company, including, but not limited to (i) any and all Confidential Information (as defined in Section 9 of this Agreement), and (ii) property, materials, equipment, documents and stored or recorded communications or information which relate to the business or activities of the Company or their customers, employees, subsidiaries or affiliates, and (iii) any and all reports, books, charts, files, records, correspondence, rolodexes, calendars, daybooks, Company letterhead and other stationary, business cards, office keys, computer access codes, office telephone and fax numbers, emails and other stored or recorded information, software, data bases, laptop computers, printers, facsimile machines, other computer hardware, computer discs, CDs, DVDs, business machines, office equipment, cell phones, Company-owned vehicles, and other tangible things   (collectively, the "Company Property"), remain the sole and exclusive property of the Company and must be returned and surrendered to the Company following the Transition Period.  With respect to such items, Marks represents and warrants that any information whatsoever pertaining to or about the Company shall be deleted as soon as practicable following the Transition Period.  Except as provided herein, Marks promises and represents to the Company that he will return, surrender and deliver to the Company, on the last day of the Transition Period, or as soon as practicable thereafter, all Company Property then in his care, custody, control or possession. Marks further promises the Company that he will return,

6

surrender and deliver to the Company any Company Property he subsequently discovers in his care, custody, control or possession, within three (3) business days after he discovers the existence of such Company Property. The Company agrees to reimburse Marks for the reasonable out-of-pocket expenses he incurs delivering or arranging for the delivery of the Company Property to the Company as set forth in this Section 5.

6.     Non-Disparagement.

    a.     Marks promises, covenants and agrees that he will never say, write, express, communicate or relate anything derogatory, disparaging or defamatory about the Company or any of the Company Releasees, or their business practices and activities, to any third party business contact of the Company or employee of the Company, except when otherwise required by law or process of law.

    b.     Singer promises, covenants and agrees that he will never say, write, express, communicate or relate anything derogatory, disparaging or defamatory about Marks or Marks' business practices and activities, to any third party business contact of the Company or employee of the Company, except when otherwise required by law or process of law.

    c.     The Company promises, covenants and agrees that it will never authorize any person to say, write, express, communicate or relate anything disparaging, defamatory or false about Marks or Marks' business practices and activities, to any third party business contact of the Company or employee of the Company, except when otherwise required by law or process of law. The Company agrees that any unrelated third-party inquiries made about Marks' performance, duties and activities will not be responded to negatively. Upon the receipt of a request for any references, the Company shall confirm the term of Marks' employment with the Company, that Marks was the Co-Manager of the Company, and that Marks voluntarily resigned from the Company.

    d.     The parties hereto agree that any personal telephone calls received for Marks by the Company shall be forwarded to Marks in an expeditious fashion and the parties agree that any telephone calls received for Marks relating to the business of the Company shall be responded to in accordance with a script drafted by and mutually acceptable to both parties, which shall be provided to all employees of the Company whose duties encompass potential receipt of telephone calls or other inquiries from persons outside the Company ("Business Script"). The Business Script shall be completed by the parties within five (5) days from execution of this Agreement. Similarly, any personal mail received for Marks by the Company shall be forwarded to him in an expeditious fashion.

    d.     The Parties shall also prepare a script with respect to the resignation of Marks from the Company, which shall serve as the official message to be delivered to the employees of the Company ("Resignation Script"). The Resignation Script shall be completed by the parties within two (2) days following the execution of this Agreement. The Business Script and Resignation Script shall in all respects be

7

02-04-'10 13:28 FROM-                                              T-609  P009/017 F-599

drafted jointly and acceptable to both parties, and neither party shall issue any other statement or make any such public statements without the prior consent of the other party regarding Marks' retirement from the Company and this Agreement. Notwithstanding the foregoing, it is hereby agreed that the initial statement shall include an invitation for any and all employees of the Company to attend a farewell event for Marks, outside of the Company's regular hours of business, at a restaurant located near the Company's principal business office.

7.   **Non-Solicitation.**  Marks hereby covenants and agrees that for a period of thirty (30) months from the date of this Agreement (the "Restricted Period"), he shall not interfere with the business of the Company by soliciting or inducing any customer, employee or independent contractor to terminate or breach an employment, contractual, or other pre-existing relationship with the Company or to accept employment with any third party including, without limitation, any company owned directly or indirectly by Marks. In addition, Marks agrees not to interfere in any manner whatsoever with any existing or prospective contracts of the Company.

8.   **Non-Compete.**

a.   Except in connection with the performance of the Transition Services, Marks covenants and agrees that, during the Restricted Period, Marks shall not, directly or indirectly, participate in any business which engages, wholly or in part, directly or indirectly, in the business of inventing, developing, licensing and/or distributing computer casino games and related peripheral equipment in the United States of America (a "Competitive Business").

b.   As used in paragraph (a) of this Section 6, the term "participate" shall mean and include: (i) serving as an employee, director, officer, agent, representative, advisor, consultant, independent contractor or sole proprietor of, to or for a Competitive Business; (ii) owning or controlling any financial or equity interest in a Competitive Business; and (iii) soliciting customers or otherwise serving as an intermediary for a Competitive Business; provided that nothing in this Section 8 shall preclude Marks from acquiring or holding, solely for investment purposes, any debt or equity securities of a Competitive Business the stock or ownership interests of which are listed on a national securities exchange or publicly traded in the over-the-counter market, so long as the debt or equity securities so held by Marks do not, in the aggregate, constitute more than 3% of the class or series of such securities outstanding.

9.   **Confidential Information.**  Marks acknowledges that the Company owns and has a proprietary interest in Confidential Information (as defined below) relating to the business of the Company. For purposes of this Agreement, the term "Confidential Information" shall mean customer and price lists; agreements; customer service requirements; costs of providing services; equipment and equipment maintenance costs; materials or records of a proprietary nature; including patents, trademarks and copyrights, engineering, sales or technical data; and records and policy matters relating to research, finance, accounting, sales, personnel, management, marketing and operations. Marks

8

agrees that he shall hold all Confidential Information in strict confidence and trust for the sole benefit of the Company and to not, directly or indirectly, disclose, use, copy, publish, summarize, or remove from the premises of the Company, without the prior written consent of the Company, any Confidential Information except during the Transition Period to the extent necessary to carry out Marks' responsibilities under this Agreement. For purposes of this Section 9, "Confidential Information" shall not include any information which is generally available to the public or which hereafter becomes generally available to the public other than as a result of Marks' breach of his obligation under this Section 9.

10.  **Cooperation.** By signing this Agreement, Marks promises and agrees, at all times, to cooperate fully with the Company and its officers, directors, employees, agents and legal counsel, at the sole discretion of the Company, in connection with the business of the Company or with respect to any claim, complaint, charge, suit or action previously or hereafter asserted or filed against the Company or any of the Company Releasees which relates to, arises out of or is connected directly or indirectly with (i) Marks's employment with the Company, (ii) any other relationship or dealings between Marks and the Company or any of the Company Releasees, or (iii) any other matter relating to the Company or any of the Company Releasees. Marks's cooperation with the Company shall continue throughout the Restricted Period and, as well, during the pendency of any such claim, complaint, charge, suit or action. Further, Marks promises and agrees that, in the event he is subject to a valid and enforceable subpoena or court order which compels his testimony at a trial, hearing or deposition concerning his relationship with the Company or any other matter relating to the Company or any of the Company Releasees, he will provide reasonable and prompt notice to the Company of this fact and cooperate fully with the Company prior to and during his testimony, to the maximum extent possible, consistent with his obligation to provide truthful testimony. Marks's cooperation in this regard shall include, but shall not be limited to, full consultation with reasonable notice, at a reasonable time, with the Company's officers, directors, employees, agents and legal counsel. Marks further agrees that, in the event he is named as a defendant in a legal proceeding resulting from, arising out of, or connected directly or indirectly with Marks's employment with the Company, or any act, omission or conduct occurring during Marks's employment with the Company, he will provide reasonable and prompt notice of this fact to the Company. The Company agrees to reimburse Marks for reasonable out-of-pocket expenses resulting from such consultation.

11.  **Injunctive Relief.**

a.    Marks acknowledges and agrees that he has carefully read and fully understands the terms and provisions of Sections 6 through 10 of this Agreement, that the terms and provisions of Sections 6 through 10 of this Agreement are reasonable as to time, scope and content, that Marks's compliance with Sections 6 through 10 of this Agreement is necessary to protect the business and goodwill of the Company, that the terms and provisions of Sections 6 through 10 of this Agreement are not unreasonably restrictive of Marks's rights and will not diminish his ability to earn a livelihood or create or impose upon him any unfair or undue hardship, that the restrictions placed upon him

9

02-04-'10 13:28 FROM-                                             T-609  P011/017 F-599

by reason of Sections 6 through 10 of this Agreement are not prejudicial to the public interest, and that any actual or prospective breach of Marks's promises or covenants in Sections 6 through 10 of this Agreement will cause substantial and irreparable harm to the Company and that the damages arising therefrom would be difficult, if not impossible, to determine. Accordingly, if Marks breaches or attempts to breach any of the terms or provisions of Sections 6 through 10 above, the Company shall be entitled to seek immediate temporary, preliminary and permanent injunctive relief from any court of competent jurisdiction, without bond, to enforce the terms of this Agreement and enjoin Marks from continuing or commencing any activity which violates or would violate the terms or provisions of this Agreement, in addition to any and all other rights or remedies available to the Company under applicable law, including damages and equitable relief. This Section 11(a) shall not be construed as a waiver of any of the rights which the Company may have against Marks for injunctive relief, damages or otherwise.

           b.      Singer acknowledges and agrees that he has carefully read and fully understands the terms and provisions of Section 6 of this Agreement, that the terms and provisions of Section 6 of this Agreement are reasonable as to time, scope and content, that Singer's compliance with Section 6 of this Agreement is necessary to protect the reputation of Marks, that the terms and provisions of Section 6 of this Agreement are not unreasonably restrictive of Singer's rights and will not diminish his ability to earn a livelihood or create or impose upon him any unfair or undue hardship, that the restrictions placed upon him by reason of Section 6 of this Agreement are not prejudicial to the public interest, and that any actual or prospective breach of Singer's promises or covenants in Section 6 of this Agreement will cause substantial and irreparable harm to Marks and that the damages arising therefrom would be difficult, if not impossible, to determine. Accordingly, if Singer breaches or attempts to breach any of the terms or provisions of Section 6, the Marks shall be entitled to seek immediate temporary, preliminary and permanent injunctive relief from any court of competent jurisdiction, without bond, to enforce the terms of this Agreement and enjoin Singer from continuing or commencing any activity which violates or would violate the terms or provisions of this Agreement, in addition to any and all other rights or remedies available to the Marks under applicable law, including damages and equitable relief. This Section 11(b) shall not be construed as a waiver of any of the rights which Singer may have against Marks for injunctive relief, damages or otherwise.

           c.      The Company acknowledges and agrees that it has carefully read and fully understands the terms and provisions of Sections 6 through 10 of this Agreement, that the terms and provisions of Sections 6 through 10 of this Agreement are reasonable, that the Company's compliance with Sections 6 through 10 of this Agreement is necessary to protect the reputation of Marks, that the terms and provisions of Sections 6 through 10 of this Agreement are not unreasonably restrictive of the Company's rights and will not create or impose upon the Company any unfair or undue hardship, that the restrictions placed upon the Company by reason of Sections 6 through 10 of this Agreement are not prejudicial to the public interest, and that any actual or prospective breach of the Company' s promises or covenants in Sections 6 through 10 of this Agreement will cause substantial and irreparable harm to Marks and that the damages

10

arising therefrom would be difficult, if not impossible, to determine. Accordingly, if the Company breaches or attempts to breach any of the terms or provisions of Sections 6 through 10 above, Marks shall be entitled to seek immediate temporary, preliminary and permanent injunctive relief from any court of competent jurisdiction, without bond, to enforce the terms of this Agreement and enjoin the Company from continuing or commencing any activity which violates or would violate the terms or provisions of this Agreement, in addition to any and all other rights or remedies available to Marks under applicable law, including damages and equitable relief. This Section 11(c) shall not be construed as a waiver of any of the rights which Marks may have against the Company for injunctive relief, damages or otherwise.

12.   **Representations and Warranties.**   The parties hereby represent and warrant: (i) that they each have full authority to execute this Agreement; (ii) that each party hereto intends to be fully bound by the terms hereof; (iii) that each party hereto has the unfettered right to enter into and perform this Agreement on the terms and subject to the conditions hereof; and (iv) that neither the execution and delivery of this Agreement nor the performance of any of their respective obligations hereunder constitute or will constitute a violation or breach of, or a default under, any agreement, arrangement or understanding, or any other restriction of any kind, to which the respective entity or individual is a party or by which they are bound.

13.   **Entire Agreement.**   This Agreement contains the entire agreement between the parties with respect to the matters set forth herein, and supersedes and replaces any and all prior agreements, representations, promises or understandings of any kind between the parties, except that Sections 6 through 10 of this Agreement shall survive and remain in force and effect. No modification, amendment or waiver of any of the provisions of this Agreement shall be effective unless in writing and signed by the parties hereto.

14.   **Severability.**   If any provision of this Agreement, or any portion thereof, is held, by a court of competent jurisdiction, to be illegal, invalid, unenforceable or to conflict with any federal, state or local law as written, such provision or portion or portions of this Agreement shall be interpreted so as to be legal, valid and enforceable. If any court of competent jurisdiction shall hold any promise or covenant of Marks and/or the Company to be unreasonable or unenforceable in any jurisdiction because of its duration, geographic area, or otherwise, such restrictions shall be deemed reduced and narrowed to the extent necessary in the opinion of such court to make the restrictions valid, reasonable and enforceable in such jurisdiction and shall be enforced as amended to the maximum equitable extent.

15.   **Assignability and Binding Effect.**   This Agreement shall be binding upon, inure to the benefit of, and be enforceable by Marks' heirs, beneficiaries, executors, administrators and personal representatives, and shall be binding upon, inure to the benefit of, and be enforceable by the Company, its affiliates and/or subsidiaries, and its or their respective successors and assigns. It is hereby acknowledged and agreed that: (i) so long as the Company is not in breach of this Agreement, it shall have the right to assign

11

02-04-'18 13:29 FROM-                                    T-629  P013/017 F-599

all or any part of its rights, title and interest in and to the covenants and agreements set forth in this Agreement to one or more purchasers in the event of a sale of all or substantially all of the assets of any of the Company; and (ii) the obligations of Marks may not be delegated by Marks and Marks may not assign, transfer, pledge, encumber, hypothecate or otherwise dispose of this Agreement, or any of his rights or obligations hereunder, and any such attempted delegation, assignment, transfer or disposition by Marks shall be null, void and without effect.

16.   **Resolution of Disputes.**

a.     Other than claims for which a party is entitled to equitable relief, any controversy arising hereunder shall be settled by arbitration. Such arbitration shall be governed by the Federal Arbitration Act, 9 USC §1-15. A single arbitrator determined pursuant to 9 USC §5 shall be empowered to determine each and every issue relating to such controversy or claim including whether the controversy, claim or issue is subject to arbitration.

b.     The arbitration shall take place in Roseland, New Jersey and shall be governed by the "Rules For Non-Administered Arbitration of Business Disputes" promulgated by the Center for Public Resources, Inc. (N.Y.), when not inconsistent with this Agreement.

c.     Each party shall be entitled to discovery which must be completed within forty-five (45) days of the date the arbitrator is appointed (unless extended by the arbitrator for good cause). Discovery shall be limited to the inspection and copying of documents within fifteen (15) days after a written request therefor and oral depositions at which reasonable document production may be requested.

d.     The arbitrator shall make all decisions concerning issues submitted in accordance with applicable principles of substantive law. The arbitrator shall file a written determination making the award and stating findings of fact and conclusions of law as to all relevant issues submitted to arbitration. If the arbitrator fails to make his decision in accordance with substantive law, or to properly apply the facts to the law, the arbitrator's award will be deemed to have been procured by "undue means" pursuant to 9 USC §10, sub-clause (a) and beyond the arbitrator's power in violation of 9 USC §10, sub-clause (d). Any party may apply to a court of competent jurisdiction to have the arbitrator's decision confirmed, reviewed, modified, affirmed or remanded to the arbitrator with directions.

e.     All fees and expenses of the arbitration, including the fees of the arbitrator and costs of the hearing (including court reporter, hearing room rental, etc.) shall be paid by the non-prevailing party. Should no party be designated by the arbitrator as the "prevailing party" then each of the parties shall pay one-half (1/2) of such fees and expenses. In addition, the arbitrator shall order the non-prevailing party to pay one-half (1/2) of the legal fees and disbursements of the prevailing party. Should

12



no party be designated as the "prevailing party," then each party shall pay its own legal fees and disbursements.

    17.   **Remedies Upon Breach.** Notwithstanding any provision herein to the contrary, Marks acknowledges and agrees that, in the event he breaches any of the terms or provisions of this Agreement, nothing herein shall be construed to preclude or limit the Company from asserting claims or filing a lawsuit against Marks for the purpose of (i) enforcing its rights under this Agreement, (ii) recovering moneys paid or benefits provided under this Agreement, or (iii) pursuing any other rights and remedies available under law. Notwithstanding any provision herein to the contrary, each of the Singer and the Company acknowledges and agrees that, in the event either of them (or the Company's successors or assigns) breaches any of the terms or provisions of this Agreement, nothing herein shall be construed to preclude or limit Marks from asserting claims or filing a lawsuit against Singer or the Company, as applicable, for the purpose of (i) enforcing his rights under this Agreement, or (ii) pursuing any other rights and remedies available under law. This Agreement may be introduced as evidence in a proceeding or court action only for purposes of enforcing its terms or to evidence the parties' intent in executing it.

    18.   **Waiver Of A Breach.** A waiver by any party of a breach of any of the provisions of this Agreement shall not operate or be construed as a waiver of any other provision of this Agreement or of any subsequent breach of the same or any other provisions of this Agreement. The understandings and representations of the parties set forth in this Agreement shall survive any breach of this Agreement and be enforceable by any non-breaching party.

    19.   **Interpretation Of Agreement.** The parties to this Agreement acknowledge and agree that (i) this Agreement and its reduction to final written form are the result of good faith negotiations between the parties, (ii) both parties have carefully reviewed and examined this Agreement before execution of this Agreement by the parties, or any of them, and (iii) any statute or rule of construction that ambiguities are to be resolved against the drafting parties shall not be employed in the interpretation of this Agreement.

    20.   **Counterparts.** This Agreement may be executed in any number of counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one Agreement. This Agreement, to the extent signed and delivered by means of a facsimile machine, shall be treated in all manner and respects as an original agreement or instrument and shall be considered to have the same binding legal effect as if it were the original signed version thereof delivered in person.

    21.   **Governing Law.** This Agreement will be governed in all respects by and construed in accordance with the substantive laws of the State of New Jersey, without regard to the principles of conflicts of law.

13

02-04-'10 13:29 FROM-                                    T-609  P015/017 F-599

22.   **Headings.** The headings contained in this Agreement are for convenience and reference purposes only and shall not be deemed to be part of the Agreement or to affect the meaning or interpretation of this Agreement.

23.   **Further Assurances.**   The parties agree to give such further assurances and to execute such documents as may be necessary to correct, confirm and effectuate this Agreement.

24.   **Non-Disclosure.** Marks agrees to keep both the existence and the terms and amount of this Agreement completely confidential, except that Marks may discuss this Agreement (i) with an immediate family member; (ii) with Marks' counsel, accountants, or other professionals, each of whom must agree to be bound by these confidentiality provisions; (iii) as may be required by law; or (iv) as may be necessary to enforce his rights under this Agreement in a judicial proceeding. The Company agrees to keep the terms of this Agreement confidential except (i) as to those employees or agents of the Company who have a need to know the terms hereof; (ii) as to the respective immediate family members, counsel, accountants or other professional advisors of the Company and/or the Co-Managers of the Company, each of which professional advisors must agree to be bound by these confidentiality provisions;  (iii) as may be required by law; or (iv) as may be necessary to enforce its or their rights under this Agreement in a judicial proceeding.

25.   **Notices.** All notices required by this Agreement will be in writing, and will be deemed to have been duly delivered when delivered in person, when mailed via certified mail, return receipt requested, or when mailed via a nationally recognized overnight courier, as follows:

If to Marks:

    Daniel Marks
    8 Whitehill Place
    Cold Springs, NY 10516

with copies to Marks' counsel:

    Ira B Marcus, Esq.
    Marcus, Brody, Ford, Kessler & Sahner, LLC
    5 Becker Farm Road
    Roseland, NJ 07068

If to Singer:

    Anthony Singer
    1200 MacArthur Blvd.
    Mahwah, NJ 07430

14

02-04-'10 13:29 FROM-                                     T-809  P016/017 F-599

With copy to Singer's counsel:

      Kurt D. Olender, Esq.
      OlenderFeldman, LLP
      2840 Morris Avenue
      Union, NJ 07083

If to the Company:

      PTT Games, LLC d/b/a High 5 Games
      1200 MacArthur Blvd.
      Mahwah, NJ 07430

   26.   **Parties' Legal Representatives.**  Marks acknowledges that he has been represented by Ira Marcus, Esq., of Marcus, Brody, Ford, Kessler & Salmer, L.L.C. Anthony Singer, the member executing this Agreement on behalf of the Company, acknowledges that he has been represented by Kurt Olender, Esq., of OlenderFeldman, LLP.  The Company has been represented by Seth Zuckerman, Esq., of Salber, LLC.  .

*Signatures Appear on Next Page*



15

02-04-'10 13:29 FROM-                                    T-609   P017/017 F-599

IN WITNESS WHEREOF, this Agreement has been entered into as of the date first above written.

Daniel Marks

Anthony Singer

PTT, LLC, D/B/A HIGH 5 GAMES

By:
Name: Anthony Singer
Title:  Manager

16

IN WITNESS WHEREOF, this Agreement has been entered into as of the date first above written.

_____
Daniel Marks

_____
Anthony Singer

PTT, LLC, D/B/A HIGH 5 GAMES

By:_____
    Name: Anthony Singer
    Title: Manager

16

EXHIBIT 2



**NEW YORK OFFICE**
50 W. 23rd St
New York, NY 10010
**646.205.3600**

**NEW JERSEY OFFICE**
1200 MacArthur Blvd
Mahwah, NJ 07430
**201.825.1711**

June 7, 2012

Joseph Masci
8 High Road
Montrose, NY 10549

Dear Joe:

As you know, your employment with PTT, LLC (the "Company") will terminate. In appreciation of your efforts and service to the Company, we are pleased to offer you the separation benefits described below to assist you in your employment transition. This letter sets forth the substance of these benefits as well as other terms applicable to your separation from the Company and is referred to herein as the "Agreement."

1. **Separation.** Your last day of work with the Company and your employment termination date will be June 7, 2012 (the "Separation Date").

2. **Accrued Salary and Paid Time Off.** On the Separation Date, the Company will pay you all accrued salary, and all accrued and unused paid time off earned through the Separation Date, subject to standard payroll deductions and withholdings. You are entitled to these payments by law.

3. **Severance Payment.** Although the Company has no obligation to do so, if you sign this Agreement, then the Company will pay you, as severance, the equivalent of 52 weeks of your base salary in effect as of the Separation Date, subject to standard payroll deductions and withholdings. This amount will be paid in equal installments over the 52 weeks following the Effective Date (as defined in paragraph 13 below) on the Company's regularly scheduled payroll dates.

4. **Appreciation Rights Award Acceleration.** Although the Company has no obligation to do so, if you sign this Agreement, then the Company will accelerate the vesting of the appreciation rights granted to you pursuant to the Membership Interest Appreciation Rights Plan Letter dated November 10, 2011 (the "Award") such that your entire Award will be vested as of the Separation Date. You and the Company hereby acknowledge and agree that (i) the Appreciation Rights under the Award as of November 10, 2011 (the "Grant Date") constitutes 1% of the total number of units of the Company outstanding on the Grant Date and is intended to remain at 1%, i.e., shall not be diluted; and (ii) that the initial Fair Market Value for purposes of the Award equaled $4,000,000. Your vested Award shall be subject to the terms of the Membership Interest Appreciation Rights Plan.

5. **Other Compensation or Benefits.** You acknowledge that, except as expressly provided in this Agreement, you will not receive any additional compensation, bonus, severance, or benefits after the Separation Date. You understand and agree that the benefits and payments provided to you under this Agreement are in lieu of any and all benefits, payments or bonus to which you may have been entitled to under any other agreements or arrangements with the Company and any obligation to provide pay in lieu of notice.

1883472 v1/NY

www.h5g.com



NEW YORK OFFICE
50 W. 23rd St
New York, NY 10010
646.205.3600

NEW JERSEY OFFICE
1200 MacArthur Blvd
Mahwah, NJ 07430
201.825.1711

6. **Expense Reimbursements.** You agree that, within ten (10) days of the Separation Date, you will submit your final documented expense reimbursement statement reflecting all business expenses you incurred through the Separation Date, if any, for which you seek reimbursement. The Company will reimburse you for these expenses pursuant to its regular business practice.

7. **Return of Company Property.** Within 25 days of the Separation Date, you agree to return to the Company all Company documents (and all copies thereof) and other Company property that you have had in your possession at any time, including, but not limited to, Company files, notes, drawings, records, business plans and forecasts, financial information, specifications, computer-recorded information, tangible property (including, but not limited to, computers), credit cards, entry cards, identification badges, and keys; and, any materials of any kind that contain or embody any proprietary or confidential information of the Company (and all reproductions thereof). Your timely return of all such Company documents and other property is a condition precedent to your receipt of the severance benefits provided under this Agreement.

8. **Assignment, Proprietary Information and Related Obligations.** You acknowledge your continuing obligations under your: Award Letter Pursuant to Membership Interest Appreciation Rights Plan dated on or about November 1, 2011; Confidentiality Agreement with the Company dated on or about February 24, 2006; Intellectual Property Agreement with the Company dated on or about February 27, 2006; Agreement Not To Compete with the Company dated on or about February 24, 2006; Employee Proprietary Information Agreement with the Company dated on or about October 4, 1999. You understand that your continuing obligations pertain to confidential, proprietary and trade secret information and covenants not to compete or to solicit employees or customers of the Company. You further understand, reaffirm and agree that you have assigned any and all inventions and intellectual property of any kind and any ownership interest therein to the Company and that you have no claim and shall make no claim of any ownership interest in any property (intellectual or otherwise) or rights of the Company. You further agree that you shall provide any and all assistance to the Company necessary to perfect any interest, ownership, or right in or to any intellectual property or invention. The Company agrees that it shall reimburse you for any costs incurred in your compliance with the foregoing sentence. Your compliance with the obligations discussed herein is a condition precedent to your receipt of the benefits provided to you under this Agreement.

9. **Confidentiality.** The provisions of this Agreement will be held in strictest confidence by you and the Company and will not be publicized or disclosed in any manner whatsoever; *provided, however,* that: (a) you may disclose this Agreement in confidence to your immediate family; (b) the parties may disclose this Agreement in confidence to their respective attorneys, accountants, auditors, tax preparers, and financial advisors; (c) the Company may disclose this Agreement as necessary to fulfill standard or legally required corporate reporting or disclosure requirements; and (d) the parties may disclose this Agreement



NEW YORK OFFICE
50 W. 23rd St
New York, NY 10010
646.205.3600

NEW JERSEY OFFICE
1200 MacArthur Blvd
Mahwah, NJ 07430
201.825.1711

insofar as such disclosure may be necessary to enforce its terms or as otherwise required by law.

10. **Nondisparagement.** You agree not to disparage the Company, its officers, directors, employees, members, shareholders, and agents, in any manner likely to be harmful to its or their business, business reputation, or personal reputation; provided that you will respond accurately and fully to any question, inquiry or request for information when required by legal process. Similarly, the Company agrees that its board of directors and executive management (including those in vice president and director positions) will not disparage you in any manner likely to be harmful to your business or personal reputation; provided that the Company will respond accurately and fully to any question, inquiry or request for information when required by legal process.

11. **No Admissions.** You understand and agree that the promises and payments in consideration of this Agreement shall not be construed to be an admission of any liability or obligation by the Company to you or to any other person, and that the Company makes no such admission.

12. **Release of Claims.** In exchange for the consideration under this Agreement to which you would not otherwise be entitled, you hereby generally and completely release the Company and its directors, officers, employees, shareholders, partners, agents, attorneys, predecessors, successors, parent and subsidiary entities, insurers, affiliates, and assigns from any and all claims, liabilities and obligations, both known and unknown, that arise out of or are in any way related to events, acts, conduct, or omissions occurring at any time prior to and including the date you sign this Agreement. This general release includes, but is not limited to claims under: Title VII of the Civil Rights Act of 1964, as amended; the Civil Rights Act of 1991; Sections 1981 through 1988 of Title 42 of the United States Code, as amended; the Employee Retirement Income Security Act of 1974, as amended; the Americans with Disabilities Act of 1990, as amended; the Age Discrimination in Employment Act of 1967, as amended ("ADEA"); the New York Human Rights Laws, as amended; the New York Civil Rights Act, as amended; the New York Minimum Wage Law, as amended; Equal Pay Law for New York, as amended; any other federal, state or local civil or human rights law or any other local, state or federal law, regulation or ordinance; and any public policy, contract, tort, or common law.

13. **ADEA Waiver.** You acknowledge that you are knowingly and voluntarily waiving and releasing any rights you may have under the ADEA ("ADEA Waiver"). You also acknowledge that the consideration given for the ADEA Waiver is in addition to anything of value to which you were already entitled. You further acknowledge that you have been advised by this writing, as required by the ADEA, that: (a) your ADEA Waiver does not apply to any rights or claims that arise after the date you sign this Agreement; (b) you should consult with an attorney prior to signing this Agreement; (c) you have thirty-five (35) days to consider this Agreement (although you may choose to voluntarily sign it sooner); (d) you have seven (7) days following the date you sign this Agreement to revoke the ADEA Waiver (in a

**HIGH 5 GAMES**

NEW YORK OFFICE
50 W. 23rd St
New York, NY 10010
646.205.3600

NEW JERSEY OFFICE
1200 MacArthur Blvd
Mahwah, NJ 07430
201.825.1711

written revocation sent to me); and (e) the ADEA Waiver will not be effective until the date upon which the revocation period has expired, which will be the eighth day after you sign this Agreement (the "Effective Date"). You understand that if you do not sign this agreement and allow it to become effective within the timeframe set forth in this paragraph 13, you shall not be entitled to any benefit or payment provided for in this Agreement, except as may be required by law.

14. **Application of Section 409A.** It is intended that each installment of the severance payments and benefits provided for in this Agreement is a separate "payment" for purposes of Section 409A and, accordingly, each installment payment hereunder shall at all times be considered a separate and distinct payment. For the avoidance of doubt, it is intended that the severance payments and benefits satisfy, to the greatest extent possible, the exemptions from the application of Section 409A provided under Treasury Regulation Sections 1.409A-1(b)(4), 1.409A-1(b)(5) and 1.409A-1(b)(9) and this Agreement will be construed to the greatest extent possible as consistent with those provisions, and to the extent not so exempt, this Agreement (and any definitions hereunder) will be construed in a manner that complies with Section 409A. If the Company (or, if applicable, the successor entity thereto) determines that the severance payments and benefits provided upon a Separation from Service constitute "deferred compensation" under Section 409A of the Code (together, with any state law of similar effect, "Section 409A") and if Executive is a "specified employee" of the Company or any successor entity thereto as of the Separation from Service, as such term is defined in Section 409A(a)(2)(B)(i) (a **"Specified Employee"**), then, solely to the extent necessary to avoid the incurrence of the adverse personal tax consequences under Section 409A, the timing of the severance payments and benefits (or any portion thereof) shall be delayed as follows: on the earlier to occur of (i) the date that is six months and one day after the date of separation of service or (ii) the date of Executive's death (such earlier date, the **"Delayed Initial Payment Date"**), the Company (or the successor entity thereto, as applicable) shall (A) pay to Executive a lump sum amount equal to the sum of the severance payments and benefits that Executive would otherwise have received through the Delayed Initial Payment Date if the commencement of the payment of the severance payments and benefits had not been delayed pursuant to this paragraph and (B) commence paying the balance of the severance payments and benefits in accordance with the payment schedule set forth above.

15. **Miscellaneous.** This Agreement constitutes the complete, final and exclusive embodiment of the entire agreement between you and the Company with regard to its subject matter. It is entered into without reliance on any promise or representation, written or oral, other than those expressly contained herein, and it supersedes any other such promises, warranties or representations. This Agreement may not be modified or amended except in a writing signed by both you and a duly authorized officer of the Company. This Agreement will bind the heirs, personal representatives, successors and assigns of both you and the Company, and inure to the benefit of both you and the Company, their heirs, successors and assigns. If any provision of this Agreement is determined to be invalid or unenforceable, in whole or in part, this determination will not affect any



NEW YORK OFFICE
50 W. 23rd St
New York, NY 10010
646.205.3600

NEW JERSEY OFFICE
1200 MacArthur Blvd
Mahwah, NJ 07430
201.825.1711

other provision of this Agreement and the provision in question will be modified so as to be rendered enforceable. This Agreement will be deemed to have been entered into and will be construed and enforced in accordance with the laws of the State of New Jersey as applied to contracts made and to be performed entirely within New Jersey. Any ambiguity in this Agreement shall not be construed against either party as the drafter. Any waiver of a breach of this Agreement shall be in writing and shall not be deemed to be a waiver of any successive breach. This Agreement may be executed in counterparts and facsimile signatures will suffice as original signatures.

If this Agreement is acceptable to you, please sign below and return the original to me. We wish you the best in your future endeavors.

Sincerely,

PTT, LLC

By: _____

Anthony M. Singer
President  & Chief Executive Officer

I have read, understand and agree fully to the foregoing Agreement:

_____
Joseph Masci

Date: _7.6.2012_ , 2012

# CONFIDENTIALITY AGREEMENT

THIS AGREEMENT is made between High 5 Games, hereinafter referred to as the "Corporation", and _Joseph Masci_____, of _8 High Rd_____, _Joseph_____, _M_, _Masci  yu_____ hereinafter referred to as the "Employee." _Montrose_  _NY_  _10548_

WHEREAS, Employee is employed as an agent or employee of the Corporation; and

WHEREAS, the Corporation and the Employee desire that the Employee enter into covenants with the Corporation;

NOW THEREFORE, in consideration of Corporation employing Employee at this time, which employment Corporation may terminate at will, Employee hereby agrees as follows:

1.  **Not to Carry on Similar Business.**  As long as Employee is an agent or employee of Corporation, and also for the period of one (1) year after termination of employment, Employee will not directly or indirectly own, manage, be employed by, engage in, carry on or be connected in any other manner with any business similar to the type of business conducted by the Corporation at that time.

2.  **Not to Disclose Customer Information.**  Employee will not at any time, either during employment or after employment terminates, directly or indirectly make known or divulge to any person, firm, or corporation the names or addresses of any of the customers of the Corporation.

3.  **Not to Solicit Customers.**  Employee will not, during the period of one (1) year after termination of employment, directly or indirectly, either for himself/herself or for any other person, firm, or corporation, call upon, solicit, divert, or take away, or attempt to solicit, divert, or take away, any of the customers of the Corporation.

4.  **Not to Disclose Information.**  Employee will not at any time, in any fashion, form, or manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm, or corporation in any manner whatsoever any information of any kind, nature, or description concerning any matters affecting or relating to the business of the Corporation, including, but not limited to, the names of any of its customers or prospective customers or any other information concerning the business of the Corporation, its manner of operation, its plans, or any other data of any kind, nature, or description, without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important; provided however, that Employee may disclose such information to a customer of the Corporation in the ordinary course of business and may disclose such information to another employee of the Corporation in the ordinary course of working together for the Corporation.

Page 1 of 2

Case 2:13-cv-07161-JLL-JAD   Document 25   Filed 07/02/13   Page 42 of 64 PageID 241

## CONFIDENTIALITY AGREEMENT

   5.   Records Belong to Corporation.  All books, records, files, forms, reports, accounts and documents relating in any manner to the Corporation's business or customers, whether prepared by Employee or anyone else, shall be the exclusive property of the Corporation and shall be returned immediately to the Corporation upon termination of employment or upon the Corporation's request at any time.

   6.   Breach.  The parties hereby stipulate that each of the foregoing matters are important, material, and confidential, and gravely affect the effective and successful conduct of the business of the Corporation and affect its reputation and goodwill, and that any breach of the terms of this Agreement is a material breach of this Agreement, from which Employee may be enjoined and for which the Employee shall also pay to the Corporation all damages (including but not limited to compensatory, incidental, consequential and lost profits damages), which arise from the breach, together with interest, costs, attorneys' fees (including those expended to collect such damages) and all litigation expenses to fullest extent allowable by law.

   7.   No Waiver of Breach.   Corporation may waive a provision of this Agreement only in a writing signed by any officer of Corporation.  The waiver by the Corporation of a breach by Employee of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by the Employee.

   8.   Assignment.  The rights and obligations of the Corporation under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Corporation.  Employee shall not assign his rights or obligations under this Agreement.

   IN WITNESS WHEREOF, the parties have executed this Agreement as of the 24 day of    FEBRUARY   , 20 06.

EMPLOYEE                                   HIGH 5 GAMES

By: _____        By: _____

Print Name: JOSEPH MASEN        Print Name: DANIEL MARKS

Date:  2·24·06                           Date:  02/14/06

# AGREEMENT NOT TO COMPETE

IN CONSIDERATION of High 5 Games' (hereinafter referred to as the "Corporation") employing me at this time, I, ___Joseph Masci___ hereby covenant and agree with the Corporation as follows:

1.    Non-Compete.  I will not do or attempt to do any of the following, either directly or indirectly, during my employment or during the period of 1 year after my employment terminates:  (a) compete against the Corporation;  (b) carry on a business similar to the Corporation's business;  (c) engage in a business similar to the Corporation's business; (d) solicit old customers of the Corporation; (e) or own, manage, be employed by, work for, consult for, be an officer or director of, advise, represent, engage in, or carry on any business engaged in the design, manufacture or sale of casino games or any other business similar to the type of business engaged in by the Corporation at that time.

2.    Injunction and Damages.  I agree that this Agreement is important, material, confidential, and gravely affects the effective and successful conduct of the business of the Corporation and affects its reputation and goodwill.  The Corporation is entitled to obtain an injunction and damages for any breach of this Agreement, including but not limited to compensatory, incidental, consequential, exemplary, and lost-profits damages.  I agree to pay the Corporation's attorneys' fees, litigation expenses and costs for enforcement of this Agreement if I breach this Agreement.

3.    Miscellaneous.  Wherever used in this Agreement, the phrase "directly or indirectly" includes, but is not limited to, acting through my wife, children, parents, brothers, sisters, or any other relatives, friends, trustees, agents or associates.  The Corporation may waive a provision of this Agreement only in a writing signed by the President of the Corporation and specifically stating what is waived.  The rights of the Corporation under this Agreement may be assigned, but I may not assign my rights or obligations under this Agreement.   The title of this Agreement and the paragraph headings of this Agreement are not substantive parts of this Agreement and shall not limit or restrict this Agreement in any way.   This Agreement is not a contract for future employment and does not change the fact that my employment may be terminated at any time by either me or the Corporation.  This Agreement survives after my employment terminates.  No change, addition, deletion or amendment of this Agreement shall be valid or binding upon me or the Corporation unless in writing and signed by me and the Corporation.  This Agreement is in addition to any other agreement signed by me and does not supersede any other agreement.  If a court of competent jurisdiction finally determines this agreement to be unreasonable, then said court may reduce the term of years or the geographical range, or both, so as to be reasonable.

## AGREEMENT NOT TO COMPETE

EMPLOYEE                                    HIGH 5 GAMES

By: _____                        By: _____

Print Name: JOSEPH MASCI                    Print Name: RANDU MARKS

Date: 2·24·06                               Date: 02/24/06

# INTELLECTUAL PROPERTY AGREEMENT

THIS AGREEMENT is made between High 5 Games, hereinafter referred to as the "Corporation", and ___JOSEPH MASCi_____, of _8 HIGH Rd._____, _MONTROSE_____, _NY_, _10548_, hereinafter referred to as the "Employee."

WHEREAS, Employee is employed as an agent or employee of the Corporation; and

WHEREAS, the Corporation and the Employee desire that the Employee enter into covenants with the Corporation;

NOW THEREFORE, in consideration of Corporation employing Employee at this time, which employment Corporation may terminate at will, Employee hereby agrees as follows:

1.    Assignment of Inventions. Employee hereby agrees to make full written disclosure the Corporation, will hold in trust for the sole right of the Corporation, and hereby assigns to the Corporation, or its designee, all rights, title, and interest in and to any and all inventions, original works of authorship or artwork, developments, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time that Employee is in the employ of the Corporation (collectively referred to as "Inventions") related to casino gaming or any other business that the Corporation may foreseeably enter into. Employee further acknowledges that all original work of authorship or artwork which are made by the Employee (solely or jointly with others) within the scope of and during the period of employment with the Corporation and which are protectible by copyright are "works for hire," as that terms is defined in the United States Copyright Act.

2.    Assistance with Inventions. Employee hereby agrees to assist the Corporation, or its designee, at the expense of the Corporation, in every proper way to secure the Corporation's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to Corporation of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Corporation shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Corporation, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto. Employee further agrees that the obligation to execute or cause to be executed, when it is Employee's power to do so, any such instrument or papers shall continue after the termination of this Agreement. If the Corporation is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to

### INTELLECTUAL PROPERTY AGREEMENT

pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship or artwork assigned to the Corporation above, then I hereby irrevocably designate and appoint the Corporation and its duly appointed officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letter patents or copyright registrations thereon with the same legal force and effect as if executed by the Employee.

3. **Breach.** The parties hereby stipulate that each of the foregoing matters are important, material, and confidential, and gravely affect the effective and successful conduct of the business of the Corporation and affect its reputation and goodwill, and that any breach of the terms of this Agreement is a material breach of this Agreement, from which Employee may be enjoined and for which the Employee shall also pay to the Corporation all damages (including but not limited to compensatory, incidental, consequential and lost profits damages), which arise from the breach, together with interest, costs, attorneys' fees (including those expended to collect such damages) and all litigation expenses to fullest extent allowable by law.

4. **No Waiver of Breach.** Corporation may waive a provision of this Agreement only in a writing signed by any officer of Corporation. The waiver by the Corporation of a breach by Employee of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by the Employee.

5. **Assignment.** The rights and obligations of the Corporation under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Corporation. Employee shall not assign his rights or obligations under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the 27th day of February, 2006.

EMPLOYEE

By: _____

Print Name: JOSEPH MASCI

Date: 2-27-06

HIGH 5 GAMES

By: _____

Print Name: DANIEL MARKS

Date: 62/27/06

People Think Too!

## EMPLOYEE PROPRIETARY INFORMATION AGREEMENT

As a condition of my employment with People Think Too L.L.C, its subsidiaries, affiliates, successors or assigns (together the "**Company**"), and in consideration of my employment with the Company and my receipt of the compensation now and hereafter paid to me by Company, I agree to the following:

1. **At-Will Employment.** I understand and acknowledge that my employment with the Company is for an unspecified duration and constitutes "at-will" employment. I acknowledge that this employment relationship may be terminated at any time, with or without good cause or for any or no cause, at the option either of the Company or myself, with or without notice.

2. **Confidential Information.**

(a) **Company Information.** I agree at all times during the term of my employment and thereafter, to hold in strictest confidence, and not to use, except for the benefit of the Company, or to disclose to any person, firm or corporation without written authorization of the Board of Directors of the Company, any Confidential Information of the Company. I understand that "**Confidential Information**" means any Company proprietary information, technical data, trade secrets or know-how, including, but not limited to, research, product plans, products, services, customer lists and customers (including, but not limited to, customers of the Company on whom I called or with whom I became acquainted during the term of my employment), markets, software, developments, inventions, processes, formulas, technology, designs, drawings, engineering, hardware configuration information, marketing, finances or other business information disclosed to me by the Company either directly or indirectly, in writing, orally, by drawings, or by observation of parts or equipment. I further understand that Confidential Information does not include any of the foregoing items which has become publicly known and made generally available through no wrongful act of mine or of others who were under confidentiality obligations as to the item or items involved.

(b) **Former Employer Information.** I agree that I will not, during my employment with the Company, improperly use or disclose any proprietary information or trade secrets of any former or concurrent employer or other person or entity and that I will not bring onto the premises of the Company any unpublished document or proprietary information belonging to any such employer, person or entity unless consented to in writing by such employer, person or entity.

(c) **Third Party Information.** I recognize that the Company has received and in the future will receive from third parties their confidential or proprietary information subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. I agree to hold all such confidential or proprietary information in the strictest confidence and not to disclose it to any person, firm or corporation or to use it except as necessary in carrying out my work for the Company consistent with the Company's agreement with such third party.

3. **Inventions.**

(a) **Inventions Retained and Licensed.** I have attached hereto, as Exhibit A, a list describing all inventions, original works of authorship, developments, improvements, and trade secrets which were made by me prior to my employment with the Company, which belong to me, which relate to the Company's proposed business, products or research and development, and which are not assigned to the Company hereunder (collectively referred to as "Prior Inventions"); or, if no such list is attached, I represent that there are no such Prior Inventions. If in the course of my employment with the Company, I incorporate into any invention, improvement, development, product, copyrightable material or trade secret any invention, improvement, development, concept, discovery or other

proprietary information owned by me or in which I have an interest, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such item as part of or in connection with such product, process or machine.

(b)   Assignment of Inventions. I agree that I will promptly make full written disclosure to the Company, will hold in trust for the sole right and benefit of the Company, and hereby assign to the Company, or its designee, all my right, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which I may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time I am in the employ of the Company (collectively referred to as "Inventions"), except as provided in Section 3(f) below.  I further acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of and during the period of my employment with the Company and which are protectible by copyright are "works made for hire," as that term is defined in the United States Copyright Act.

(c)   Inventions Assigned to the United States.  I agree to assign to the United States government all my right, title, and interest in and to any and all Inventions whenever such full title is required to be in the United States by a contract between the Company and the United States or any of its agencies.

(d)   Maintenance of Records.  I agree to keep and maintain adequate and current written records of all Inventions made by me (solely or jointly with others) during the term of my employment with the Company.  The records will be in the form of notes, sketches, drawings, and any other format that may be specified by the Company. The records will be available to and remain the sole property of the Company at all times.

(e)   Patent and Copyright Registrations.  I agree to assist the Company, or its designee, at the Company's expense, in every proper way to secure the Company's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to the Company of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Company shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Company, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  I further agree that my obligation to execute or cause to be executed, when it is in my power to do so, any such instrument or papers shall continue after the termination of this Agreement.  If the Company is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship assigned to the Company as above, then I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letters patent or copyright registrations thereon with the same legal force and effect as if executed by me.

(f)   Exception to Assignments.  I understand that the provisions of this Agreement requiring assignment of Inventions to the Company do not apply to any invention which qualifies fully under the provisions of California Labor Code Section 2870 (attached hereto as Exhibit B).  I will advise the Company promptly in writing of any inventions that I believe meet the criteria in California Labor Code Section 2870 and not otherwise disclosed on Exhibit A.

4.   Conflicting Employment.  I agree that, during the term of my employment with the Company, I will not engage in any other employment, occupation, consulting or other business activity directly related to the business

in which the Company is now involved or becomes involved during the term of my employment, nor will I engage in any other activities that conflict with my obligations to the Company.

5.    Returning Company Documents.   I agree that, at the time of leaving the employ of the Company, I will deliver to the Company (and will not keep in my possession, recreate or deliver to anyone else) any and all devices, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, blueprints, sketches, materials, equipment, other documents or property, or reproductions of any aforementioned items developed by me pursuant to my employment with the Company or otherwise belonging to the Company, its successors or assigns. In the event of the termination of my employment, I agree to sign and deliver the "**Termination Certification**" attached hereto as Exhibit C.

6.    Notification to New Employer.   In the event that I leave the employ of the Company, I hereby grant consent to notification by the Company to my new employer about my rights and obligations under this Agreement.

7.    Solicitation of Employees.   I agree that for a period of twelve (12) months immediately following the termination of my relationship with the Company for any reason, whether with or without cause, I shall not either directly or indirectly solicit, induce, recruit or encourage any of the Company's employees to leave their employment, or take away such employees, or attempt to solicit, induce, recruit, encourage or take away employees of the Company, either for myself or for any other person or entity.

8.    Representations.   I agree to execute any proper oath or verify any proper document required to carry out the terms of this Agreement. I represent that my performance of all the terms of this Agreement will not breach any agreement to keep in confidence proprietary information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any oral or written agreement in conflict herewith.

9.    Arbitration and Equitable Relief.

(a)    Arbitration.   Except as provided in Section 9(b) below, I agree that any dispute or controversy arising out of or relating to any interpretation, construction, performance or breach of this Agreement, shall be settled by arbitration to be held in Westchester County, New York, in accordance with the rules then in effect of the American Arbitration Association. The arbitrator may grant injunctions or other relief in such dispute or controversy. The decision of the arbitrator shall be final, conclusive and binding on the parties to the arbitration. Judgement may be entered on the arbitrator's decision in any court having jurisdiction. The Company and I shall each pay one-half of the costs and expenses of such arbitration, and each of us shall separately pay our counsel fees and expenses.

(b)    Equitable Remedies.   I agree that it would be impossible or inadequate to measure and calculate the Company's damages from any breach of the covenants set forth in Sections 2, 3, and 5 herein. Accordingly, I agree that if I breach any of such Sections, the Company will have available, in addition to any other right or remedy available, the right to obtain an injunction from a court of competent jurisdiction restraining such breach or threatened breach and to specific performance of any such provision of this Agreement. I further agree that no bond or other security shall be required in obtaining such equitable relief and I hereby consent to the issuance of such injunction and to the ordering of specific performance.

10.   General Provisions

     (a)   Governing Law; Consent to Personal Jurisdiction.  This Agreement will be governed by the laws of the State of California.

     (b)   Entire Agreement.  This Agreement sets forth the entire agreement and understanding between the Company and me relating to the subject matter herein and merges all prior discussions between us.  No modification of or amendment to this Agreement, nor any waiver of any rights under this agreement, will be effective unless in writing signed by the party to be charged.  Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

     (c)   Severability.  If one or more of the provisions in this Agreement are deemed void by law, then the remaining provisions will continue in full force and effect.

     (d)   Successors and Assigns.  This Agreement may not be assigned without the prior written consent of the Company.  Subject to the foregoing sentence, this Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

Date:  10/4/99  1999 ~~1998~~ 

Signature

Joseph Masci

Name of Employee (typed or printed)

Witness

-4-

**EXHIBIT A**

**LIST OF PRIOR INVENTIONS**
**AND ORIGINAL WORKS OF AUTHORSHIP**

| Title | Date | Identifying Number or Brief Description |
|-------|------|----------------------------------------|
|       |      |                                        |

✓ No inventions or improvements

___ Additional Sheets Attached

Signature of Employee: _____

Print Name of Employee: _Joseph Masci_

Date: _10/4/99_

KAM::ODMA\MHODMA\PALib2;979211;1

EXHIBIT 3

# <u>CONFIDENTIALITY AGREEMENT</u>

THIS AGREEMENT is made between High 5 Games, hereinafter referred to as the "Corporation", and _Brian Kavanagh_, of _480 Bushkill Center Rd._, _Nazareth_, _PA_, _18064_, hereinafter referred to as the "Employee."

WHEREAS, Employee is employed as an agent or employee of the Corporation; and

WHEREAS, the Corporation and the Employee desire that the Employee enter into covenants with the Corporation;

NOW THEREFORE, in consideration of Corporation employing Employee at this time, which employment Corporation may terminate at will, Employee hereby agrees as follows:

1.    Not to Carry on Similar Business.  As long as Employee is an agent or employee of Corporation, and also for the period of one (1) year after termination of employment, Employee will not directly or indirectly own, manage, be employed by, engage in, carry on or be connected in any other manner with any business similar to the type of business conducted by the Corporation at that time.

2.    Not to Disclose Customer Information.  Employee will not at any time, either during employment or after employment terminates, directly or indirectly make known or divulge to any person, firm, or corporation the names or addresses of any of the customers of the Corporation.

3.    Not to Solicit Customers.  Employee will not, during the period of one (1) year after termination of employment, directly or indirectly, either for himself/herself or for any other person, firm, or corporation, call upon, solicit, divert, or take away, or attempt to solicit, divert, or take away, any of the customers of the Corporation.

4.    Not to Disclose Information.  Employee will not at any time, in any fashion, form, or manner, either directly or indirectly, divulge, disclose, or communicate to any person, firm, or corporation in any manner whatsoever any information of any kind, nature, or description concerning any matters affecting or relating to the business of the Corporation, including, but not limited to, the names of any of its customers or prospective customers or any other information concerning the business of the Corporation, its manner of operation, its plans, or any other data of any kind, nature, or description, without regard to whether any or all of the foregoing matters would be deemed confidential, material, or important; provided however, that Employee may disclose such information to a customer of the Corporation in the ordinary course of business and may disclose such information to another employee of the Corporation in the ordinary course of working together for the Corporation.

## CONFIDENTIALITY AGREEMENT

5.     Records Belong to Corporation.  All books, records, files, forms, reports, accounts and documents relating in any manner to the Corporation's business or customers, whether prepared by Employee or anyone else, shall be the exclusive property of the Corporation and shall be returned immediately to the Corporation upon termination of employment or upon the Corporation's request at any time.

6.     Breach.  The parties hereby stipulate that each of the foregoing matters are important, material, and confidential, and gravely affect the effective and successful conduct of the business of the Corporation and affect its reputation and goodwill, and that any breach of the terms of this Agreement is a material breach of this Agreement, from which Employee may be enjoined and for which the Employee shall also pay to the Corporation all damages (including but not limited to compensatory, incidental, consequential and lost profits damages), which arise from the breach, together with interest, costs, attorneys' fees (including those expended to collect such damages) and all litigation expenses to fullest extent allowable by law.

7.     No Waiver of Breach.  Corporation may waive a provision of this Agreement only in a writing signed by any officer of Corporation.  The waiver by the Corporation of a breach by Employee of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by the Employee.

8.     Assignment.  The rights and obligations of the Corporation under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Corporation.  Employee shall not assign his rights or obligations under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the _19_ day of _January_ , 20_09_ .

EMPLOYEE                                          HIGH 5 GAMES

By: _Brian E Kavanagh_                            By: _[signature]_

Print Name: _BRIAN E KAVANAGH_                    Print Name: _DANIEL MARKS_

Date: _1/19/09_                                   Date: _01/19/09_

### Confidential Disclosure Agreement

This Agreement is entered into this 15 day of July of 2008 by and between PTT LLC (d/b/a High 5 Games) with offices at 1200 MacArthur Blvd, Mahwah, NJ 07430 (hereinafter "Discloser") and Brian Fournajf, with offices at 22 member Creek Lane Columoore PA 19843 (hereinafter "Recipient").

WHEREAS Discloser possesses certain ideas and information relating to all of the casino gaming concepts as embodied in the game art, math, code, and related processes and tools that is confidential and proprietary to Discloser (hereinafter "Confidential Information"); and

WHEREAS the Recipient is willing to receive disclosure of the Confidential Information pursuant to the terms of this Agreement for the purpose of art consulting for Discloser;

NOW THEREFORE, in consideration for the mutual undertakings of the Discloser and the Recipient under this Agreement, the parties agree as follows:

1. Disclosure. Discloser agrees to disclose, and Receiver agrees to receive the Confidential Information.

2. Confidentiality.

2.1 No Use. Recipient agrees not to use the Confidential Information in any way, or to manufacture or test any product embodying Confidential Information, except for the purpose set forth above.

1

2.2 No Disclosure. Recipient agrees to use its best efforts to prevent and protect the Confidential Information, or any part thereof, from disclosure to any other person or party not authorized by Discloser to receive the Confidential Information.

2.3 Protection of Secrecy. Recipient agrees to take all steps reasonably necessary to protect the secrecy of the Confidential Information, and to prevent the Confidential Information from falling into the public domain or into the possession of unauthorized persons or parties.

3. Limits on Confidential Information. Confidential Information shall not be deemed proprietary and the Recipient shall have no obligation with respect to such information where the information:

(a) was known to Recipient prior to receiving any of the Confidential Information from Discloser;

(b) has become publicly known through no wrongful act of Recipient;

(c) was received by Recipient without breach of this Agreement from a third party without restriction as to the use and disclosure of the information;

(d) was independently developed by Recipient without use of the Confidential Information; or

(e) was ordered to be publicly released by the requirement of a government agency.

4. Ownership of Confidential Information. Recipient agrees that all Confidential Information shall remain the property of Discloser, and that Discloser may use such Confidential Information for any purpose without obligation to Recipient. Nothing contained herein shall be construed as granting or implying any transfer of rights to Recipient in the Confidential Information, or any patents or other intellectual property protecting or relating to the Confidential Information.

5. Term and Termination. The obligations of this Agreement shall be continuing until the Confidential Information disclosed to Recipient is no longer confidential.

2

6. Survival of Rights and Obligations. This Agreement shall be binding upon, inure to the benefit of, and be enforceable by (a) Discloser, its successors, and assigns; and (b) Recipient, its successors and assigns.

IN WITNESS WHEREOF, the parties have executed this agreement effective as of the date first written above.

DISCLOSER

Signed:

Print Name:  Daniel Marks
Position:    Managing Member

Date:

RECEIPIENT

Signed:

Print Name: Brian E Kavanagh

Date: 1/13/09

3

# PROPRIETARY INFORMATION AGREEMENT

THIS AGREEMENT is made between High 5 Games, hereinafter referred to as the "Corporation", and _Brian Kavanagh_ , of _860 Bushkill Center Rd_ , _Nazareth_ , _PA_ , _18064_ , hereinafter referred to as the "Employee."

WHEREAS, Employee is employed as an agent or employee of the Corporation; and

WHEREAS, the Corporation and the Employee desire that the Employee enter into the following covenants with the Corporation;

NOW THEREFORE, in consideration of Corporation working with Employee at this time, Employee hereby agrees as follows:

1.     Use of Inventions.  If during the course of consulting with the Corporation, the Employee incorporates any invention, development, concept, discovery or other proprietary information owned by Employee or in which the Employee has as interest, the Corporation is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license to make, have made, modify, use and sell such item(s) as part of or in connection with Corporation's products, processes, or machines.

2.     Assignment of Inventions.  Employee agrees to promptly make full written disclosure to the Corporation, will hold in trust for the sole right and benefit of the Corporation, and hereby assign to the Corporation, or its designee, all rights, title, and interest in and to any and all inventions, original works of authorship, developments, concepts, improvements or trade secrets, whether or not patentable or registerable under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or can cause to be conceived or developed or reduced to practice, during the period of time Employee is consulting for the Corporation (collectively referred to as "Inventions").  Employee further acknowledges that all original works of authorship which are made by Employee (solely or jointly with others) within the scope of and during the period of consultation with the Corporation and which are protectable by copyright are "works for hire," as that term is defined in the United States Copyright Act.

3.     Record-keeping of Inventions.  Employee agrees to keep and maintain adequate and current written records of all Inventions made by Employee (solely or jointly with others) during all periods of consultation with the Corporation.  The records will be in the form of notes, sketches, drawings, detailed invoices on Employee's letterhead, and any other format that may be specified by the Corporation.  The records will be available to and remain the sole property of the Corporation at all times.

4.     Assistance with Patents and Copyrights.  Employee agrees to assist the Corporation, or its designee, at the Corporation's expense, in every proper way to secure the Corporation's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to

## CONFIDENTIALITY AGREEMENT

the Corporation of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Corporation shall deem necessary in order to apply for and obtain such right and in order to assign and convey to the Corporation, its successors, assigns, and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  Employee further agrees that Employee's obligation to execute or cause to be executed, when it is the Employee's power to do so, and any such instrument or papers shall continue after the termination of this Agreement.  If the Corporation is unable because of Employee's mental or physical incapacity or for any other reason to secure Employee's signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original work of authorship assigned to the Corporation as above, then Employee hereby irrevocably designate and appoint the Corporation and its duly authorized officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letter patent or copyright registrations thereon with the same legal force and effect as if executed by Employee.

5.  Breach.  The parties hereby stipulate that each of the foregoing matters are important, material, and confidential, and gravely affect the effective and successful conduct of the business of the Corporation and affect its reputation and goodwill, and that any breach of the terms of this Agreement is a material breach of this Agreement, from which Employee may be enjoined and for which the Employee shall also pay to the Corporation all damages (including but not limited to compensatory, incidental, consequential and lost profits damages), which arise from the breach, together with interest, costs, attorneys' fees (including those expended to collect such damages) and all litigation expenses to fullest extent allowable by law.

6.  No Waiver of Breach.  Corporation may waive a provision of this Agreement only in a writing signed by any officer of Corporation.  The waiver by the Corporation of a breach by Employee of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by the Employee.

7.  Assignment.  The rights and obligations of the Corporation under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Corporation.  Employee shall not assign his rights or obligations under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the _19_ day of _January_ , 20_09_ .


EMPLOYEE                               HIGH 5 GAMES

By: _Brian E Kavanagh_                 By: _____

Print Name: _BRIAN E KAVANAGH_         Print Name: _DAMIN MARS_

# AGREEMENT NOT TO COMPETE

IN CONSIDERATION of High 5 Games' (hereinafter referred to as the "Corporation") employing me at this time, I, _Brian Kavanagh_ hereby covenant and agree with the Corporation as follows:

1.     **Non-Compete.**  I will not do or attempt to do any of the following, either directly or indirectly, during my employment or during the period of 1 year after my employment terminates:    (a) compete against the Corporation;    (b) carry on a business similar to the Corporation's business;  (c) engage in a business similar to the Corporation's business;  (d) solicit old customers of the Corporation;  (e) or own, manage, be employed by, work for, consult for, be an officer or director of, advise, represent, engage in, or carry on any business engaged in the design, manufacture or sale of casino games or any other business similar to the type of business engaged in by the Corporation at that time.

2.     **Injunction and Damages.**  I agree that this Agreement is important, material, confidential, and gravely affects the effective and successful conduct of the business of the Corporation and affects its reputation and goodwill.  The Corporation is entitled to obtain an injunction and damages for any breach of this Agreement, including but not limited to compensatory, incidental, consequential, exemplary, and lost-profits damages.  I agree to pay the Corporation's attorneys' fees, litigation expenses and costs for enforcement of this Agreement if I breach this Agreement.

3.     **Miscellaneous.**   Wherever used in this Agreement, the phrase "directly or indirectly" includes, but is not limited to, acting through my wife, children, parents, brothers, sisters, or any other relatives, friends, trustees, agents or associates.  The Corporation may waive a provision of this Agreement only in a writing signed by the President of the Corporation and specifically stating what is waived.  The rights of the Corporation under this Agreement may be assigned, but I may not assign my rights or obligations under this Agreement.  The title of this Agreement and the paragraph headings of this Agreement are not substantive parts of this Agreement and shall not limit or restrict this Agreement in any way.  This Agreement is not a contract for future employment and does not change the fact that my employment may be terminated at any time by either me or the Corporation.  This Agreement survives after my employment terminates.  No change, addition, deletion or amendment of this Agreement shall be valid or binding upon me or the Corporation unless in writing and signed by me and the Corporation.  This Agreement is in addition to any other agreement signed by me and does not supersede any other agreement.  If a court of competent jurisdiction finally determines this agreement to be unreasonable, then said court may reduce the term of years or the geographical range, or both, so as to be reasonable.

## AGREEMENT NOT TO COMPETE

EMPLOYEE

By: _Brian E Kavanagh_

Print Name: BRIAN E KAVANAGH

Date: 1/19/09

HIGH 5 GAMES

By: _____

Print Name: DANIEL MARKS

Date: 6/19/09

Case 2:13-cv-07161-JLL-JAD  Document 251  Filed 07/01/13  Page 67 of 687 PageID 261

# INTELLECTUAL PROPERTY AGREEMENT

THIS AGREEMENT is made between High 5 Games, hereinafter referred to as the "Corporation", and _Brian Kavanach_, of _880 Bushkill Center Rd._, _Nazareth_, _PA, 14064_, hereinafter referred to as the "Employee."

WHEREAS, Employee is employed as an agent or employee of the Corporation; and

WHEREAS, the Corporation and the Employee desire that the Employee enter into covenants with the Corporation;

NOW THEREFORE, in consideration of Corporation employing Employee at this time, which employment Corporation may terminate at will, Employee hereby agrees as follows:

1.     Assignment of Inventions.  Employee hereby agrees to make full written disclosure the Corporation, will hold in trust for the sole right of the Corporation, and hereby assigns to the Corporation, or its designee, all rights, title, and interest in and to any and all inventions, original works of authorship or artwork, developments, concepts, improvements or trade secrets, whether or not patentable or registrable under copyright or similar laws, which Employee may solely or jointly conceive or develop or reduce to practice, or cause to be conceived or developed or reduced to practice, during the period of time that Employee is in the employ of the Corporation (collectively referred to as "Inventions") related to casino gaming or any other business that the Corporation may foreseeably enter into.  Employee further acknowledges that all original work of authorship or artwork which are made by the Employee (solely or jointly with others) within the scope of and during the period of employment with the Corporation and which are protectible by copyright are "works for hire," as that terms is defined in the United States Copyright Act.

2.     Assistance with Inventions.  Employee hereby agrees to assist the Corporation, or its designee, at the expense of the Corporation, in every proper way to secure the Corporation's rights in the Inventions and any copyrights, patents, mask work rights or other intellectual property rights relating thereto in any and all countries, including the disclosure to Corporation of all pertinent information and data with respect thereto, the execution of all applications, specifications, oaths, assignments and all other instruments which the Corporation shall deem necessary in order to apply for and obtain such rights and in order to assign and convey to the Corporation, its successors, assigns and nominees the sole and exclusive rights, title and interest in and to such Inventions, and any copyrights, patents, mask work rights or other intellectual property rights relating thereto.  Employee further agrees that the obligation to execute or cause to be executed, when it is Employee's power to do so, any such instrument or papers shall continue after the termination of this Agreement.  If the Corporation is unable because of my mental or physical incapacity or for any other reason to secure my signature to apply for or to pursue any application for any United States or foreign patents or copyright registrations covering Inventions or original works of authorship or artwork assigned to the Corporation above, then I hereby irrevocably designate and appoint the Corporation and its duly appointed officers and agents as my agent and attorney in fact, to act for and in my behalf and stead to

## INTELLECTUAL PROPERTY AGREEMENT

execute and file any such applications and to do all other lawfully permitted acts to further the prosecution and issuance of letter patents or copyright registrations thereon with the same legal force and effect as if executed by the Employee.

3.  Breach.  The parties hereby stipulate that each of the foregoing matters are important, material, and confidential, and gravely affect the effective and successful conduct of the business of the Corporation and affect its reputation and goodwill, and that any breach of the terms of this Agreement is a material breach of this Agreement, from which Employee may be enjoined and for which the Employee shall also pay to the Corporation all damages (including but not limited to compensatory, incidental, consequential and lost profits damages), which arise from the breach, together with interest, costs, attorneys' fees (including those expended to collect such damages) and all litigation expenses to fullest extent allowable by law.

4.  No Waiver of Breach.  Corporation may waive a provision of this Agreement only in a writing signed by any officer of Corporation.  The waiver by the Corporation of a breach by Employee of any provision of this Agreement shall not operate or be construed as a waiver of any subsequent breach by the Employee.

5.  Assignment.  The rights and obligations of the Corporation under this Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the Corporation.  Employee shall not assign his rights or obligations under this Agreement.

IN WITNESS WHEREOF, the parties have executed this Agreement as of the _19_ day of _January_, 20_09_.

EMPLOYEE

By: _Brian E Kavanagh_

Print Name: BRIAN E KAVANAGH

Date: 1/19/09

HIGH5 GAMES

By: _____

Print Name: DANIEL MARKS

Date: 01/19/09