1
                    UNITED STATES DISTRICT COURT
                  FOR THE DISTRICT OF NEW JERSEY
2                     Civil No. 13-7161(JLL)


3
        - - - - - - - - - - - - - - - -X
4       PTT, LLC, a Delaware Limited   :      TRANSCRIPT OF
        Liability Company d/b/a High 5 :       PROCEEDINGS
5       Games,                         :
                                       :      October 3, 2014
6             Plaintiff/               :
              Counterclaim Defendant,  :
7                                      :
                 -vs-                  :      Newark, New Jersey
8                                      :
        GIMMIE GAMES, an entity; DANIEL:
9       MARKS, an individual; JOSEPH   :
        MASCI, an individual; BRIAN    :
10      KAVANAGH, an individual; MARKS :
        STUDIOS, LLC, an entity;       :
11      ARISTOCRAT TECHNOLOGIES, INC., :
        an entity; JOHN SMITH(s) 1-7,  :
12      individuals, and XYZ COMPANIES :
        1-7,                           :
13            Defendants/             :
              Counterclaim Plaintiffs.:
14      - - - - - - - - - - - - - - - -X


15
        B E F O R E:
16
                    THE HONORABLE JOSE L. LINARES,
17             UNITED STATES DISTRICT COURT JUDGE


18


19


20
           Pursuant to Section 753 Title 28 United States Code, the
21      following transcript is certified to be an accurate record
        as taken stenographically in the above-entitled proceedings.
22
        s/Phyllis T. Lewis, CCR, CRCR
23      - - - - - - - - - - - - - - - - - - - - - - - - - - - - -
                    PHYLLIS T. LEWIS, C.C.R., C.R.C.R.
24      Official Court Reporter - United States District Court
                    Newark, New Jersey 07101
25                     (732) 735-4522

```
 1        A P P E A R A N C E S:

 2                MANDELBAUM SALSBURG, PC
                  153 Prospect Avenue
 3                West Orange, New Jersey 07052
                  973-736-4600
 4                BY:  MICHAEL A. SAFFER, ESQ.
                       KHIZAR A. SHEIKH, ESQ.
 5                     JONATHAN A. FALLON, ESQ.
                  Attorneys for Plaintiff.

 6

 7                FOLEY & LARDNER, LLP
                  90 Park Avenue
 8                New York, New York 10016
                  212-682-7474
 9                BY:  JONATHAN E. MOSKIN, ESQ.
                       RAMY HANNA, ESQ.
10                Attorneys for Defendants.

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE CLERK:  All rise.

 2                    THE COURT:  Thank you.

 3                    You may be seated.

 4                    All right.  Counsel, let me just get everyone's

 5        appearances on the record before we start.  This is in the

 6        matter of PTT, LLC doing business as High 5 versus Gimmie

 7        Games and other people, so I am going to say "et al." For

 8        purposes of the record.

 9                    Can you enter your appearances on the record,

10        please?

11                    MR. SHEIKH:  Good morning, your Honor.

12                    Khizar Sheikh of Mandelbaum Salsburg, attorneys for

13        PTT, LLC.

14                    With me today to my right is Jon Fallon, who is

15        also at Mandelbaum Salsburg, and Michael Saffer.

16                    THE COURT:  Good morning.

17                    MR. MOSKIN:  Good morning, your Honor.

18                    My name is Jonathan Moskin of the firm of Foley &

19        Lardner.  With me at counsel table is my colleague, Ramy

20        Hanna.

21                    I do want to note, because I don't want to

22        interrupt the plaintiff's submission, I do have some concern

23        that, as your Honor can see, there is a slide presentation,

24        which I gather is some 64 slides together with some internet

25        links that I take it that plaintiff would like to show
```

1        something from the internet.  My guess is that -- well, let

2        me just say it this way:  To the extent that this goes

3        beyond anything in their papers, I want to note an objection

4        at the outset, so that I don't have to interrupt.

5              The law is quite clear that even if they had

6        requested leave to file a reply brief, which they didn't,

7        they can't go beyond what is in their moving papers as far

8        as evidence presented to the Court.  One of the cases that

9        we cited to your Honor in our own moving papers --

10              THE COURT:  Counsel, hang on a second.

11              Are you going to be going over stuff that is not

12        included in your papers?

13              MR. SHEIKH:  Well, your Honor, we did request a

14        reply brief.  That request was denied, and so anything that

15        we are showing today in the slide presentation either

16        defendants already have it, or it is in public knowledge, so

17        any links to anything that is indicated in the presentation

18        refers to videos.

19              With respect to the games that defendants have

20        cited in their own papers, and again, we have not had an

21        opportunity to respond to defendants' response, preliminary

22        injunction --

23              THE COURT:  Because in a preliminary injunction

24        setting usually there is no reply because you are the one

25        seeking the relief, you are supposed to put on your best

1    case right off the top, and then they show cause why the

2    injunction should not be issued.

3            Let me see what they produce, okay?

4            At the end of the day, this is a discretionary

5    matter, and I can choose to view or accept it if I think it

6    is going to help me make the right call.  If it is such that

7    I believe it is creating some kind of undue prejudice to

8    you, because you have not seen it before, and you think you

9    need some additional argument, I may give you some time to

10   respond to something, but let's just take it one step at a

11   time.  I think that's the fair way to do it.

12           MR. MOSKIN:  Thank, your Honor.

13           I do want to note, I did begin by saying I didn't

14   want to interrupt them, so I wanted to raise it so as to

15   allow --

16           THE COURT:  Your objection has been noted.

17           At end of his presentation, if you think there are

18   things in there that you were not aware of and could not

19   fairly have anticipated in your arguments, and you need to

20   have some additional time or something, I will consider

21   that.  I am not saying I am going to give it to you, but at

22   least I will consider it once I listen to it, okay?

23           MR. MOSKIN:  Thank you.

24           THE COURT:  Counsel, I gave you both an hour.  I

25   don't think you need an hour.  I was trying to be nice and

1    give you as much time as I thought was necessary, but I have

2    read your briefing.  This is not all that complicated.  I

3    mean, it is a serious matter for your clients, and I

4    understand that.  But in terms of the amount of argument

5    that you may need as to whether or not a preliminary

6    injunction should issue or not, I don't know if you

7    necessarily need the hour, but let's get going and see where

8    we go from there.

9         MR. SHEIKH:  Your Honor, first off, I would like to

10   thank the Court for the opportunity to argue today for about

11   an hour, but my intention in going through the presentation

12   was to make things a little bit more clear for your Honor as

13   we go through this process.

14        My initial plan was to probably take about 40 or 45

15   minutes to go everything in the PowerPoint and also in

16   argument to the Judge --

17        THE COURT:  Let's get started, because I have

18   reserved until one o'clock.  We got started a little late

19   because there were technical difficulties on the setup.

20   It's okay, but let's go.

21        MR. SHEIKH:  Your Honor, I apologize in advance.  I

22   am dealing with a sore throat today, so if my voice sounds

23   raspy or if I am putting something like a lozenger in my

24   mouth, I apologize in advance.

25        Your Honor, we are here today before your Honor to

1          seek a preliminary injunction based on defendants'

2          infringement of the '223 patent.  Every day that the

3          defendants infringe the '223 patent, High 5 is harmed by the

4          defendants' conduct.

5                  Now, High 5 Games is an award winning developer of

6          casino games for the land based social and mobile markets.

7          It has one of the highest ranked social casinos on Facebook

8          and the largest agent themed social casino out there today.

9                  High 5 has created a Super Symbols invention and

10         was issued the '223 patent on May 27th, 2014, and that date

11         is a very important date because that is specifically the

12         date that the patent was issued in this case.

13                 It is not -- the Super Symbols invention and the

14         Super Symbols games that come out of that invention are not

15         simply games with oversized symbols.  They have unique,

16         very, very specific unique features that are deployed in

17         High 5's games.

18                 These same features are in defendants' Mega Symbols

19         games that they market as Storm Queens and Red Moon. The

20         Mega Symbols games look and play like High 5 games' Super

21         Symbols games, and it is our contention that the Mega

22         Symbols games infringe the '223 patent.

23                 Now, as clear, as set forth in the declaration of

24         defendant, Dan Marks, defendants are making profits with the

25         Mega Symbols Games, and defendants are damaging the value

```
1    and exclusivity --
2              THE COURT:  How long have they been in the market
3    with their games?
4              MR. SHEIKH:  To our knowledge, your Honor, they
5    have been in the market with the Mega Symbols games since
6    September of 2013.
7              THE COURT:  2013.
8              MR. SHEIKH:  That's right.
9              THE COURT:  And you have known about this since
10   2013, right?
11             MR. SHEIKH:  We have known that the Mega Symbols
12   games were in the marketplace since 2013, that's right.
13             THE COURT:  So where is your immediate irreparable
14   harm with the emphasis on "immediate"?
15             MR. SHEIKH:  Well, your Honor, to clarify what was
16   happening at the time in September of 2013, and I want to
17   reiterate the fact that the patent did not issue until May
18   27th, 2014, but at the time, in September of 2013, High 5
19   games was at the 2013 G2E Show, and while they were getting
20   ready to deploy their own Super Symbols games, they noticed
21   in Aristocrat's booth that they were marketing and selling
22   games that included this Mega Symbols feature.
23             At the time these were land based casino slot
24   boxes, and so when they saw what Aristocrat was doing, the
25   slot boxes themselves had Aristocrat's logo, but also had
```

```
1          Gimme Games' logo who is a defendant in this case.

2              At the time, High 5 believed that Gimme Games and

3      the three individual defendants that were named in this

4      lawsuit had misappropriated the Super Symbols technology as

5      well as other technologies of High 5 games.

6              THE COURT:  So if you believed that, why didn't you

7      go for your injunction at that time?

8              MR. SHEIKH:  At the time, your Honor --

9              THE COURT:  I know you didn't have your patent, but

10     you felt that they had appropriated trade secrets, right?

11             MR. SHEIKH:  Yes.

12             THE COURT:  So if there was going to be irreparable

13     harm, immediate irreparable harm, it existed as of that

14     time, right?

15             MR. SHEIKH:  Well, one of the things I would like

16     to make clear is, again, the games that were being deployed

17     in September of 2013 were around the land based market.  As

18     our papers indicated, right now High 5 Games has a licensing

19     arrangement with a distributor called Bally with respect to

20     those land based games.  And so if we came to court at that

21     time seeking an injunction, then one of the things that the

22     Court would have asked us is:  Well, aren't any damages that

23     are available in this case easily quantifiable based on the

24     licenses that you have with Bally.

25             That was the actual factual scenario that existed
```

```
 1      in 2013.

 2              THE COURT:  How does it, now moving from a land

 3      base to I guess an electronic base --

 4              MR. SHEIKH:  Yes.

 5              THE COURT:  -- customer base, how does that make

 6      the damages any less quantifiable monetarily?

 7              MR. SHEIKH:  Well, the revenue model is completely

 8      different once you move to a social casino as opposed to

 9      deployment of these land based casino games.

10              THE COURT:  And it would make it more difficult.

11              MR. SHEIKH:  It would make it more difficult, and

12      as defendants acknowledge in their own papers, they

13      themselves in their own social casino can't quantify the

14      effects that Mega Symbols games has to the revenue stream in

15      Jackpot Dreams versus any other games.

16              And the reason for that is because the way that you

17      make money in social casinos is very different.  It is not

18      only the users that are buying virtual coinage in the social

19      casino, but based on the number of users that actually come

20      into your social casino, there are opportunities to

21      advertise and market and also engage in other customer

22      relationship efforts to monetize the amount of users whether

23      on a monthly or daily basis that are actually in the social

24      casino.  So it is a very, very different revenue and

25      monetary model than exists in the land based casino market.
```

```
 1                    THE COURT:  Okay.  Go ahead.
 2                    MR. SHEIKH:  So just going along that theme, your
 3      Honor, with respect to the social casino, again, the date --
 4      the date -- there are a few dates that are important in this
 5      case.  September 2013, that is when High 5 Games first
 6      became aware that Gimmie Games was misappropriating its
 7      trade secret technology.
 8                    Now, at the time High 5 Games believed that Gimmie
 9      Games had misappropriated that technology and was
10      distributing and licensing that technology to Aristocrat.
11                    At the time High 5 did not understand that
12      Aristocrat was any kind of bad actor, and that's why with
13      the cease and desist letter that it sent to Aristocrat, what
14      it was really saying to Aristocrat was:  Look, you know
15      what?  You have to think twice with respect to who you are
16      getting into business with.  These guys, Gimmie Games, have
17      misappropriated our technology, and so by you distributing
18      any of these games, you are making the wrong business
19      decision.
20                    So fast forward, and in late 2013, High 5 Games did
21      not sit on their hands, but instead filed a lawsuit against
22      Gimmie Games and also the three individual defendants for
23      trade secret misappropriation and breach of contract.
24                    Now, if we fast forward, your Honor, to May of
25      2014, that is when the patent issued.  And instead of,
```

1    again, sitting on their hands, what High 5 did again because

2    it really had no understanding that Aristocrat -- these were

3    Aristocrat games.  In fact, your Honor, when we got

4    defendants' opposition papers, and it was listed as

5    Aristocrat's games as opposed to Gimmie Games, that gave me

6    pause because at the end of May of 2014, the indication was

7    that Aristocrat was distributing Gimmie Games' games into

8    the marketplace.

9         So the first thing that High 5 Games did was went

10   to go talk to Aristocrat and said:  Look, you know what?

11   Now it is not just trade secret misappropriation.  There is

12   a valid patent out there.  You have to be careful about what

13   games you are distributing of Gimmie Games.

14        Now, to make it clear for your Honor, this was not

15   just the Super Symbols Games.  The conversation was not

16   around just Supper Symbols with respect to the patent, but

17   also around all of the technology that High 5 Games believed

18   that Gimmie Games was misappropriating.

19        At the time in that conversation Aristocrat had

20   that conversation, and it decided not to stand down and stop

21   distributing the games from Gimmie Games.

22        Now, what happened then?

23        Again, at the time High 5 Games believed that this

24   was only a land based casino issue in the distribution.

25        It was in early August of 2014, as indicated in Mr.

1         Nadooshan's declaration that they first became aware that

2         High 5 -- that defendants were actually deploying these

3         games into their social casino, and I actually have a screen

4         shot that was submitted in our papers to your Honor on

5         Gimmie Games' actual website.  The press release is not

6         dated before June 20, 2014.  That is the date of the press

7         release on Gimmie Games' own website, where they say, now

8         you can play these Mega Symbols games on the social casino

9         site.

10              So when defendants bring up the fact that Jackpot

11        Dreams, which is the name of Aristocrat's social casino had

12        been around since January 2014, they themselves in their own

13        papers say that, Look, it is not just Mega Symbols games

14        that are being played on Jackpot Dreams, and that there were

15        games that were actually added to Jackpot Dreams after that

16        social casino was initially launched.

17              Now, I have spoken to Mr. Fallon, and he can

18        certainly speak for himself, where as he may have logged

19        into Jackpot Dreams in January and February of 2014.  The

20        first indication that High 5 had that defendants were

21        actually deploying the Mega Symbols games into the

22        marketplace, into the social casino marketplace, was early

23        August 2014.

24               Defendants raise certain defenses to this

25        preliminary injunction application, and you know, frankly

1    your Honor, I have to say their papers are very, very good.

2    They are very good writers.  But when you drill down, their

3    arguments fall down almost like a house of cards.  And what

4    I would like to do for your Honor is to kind of go through

5    each of their arguments that they raise in their opposition

6    papers and talk about what our response is to those

7    arguments just for the Court's benefit.

8         So the first argument they say is that Mega Symbols

9    games do not infringe on the '223 patent.

10        Defendants, if you read through their entire

11   papers, seem like they are raising two issues.  One of the

12   issues that they are raising is that each of the symbol

13   positions in the Mega Symbols games, that is their games,

14   has only one symbol at each symbol position.

15        Well, having more than one symbol at each symbol

16   position is not an element of the '223 patent, and we can go

17   through exactly the visual claim chart that we submitted in

18   our initial papers to indicate why that is not an element

19   of the '223 patent itself.

20        The second --

21        THE COURT:  Counsel, you understand that today we

22   are not here for the merits of the case.  There is a

23   likelihood of the success of the merits that needs to be

24   addressed, and I understand why you need to get into some of

25   this, but what you really need to convince me of is that you

```
1        meet the four elements that are necessary for a preliminary

2        injunction, likelihood of success on the merits, irreparable

3        harm.  You need to have those, or you are going to have a

4        problem getting this extraordinary remedy, which is what a

5        preliminary injunction is, and of course, the other two

6        elements.

7              So although obviously I will give you leeway to

8        talk about your likelihood of success, which is what this

9        really goes into, I do want you to spend some time on the

10       irreparable harm part of it.  I just don't want to turn this

11       into a summary judgment type of argument because that is not

12       what it is today, right?

13             MR. SHEIKH:  Absolutely, your Honor.

14             And you're absolutely right.  The reason why I am

15       talking about infringement at all is to talk about the first

16       prong of a preliminary injunction analysis, which is

17       likelihood of success on the merits.

18             With respect to that prong, not only are there

19       arguments that they are not infringing the patent not valid,

20       but also they raise two other issues, claim construction

21       issues and also validity issues, and I can talk about that,

22       your Honor, because I think it is an important piece to

23       understand why High 5 Games would -- there is a likelihood

24       that we would succeed on the merits just on the patent

25       infringement itself.  But if your Honor would like me to
```

```
 1        start with the irreparable harm, you know, in a summary
 2        fashion right now --
 3              THE COURT:  Well, I am trying to help you manage
 4        your time.  I think certainly you should talk about your
 5        infringement claims and why you have a likelihood of success
 6        on that.  But I want you to spend more of your time in
 7        convincing the Court that there is an immediate irreparable
 8        harm that will issue, that is not compensable in monetary
 9        damages, if this injunction does not issue now --
10              MR. SHEIKH:  Well, the immediate irreparable
11        harm --
12              THE COURT:  -- you can do it whichever want you
13        want --
14              MR. SHEIKH:  I understand.
15              THE COURT:  -- I am not suggesting you need to jump
16        to that.  I am just suggesting because I don't want to cut
17        you off later on --
18              MR. SHEIKH:  But I at least want to --
19              THE COURT:  -- but those are the two prongs that I
20        really want to hear from you.
21              MR. SHEIKH:  -- I at least want to tee up that
22        issue for your Honor, just so you understand exactly where
23        we are coming from with respect to the irreparable harm.
24              Now, from our perspective, defendants are damaging
25        the value and the exclusivity of the '223 patent by
```

1          infringing the '223 patent with their Mega Symbols games.

2                    One of the things that again are in our papers is

3          the slot game industry changes very quickly.  There is an

4          immeasurable risk that technology would bypass High 5's '223

5          patent by the conclusion of this litigation.  And, you know,

6          defendants concede in their own papers the difficulty of

7          segregating the revenue effect of Mega Symbols to the other

8          games that are in their social casino.

9                    So in the social gaming space, user acquisition is

10         key, and so as users come into a social casino, they play

11         other games.  They are monetized through -- not just

12         purchasing virtual coins to play those other games, but also

13         through advertising itself.

14                   And so because of the speed of the industry and

15         because of the difficulty in quantifying the revenue effects

16         of the games themselves, once they are in the social casino,

17         and also the difficulty in quantifying the numbers of users

18         High 5 may have lost to defendants --

19                   THE COURT:  Why is it difficult to quantify it?

20                   MR. SHEIKH:  Because once you are in the social

21         casino, your Honor, you can play any game you would like,

22         and so the Mega Symbols Games, they are drawing people into

23         their social casino, and once they are there, they can play

24         any game they like once they are there, so that there is a

25         difficulty in quantifying exactly what do the users do once

1        they are in the social casino.

2               THE COURT:  Why can't that be done electronically,

3        I mean, through computer experts and so forth?

4               Why can't you figure out when this person entered

5        the social casino at X number of hours, right, which is one

6        of my customers, and then these are the other games they

7        played?

8               Isn't that all electronic data that is going to be

9        available in this case?

10              MR. SHEIKH:  Well, yes, your Honor, but the

11       difficulty there, though, is how much money do you make once

12       that user starts playing that game, because again, the

13       difficulty in quantifying the damages here is that the users

14       buy virtual coins that then they can deploy in different

15       areas.

16              But what makes it really difficult is they are

17       purchasing the virtual coins, but they are also given free

18       virtual coins, and so the amount of coins that any specific

19       coin, whether it's purchased or given for free, that the

20       actual user is using to play these games is very, very

21       difficult to quantify.

22              But even beyond and above that, there is an

23       advertising model at work here, and so the number of users

24       that come into the social casino, no matter where they are

25       in the social casino, no matter what they are doing and no

```
 1    matter what they are playing, they are being fed
 2    advertisements, and based on those advertisements the
 3    company also makes money, so the issue here is, again,
 4    different from a land based casino perspective.
 5            In a land based casino when we have a
 6    distributorship model, you can look at the licensing fee and
 7    say, look, the amount of games that are being distributed
 8    out into the marketplace, and you can look at the potential
 9    license and the potential royalty that may come from that
10    land based game, and then you can quantify the harm based on
11    the number of games that were actually distributed by that
12    distributor.  The revenue model in a social gaming
13    context --
14            THE REPORTER:  I'm sorry.  Can you just slow down?
15            THE COURT:  Yes.  You are talking very fast.
16            MR. SHEIKH:  I'm sorry.  When I get excited, I
17    don't know how fast I'm speaking, so I appreciate that.
18            But that is what makes it difficult, your Honor.
19            Again, even in the declaration of Dan Marks, he
20    does say that they themselves can't split apart the actual
21    profits that they get from the Mega Symbols games versus the
22    other games once users comes into that social casino, so the
23    fact they are deploying these Mega Symbols games into their
24    social casino makes it very, very difficult because for the
25    same reason for High 5, is as users move to other social
```

1    casinos away from High 5, especially a social casino that is

2    deploying the same exact game using the same exact mechanics

3    that High 5 uses, it is not as though they shut off the user

4    account at High 5.  They just stop playing or they play

5    less, and so the metrics of revenue generation for High 5

6    then has to change because to keep those users, they may

7    have to deploy additional free coins.  They may have to

8    differentiate their advertising models based on, you know,

9    less users or less eyeballs or differentiation of how users

10    are actually moving through that social casino, so it is a

11    very, very different metric in a revenue model and very,

12    very difficult to quantify, you know, for the parties and

13    for the Court.

14           THE COURT:  Okay.

15           MR. SHEIKH:  Your Honor, to go back to just our

16    general -- the general objections that defendants raise in

17    their papers, they argue that Aristocrat games do not have

18    any statically positioned symbols, but if your Honor would

19    allow us, we have a video of their games that makes it clear

20    that the oversized symbol and regular symbol spin together

21    at the same rate, and the symbols that appear above the

22    oversized symbol and that appear below the oversized symbol

23    maintain their relative positions during and after the spin.

24           THE COURT:  Now, oversized symbol games existed in

25    the market from other entities as well, right?

1          MR. SHEIKH:  And nobody is disputing that, your

2     Honor, and for that reason, as defendants keep bringing up

3     oversized symbol games, I think one thing that we made clear

4     throughout this case is that we are not talking about just

5     oversized symbol games.  If we came into court today and

6     said --

7          THE COURT:  What is it that makes you unique?

8          MR. SHEIKH:  There are two aspects that make it

9     unique, and I will be going into that in a little bit more

10    detail, but in a nutshell, it is:  One, that Super Symbols

11    games have non expanding statically positioned oversized

12    symbols, and also that the reels that it is attached to spin

13    on and off, meaning they rotate on and off, the actual

14    display device at the same rate.

15         So those are the two unique elements, and one of

16    the things that defendants put in their own papers are

17    partial responses to Interrogatories 7 and 8 in this case,

18    and the interrogatory makes clear -- our response makes

19    clear with respect to Super Symbols, that these are the

20    unique attributes.

21         And as when we go through the presentation, even

22    when we look at the difference between the application that

23    was filed for Super Symbols and the actual patent that was

24    issued, there is very -- there is language that is distinct

25    from the application that makes clear the unique features

1          that were necessary to differentiate it from prior art, such

2          as the Jensen patent and the Jaffe patent.

3                   Defendants also argue that we need to undergo claim

4          construction, but none of -- in our view, your Honor, that

5          none of the terms require claim construction.  All of the

6          terms should be interpreted by their plain dictionary

7          meaning or by their intrinsic definition per the patent --

8                   THE COURT:  That is an argument that you always

9          hear at the time of the Markman hearing.

10                  I think what the defendants are saying is:  How can

11         you, without defining the terms, figure out whether the

12         plaintiff is going to have a likelihood of success on the

13         merits, because the definition of the terms may affect your

14         ability to win the case.

15                  MR. SHEIKH:  Well, it is interesting, your Honor,

16         the terms that they bring up, because, for example, and I

17         will just list it down, Dan Marks, who is a defendant in

18         this case, has used many of the terms that they say are

19         ambiguous now in prior patents relating to slot games or

20         video slot games of which he is a co-inventor.  So with

21         respect to the term "reel," he has used it in 54 prior

22         patents or patent applications.

23                  "Display device," he has used in 30 prior patents

24         or applications.

25                  "Spin" in 55 prior patents or patent applications.

1          "Winning symbol combination," 52 prior patents or

2     patent applications.

3          So the idea that the entire list of terms that

4     defendants say needs some kind of construction, I think,

5     your Honor, is a little bit disingenuous because at least

6     for defendant, Dan Marks here, and Dan Marks is the founder

7     of Gimmie Games and is working with Aristocrat, and he's

8     well aware of what these terms mean, specifically in the

9     video slot industry.

10          And to go with that, if we look at the file history

11     specifically of patent 7796796, and I know that number, and

12     I throw it out there because I want the reference there, it

13     includes the terms "reel, spin, winning symbol combination."

14          That application was originally filed by Stepto and

15     Johnson, but after the filing, Marks revoked the power of

16     attorney and responded to the office action pro se.

17          On Page 16 of that specification application, it

18     states:  The present invention will be embodied in an

19     electronic video slot machine.  However, mechanical slots

20     and other types of gaming devices are envisioned.

21          So, again, to defendant Dan Marks himself, there is

22     no distinction between now suddenly video slot machines are

23     so different than mechanical slot machines, or that the

24     terms " reel" or "spin" or "winning symbol combination"

25     should be construed in a manner that's different than was

```
 1              construed before, especially by the co-inventor himself.

 2                        Defendants also argue that prior art anticipates

 3              the '223 patent or makes it obvious.  None of the games, not

 4              one of the games or patents cited by defendants that predate

 5              the '223 patent have all of the limitations disclosed in our

 6              patent, so none of them anticipates our patent, and it is

 7              not obvious to combine the features shown in these games, so

 8              there is no obviousness issue.

 9                        Specifically -- and I know we are not going to have

10              time to do this -- but if your Honor would like to look at

11              any specific games, where we can show clear distinctions

12              between Super Symbols and the games that are cited by

13              defendants, I am happy to do that.

14                        If your Honor so wishes, we also have a video

15              comparing Super Symbols and Mega Symbols and playing them

16              side by side to show you exactly why their games mechanics

17              and their appearances and their play, why they look and feel

18              so much the same.

19                        THE COURT:  How does the differences between the

20              two games, if any, you say they look very similar, right?

21                        MR. SHEIKH:  They look very similar, your Honor.

22              The artwork is different.  I mean, certainly there is more

23              than one Super Symbol --

24                        THE COURT:  How does that diminish your reputation?

25                        That is one of the arguments that you make, that it
```

25

```
 1      affects your reputation and your trademark, right, or

 2      your --

 3              MR. SHEIKH:  Well, so the reputational element is

 4      that there is an infringing product out there that is

 5      exactly the same as our product, and you know, any user can

 6      now go to Jackpot Dreams or another social casino and

 7      attribute these games to defendants instead of High 5.

 8              The reason why it diminishes our reputation is

 9      because our reputation --

10              THE COURT:  That is an infringement argument, but

11      not --

12              MR. SHEIKH:  Well, our reputation has been built,

13      your Honor, on creating unique games in the marketplace.

14              If suddenly the games are not unique any more, the

15      reputation suffers because High 5's reputation in creating

16      this novel unique games will be no more.

17              Anybody can look at these other games out there and

18      say, Well, you know what, what is so unique about High 5?

19              THE COURT:  So these games were out on the market

20      before you got your patent, right?

21              MR. SHEIKH:  Yes.

22              THE COURT:  And I assume this was disclosed to the

23      patent office as prior art, or how did that work?

24              Was the patent office aware that these games

25      existed?
```

1                    MR. SHEIKH:  The Mega Symbols games?

2                    THE COURT:  Yes.

3                    MR. SHEIKH:  I don't know the answer to that

4         question, your Honor, but Mister --

5                    THE COURT:  It is a little confusing for the Court

6         how you were able to prosecute and obtain a patent on games,

7         and then say, however, the games that existed before me are

8         now infringing on my patent --

9                    MR. SHEIKH:  Well, your Honor --

10                   THE COURT:  -- I get the land based versus the

11        social, but that doesn't change the essence of the patent --

12                   MR. SHEIKH:  The Mega --

13                   THE COURT:  -- right?

14                   MR. SHEIKH:  -- the Mega Symbols Games did not

15        exist prior to the Super Symbols games.  In fact, the

16        existence of the Mega Symbols games was made apparent on --

17        on -- in September 2013 --

18                   THE COURT:  You said in 2013, which precedes your

19        patent, correct?

20                   MR. SHEIKH:  That is right, your Honor.

21                   THE COURT:  So these games that you now claim to be

22        the infringing games, right, existed in the market and in

23        the public domain prior to you obtaining your patent, right?

24                   MR. SHEIKH:  Well, just to -- just to -- just to

25        set a time line here, so the patent issued on May 27th,

```
1    2014.  The initial provisional patent application was filed
2    in 2011, and the actual patent application was filed in 2012
3    and then made public in July of 2013.
4              So the patent application had been filed with the
5    PTO prior to the existence of these Mega Symbol games, and
6    also made public as well.
7              But with respect to anything specifically that the
8    PTO may or may not have known, Mr. Fallon would have a
9    deeper understanding of that, and I am sure he would be
10   happy to answer any questions the Court may have with
11   respect to that subject.
12             THE COURT:  Well, I know this Court has handled
13   numerous, numerous patent cases, that when you go to the PTO
14   to obtain a patent, part of your duty of candor to the PTO
15   is to submit any prior art that exists in the marketplace,
16   and it is sort of, and I guess I will figure it out, but it
17   is sort of surprising to me that there would be an item out
18   there on the market that you are now claiming is infringing,
19   but existed before you even got your patent.
20             MR. SHEIKH:  I think, your Honor, it may go to the
21   specifics of --
22             MR. FALLON:  Your Honor, the definition of prior
23   art under patent laws relates to anything that was known in
24   the public or published prior to the filing date of a patent
25   application --
```

1                    THE COURT:  Right.

2                    MR. FALLON:  -- none of the Mega Symbol games

3       existed prior to 2013 --

4                    THE COURT:  That is my question.  Did they exist

5       prior to your filing date?

6                    MR. FALLON:  No, they did not, your Honor.

7                    MR. SHEIKH:  No.

8                    THE COURT:  Because the whole thing was, though, we

9       had been talking as though you became aware of their games

10      in 2013.  I didn't know that that is when they were first

11      invented or used.

12                    Is that what you are saying?

13                    MR. FALLON:  Correct, your Honor.

14                    I believe further on in -- it was either late 2012

15      or early 2013, they were first conceived, created by Gimmie

16      Games, and that was at least one year after our filing of

17      our patent application.

18                    THE COURT:  Okay.  Well, that clears something up.

19                    MR. SHEIKH:  So when we say, we first became aware

20      of the games, that is first when we became aware, but that

21      is also --

22                    THE COURT:  You just became aware, but they had

23      existed for years for all I know.

24                    MR. SHEIKH:  That is not the case.  That they first

25      became -- to our understanding, they were first marketed at

1      that September 2013 G2E Show.

2            THE COURT:  Go ahead.

3            MR. SHEIKH:  Then -- so finally, they also argue

4      High 5 Games is not being harmed by deployment of the Mega

5      Symbols games.

6            One of the things that they say is that High 5 has

7      been aware of the infringement since September 2013 and did

8      not seek an injunction.

9            As I laid out for your Honor already, what happened

10     in this case is not that we sat on our hands since September

11     2013.

12           In September 2013, we became aware of a possible

13     trade secret misappropriation by Gimmie Games and the

14     individual defendants.  We put Aristocrat on notice that

15     they should not be distributing these games, that Gimmie

16     Games is violating our intellectual property rights, and

17     they should not be engaged in the distribution of these

18     games.

19           In May 2014, again, we went to Aristocrat.  We said

20     to them, you know what?  Now, we have a validly issued

21     patent.  Do not distribute Gimmie Games.

22           It was only after we found out that these games

23     were being deployed in the social casino market in early

24     August 2014, that within two weeks we came to the Court

25     seeking preliminary injunctive relief.

1          They argue that any damages are compensable via

2     monetary relief.

3          As I said before to your Honor, the model for

4     social casino gaming is different, so High 5 makes money

5     again using virtual coins and advertising.  The games are

6     not licensed to distributors as they are in land based

7     casino games.  So the fact that High 5 Games has a license

8     with Bally, it doesn't affect exactly what they are losing

9     from the social casino side, because again, the revenue

10    metric is completely different.

11         They say that High 5 has failed to identify any

12    harm.  But as we say in our papers, approximately 50 percent

13    of High 5's revenue comes from its social casino.  And

14    revenue growth is driven by the number of daily and monthly

15    gamers or users playing games on a platform by placing and

16    selling High 5's technology into their social casino, they

17    are drawing in game players.

18         Once the players are in that social casino, they

19    may stay and play defendants' other games.  In effect,

20    defendants are using the Mega Symbols games that infringe on

21    Super Symbols to drive traffic into their own social casino.

22         If we look at the Facebook page, now, defendants

23    say, you know, why didn't we include the Facebook page, and

24    I'm happy to pull it up for your Honor, right in the front

25    there are these Mega Symbols games that are featured.

1          Now, one of the things that Dan Marks says in his

2     own declaration is that there have been games that have been

3     added to that social casino.  So even if anybody from High 5

4     was on that Facebook site, they did not notice Mega Symbols

5     games on that site.

6          But right now if you are go onto that website, they

7     were using the exact same Mega Symbols games as their

8     biggest advertisement to draw traffic into that Facebook

9     site.  And, again, so defendants can see that there is no

10    way to separate the revenue effect of Mega Symbols games and

11    that other games -- in effect, what they are saying is that

12    they will not be able to provide High 5 in the future with a

13    breakdown of what Mega Symbols is actually making in their

14    social casino.

15         So the question is:  Should defendants be allowed

16    to continue to infringe on the '223 patent and use these

17    games in their social casino, draw users in, make profits

18    from it, while given the speed of the technology and the

19    speed of the industry, High 5 has no revenue here except to

20    watch them continue to make profits from their games.

21         That is the real question before the Court today,

22    your Honor, is:  The harm here is they are using the

23    infringing games.  They are drawing users into their social

24    casino.  They are harming High 5's reputation and brand

25    position in the marketplace by having non unique games in

1        the marketplace that would affect High 5's standing in the

2        marketplace and reputation, a hard earned reputation for

3        providing unit slot games into the marketplace.

4              Your Honor, one thing that I would like to make

5        clear is when we are talking about defendants, we are not

6        talking about just an independent company that is routed out

7        and are making these slot games.  The individual defendants

8        are all former employees of High 5 Games.

9              One of the claims that we make in the trade secret

10       misappropriation case is they had knowledge of, you know,

11       specific secrets of High 5.  We talk about Super Stacks in

12       that case.  This was a different invention, and Super

13       Symbols, and when left -- Dan Marks specifically left and

14       informed Gimmie to compete in the slot game market.

15             Now, Joseph Masci and Brian Kavanagh, they are two

16       defendants.  They have submitted certifications in

17       opposition to this preliminary injunction.  The points that

18       they make is Joseph Masci says, Well, you know what?  I am

19       just a creative director.  I had no connection to the

20       technology or understanding of the games.

21             He was still at High 5 when Super Symbols was

22       conceived and invented at High 5 Games before he went to

23       Gimmie, but he is not just a creative director, and the idea

24       that he had no access to technology is a little bit I would

25       say misleading because Joseph Masci himself has eight

```
 1        patents for which he is a co-inventor of the slot games.  So
 2        he is not just doing creative work.  He's not just doing
 3        artwork.  He is a co-inventor of eight patents in the area.
 4        He is certainly aware of, you know, how these games work and
 5        how they are invented, and what they specifically do.
 6              Defendants, Gimmie Games and Marks Studios, were
 7        created by Dan Marks after he left High 5 Games.
 8              Now, if we look at the social media side, which is
 9        public, Linked-In, it shows that Dan marks started a company
10        called Marks Studios.
11              In defendants' answer to counterclaims, they say
12        that Marks Studios is the actual legal name for Gimmie
13        Games.
14              Well, if that is the case, then he actually started
15        Marks Studios during his non compete period.  What he
16        specifically did there, we have no idea.  We have not gotten
17        any discovery from defendants, not even one piece of it from
18        defendants at this point, but that is one of the issues that
19        is going to exist in discovery, but I want to frame this
20        issue for your Honor, because, again, this is not an
21        independent company that is just doing their own thing and
22        High 5 is taking offense to that.
23              These are former employees of High 5 Games that
24        went out and started a new company and are now competing
25        with High 5 and making games that look and play exactly like
```

```
1          the Super Symbols games, and it is our contention that they
2          would have never gotten to that place unless they had the
3          specific information that they took from High 5 Games.
4                    THE COURT:  All right.
5                    Are there any slides that you want me to see,
6          unless you have any new arguments?
7                    I mean, most of what you are saying is verbatim
8          from your brief, which I have read, but if there are some
9          slides that you think are going to clarify anything for
10         me --
11                   MR. SHEIKH:  Your Honor, what I can do is I can
12         flip through --
13                   THE COURT:  You don't have to, but if you think
14         that there is something there that would help your position
15         to have me see it, I would be happy to see it.
16                   MR. SHEIKH:  Well, your Honor, what I would like to
17         do is just flip through the slides.  I will stop at any
18         point that we have not already covered.  And if there are
19         specific videos or screen shots or specific games that your
20         Honor would like to take a look at, I am happy to focus on
21         those because again I don't want to waste the Court's time.
22                   So with respect to Super Symbols, we already talked
23         about this, but unlike other games that contain oversized
24         symbols, the games with the Super Symbols feature
25         incorporate at least one statically positioned non expanding
```

1           oversized symbol that occupies more than one symbol --

2                 THE COURT:  Counsel, Counsel, you already said

3     that, and you said it in your brief.  Let's not repeat

4     ourselves because that doesn't bring anything to the table

5     here.

6                 MR. SHEIKH:  So one thing, your Honor, I touched on

7     this briefly, this is the difference between in the patent

8     application and the actually issued patent, the red bold and

9     underlined and the green bold and underlined were added

10    during the PTO process, and the bolded sections are

11    amendments made to the patent application during the

12    prosecution of the actual patent to distinguish it from the

13    Jaffe and the Jensen patent, two patents that defendants

14    have cited as relevant prior art, so the Jaffe patent and

15    the Jensen patent were considered during the USPTO process.

16                Defendants distribute the Mega Symbols games, like

17    we said in our papers already, this is a screen shot of

18    their website, where they indicate on June 20th, 2014, that

19    now you can get the Mega Symbols games available on the

20    Jackpot Dreams social casino.

21                These are two videos of Super Symbols versus Mega

22    Symbols.  The Super Symbols Game I have is called Ocean's

23    Glory.  It was actually the first Super Symbols Game that

24    was rated.  Aristocrat's Flame Queen is one of the Storm

25    Queens.

 1                Would it be useful for your Honor for me to play

 2      these videos, so you can see exactly what we are talking

 3      about?

 4                THE COURT:  Yes, please.

 5                MR. SHEIKH:  For the relevant section here, your

 6      Honor, we will start at 15 seconds.

 7                But as your Honor will see, if you look at the

 8      large symbol right here, once it spins, it is spinning at

 9      the same rate as the non oversized symbols that are above

10      and below it, and it's not expanding and it's static,

11      meaning it is in one place with respect to the smaller

12      symbols that are right above.

13                (Video played)

14                MR. SHEIKH:  Your Honor, if you look at the Storm

15      Queens Game, and I will flip ahead to -- and I will play the

16      whole thing, but it is most relevant at the 35 second mark.

17                THE COURT:  Right.

18                (Video played)

19                MR. SHEIKH:  Again, if you look at the actual

20      oversized symbol, it is static with respect to the non

21      oversized symbols above and below it, and it is spinning on

22      and off the display device at the same rate as the non

23      oversized symbols.

24                So the two unique attributes that we have

25      identified and that are unique with the '223 patent

```
1          specifically are used in their Flame Queen game exactly the
2          same as our Super Symbols game.
3                    Now, again, we don't have the time today, but if
4          your Honor -- one of the things that may be useful to see is
5          to start going through some of the games.
6                    Your Honor, I won't go through everything with
7          respect to claim construction for each of these things.  As
8          I mentioned, Dan Marks uses some of these terms in prior
9          patent applications like "reel, display device, spin," and
10         for terms like "display device," we can use intrinsic
11         evidence that are right at the four corners of the patent.
12                   For example, if we look at Figures 3A and 3C and 5A
13         the other figures that are cited, it is clear what that
14         display device is meant to be with respect to this patent.
15                   You have predetermined winning symbol combination.
16         There's support that's found right in the patent itself.
17         All winning combinations are defined by pay tables.  The pay
18         tables are defined.  There is a figure in the patent itself
19         that talks about how the pay tables and winning combinations
20         are supposed to be calculated.
21                   When we come to statically positioned non expanding
22         oversized symbol, the meaning from our perspective, your
23         Honor, is plain on its face.  The oversized symbol has a
24         fixed size.  The symbol position is fixed on the reels.
25                   Mr. Ballone, who is the director of game design for
```

1    High 5 Games, in his declaration talked specifically about

2    what "static" means in this context.

3        Statically position because the oversized and

4    regular sized symbols fit together at the same rate, and the

5    symbols that appear above and below maintain their relative

6    positions.

7        We can also find intrinsic support for statically

8    positioned non expanding oversized symbol in the drawings of

9    the patent itself, specifically Figure 5A.

10       (Video played)

11   MR. SHEIKH:  Your Honor, these are the games cited

12   by defendants, games such as Fire Light, Fire Light II, Game

13   Tech, Planet 7, and Willy Wonka, Happy Days.

14       What we have done is we've looked at each of these

15   games and looked at whether they contain a statically

16   positioned non expanding oversized symbol occupying at least

17   a plurality of symbol positions or at least a plurality of

18   reels and at least one real of plurality of reels as other

19   sized symbols thereon.

20       As you can tell, not any of them, and this chart

21   actually goes on, not any of them consist of all three

22   elements of what makes the '223 patent unique.

23       There are some games that are cited such as, for

24   example, Mirror Ball, King Colossus, Hit and Riches, Riches

25   of the Arena, Dragon's Bounty, and all of the one up Mega

1     Blocks Games.  All of these games actually contain the
2     embodiments of the '223 patent, but all of them were copycat
3     games that were actually launched in 2014.
4          So from an obviousness perspective as well, as the
5     Court is aware, that is one element of the analysis for
6     obviousness is the number of copycat games or the copying
7     that existed after the patent was issued.  The patent here
8     was published in July of 2013.
9          After that, we see a series of copycat games being
10    launched into the market.
11         Now, defendants spent a fair amount of time talking
12    about Fire Light.  Fire Light does not use oversized symbols
13    in the game.  Instead, it treats three or more symbols of
14    the same kind across a horizontal pay line, and as shown in
15    the screen shot below, the combination of the three Ks and
16    the upper pay line and the three eagles in the center pay
17    line are both treated as oversized symbols, but as your
18    Honor can see, they are not oversized symbols as High 5 Game
19    is using that term.
20         Now, in Fire Light, the first two reels have the
21    same symbols and similarly the last two reels have the same
22    symbols in adjacent reels.
23         The Mega Symbols games do not mandate symbols -- or
24    the Super Symbols games do not mandate that symbols be
25    paired in adjacent reels.  So the Fire Light game is a very,

1      very different game than Super Symbols, and even their own

2      Mega Symbols.

3              Fire Light II is the same.  The first two and last

4      two reels have paired symbols only during the bonus round.

5              During the regular play, the symbols on reels one

6      and two, and four and five are not paired in the symbol

7      positions.  And when the same symbols appear adjacent to one

8      another in the horizontal pay line, no oversized symbol is

9      formed.

10              Now, there is one larger sized symbol all the way

11      to the right, but it does not span multiple reels as the

12      oversized symbols do in our Super Symbols games.

13              THE COURT:  It does not?

14              MR. SHEIKH:  It does not.

15              If you look all the way to the right, it stays on

16      the one reel.  It does not expand over to multiple reels.

17              Planet 7, oversized symbols appear in the bonus

18      round of Planet 7, but the reel containing oversized symbols

19      only shows oversized symbols in one size, and this is

20      different than the Super Symbols, where the reel containing

21      oversized symbols also contains regular sized symbols in

22      different reel positions, so there's one oversized symbol on

23      one reel, no other sized symbols throughout.

24              Now, the Willly Wonka game is based, I believe it's

25      the Jensen patent or it could be the Jaffe patent, but the

1      bonus round of the Willy Wonka game shows oversized symbols
2      spanning two to four.
3              The issue with the Willly Wonka game is if you
4      look, your Honor, at this screen shot here as it keeps
5      spinning, the super sized symbol actually moves across to a
6      different reel.  So right now it is reel positions three to
7      four, and it moves to reel positions two to three.
8              In our game, Super Symbols only appear in the
9      center reels and are not dynamically shifted to different
10     reels on different spins.  It also looks like, and you know,
11     if you look at a video of Willly Wonka, that the oversized
12     symbol is actually overlaid on top of the other sized
13     symbols and spins at a different speed.
14             The Happy Days game is the same.  It looks like the
15     oversized symbol for Happy Days is almost pasted onto the
16     reels, and so as it is spinning, the oversized symbol spins
17     at a different rate than the smaller sized symbols do.
18             Your Honor, I know I have been going on for a
19     little bit of time, and so what I would like to end with is
20     to talk about the patents that -- I apologize -- I am just
21     trying to get to the right slide.
22             THE COURT:  All right.  Counsel, you need to start
23     wrapping it up, though.
24             MR. SHEIKH:  So in just talking about the patents
25     that they cite in their papers, the Jaffe and Jensen patents

1      were specifically considered relevant prior art and

2      considered by the USPTO, and where the PTO has considered a

3      piece of prior art and issued a patent notwithstanding that

4      prior art, a code -- a court owes some deference to that

5      PTO's decision.

6              The Berman and Ainsworth patents do not contain the

7      term oversized across multiple reels anywhere.

8      Specifically, the Berman patent does not disclose the use of

9      multiple oversized symbols on different reels within the

10     play grid.

11             Berman discloses regular sized symbols in

12     subdividing the space occupied by a regular sized symbol

13     into four sub segments.

14             The Ainsworth patent does not disclose the use of

15     oversized symbols across multiple reels.  Ainsworth

16     describes an oversized symbol in a one by three setting, and

17     again, does not span across multiple reels.

18             Now, the Berman and Ainsworth patents are within

19     the field of slot machine gaming, and there is no doubt

20     about that, but the patents are not closely analogous art

21     because they do not provide any implementation of the

22     oversized symbols as discussed in High 5's '223 patent, and

23     we've talked about the games themselves.

24             So, your Honor, I will end it there.  If there are

25     any specific questions that your Honor has, I will be happy

```
 1        to answer them.  Otherwise I would request that I have at

 2        least ten or 15 minutes subsequent to defendants' argument

 3        to rebut any points that are needed to be made.

 4               THE COURT:  We will see.  Let me see how long we

 5        have with the defendant, and I may have questions for you

 6        anyway once I hear from them.

 7               MR. SHEIKH:  Thank you, your Honor.

 8               MR. MOSKIN:  Thank you, your Honor.

 9               As I noted at the beginning of the hearing, we had

10        some concern that plaintiff might seek to supplement the

11        record in inappropriate ways, and I submit that all of the

12        last ten or 15 minutes of Mr. Sheikh's argument has to be

13        excluded because none of this was in their moving papers.

14               In fact, we served discovery at the outset of this

15        case in May, asking them to explain how about a dozen games

16        with oversized symbols were distinct from their patent, from

17        their -- well, at the time it was simply described as their

18        trade secret in Super Symbols.  But for a more relevant or

19        directly relevant reason in the trade secret case, because

20        part of a claim of the secret case was they have to show not

21        only that there was something secret, but that it gave them

22        a competitive advantage.

23               So we asked them to say about their Super Symbols

24        trade secret, which is identical to their patent, in fact,

25        they admitted that in their Answer to Interrogatory 8, which
```

1       is Exhibit 20 to our papers, their Super Symbols trade

2       secret is identical to their Super Symbols patent.

3              We asked them to say in response to the

4       Interrogatory 8:  Tell us what is unique.  How does your

5       game distinguish over all of these prior art games that are

6       in the market, and they refused to answer.

7              Your Honor, if you look at the response to

8       Interrogatory 8, it is again Exhibit 20, there is no -- they

9       said -- they identified that the reels have to -- that there

10      is a static symbol, and it has to spin on and off the reels,

11      but they didn't say how that is unique from any of the other

12      games, and that goes to several issues.

13             One:  It goes to the validity of the patent because

14      some of those games that were out in the market are prior

15      art to precede the filing date of their application, and in

16      particular, the Fire Light Game that Aristocrat itself was

17      selling since 2009 and is the subject of two patents, and

18      the Jaffe patent, which is reflected as the WMS Gaming

19      Games, Willy Wonka was one of several that was shown, those

20      all claim priority to a date before the 2011 application.

21             The existence of multiple games in the market goes

22      not only to the issue of validity of the patent, and we do

23      believe that there were several prior art patents as well as

24      games, including the Berman patent, the Jaffe patent that I

25      mentioned, Ainsworth that would render this obvious to one

1        of ordinary skill in the art.  The only such witness that

2        has such an ability in this case so far would appear to be

3        Mr. Marks.  They concede in their own complaint at Paragraph

4        25 that Mr. Marks has expertise in this area.

5               By contrast, Mr. Sheikh is not a fact witness, and

6        he is not able to hold himself out as somebody having

7        ordinary skill in the art.  In fact, they have not presented

8        any witness competent to do that, so they have not even met

9        the first element to argue a patent case.

10              Contrary to what Mr. Sheikh said in the context of

11       a preliminary injunction motion, the fact that the patent

12       office issued the patent gets no deference.  As long as we

13       have raised questions, as we have, and they are unrebutted

14       that this patent would have been obvious to one of ordinary

15       skill in the art as detailed in Mr. Marks' declaration,

16       then --

17              THE COURT:  But in determining his likelihood of

18       success on the merits, don't I have to also understand that

19       they start on the merits part of the case, they are going to

20       start with the presumption of validity.  So that should play

21       a part in whether or not they have a likelihood of success,

22       right, because the burden is going to be on you to prove

23       invalidity.

24              MR. MOSKIN:  Well, ultimately at trial, yes.  But

25       in the context of a preliminary injunction motion --

1          THE COURT:   In the context of deciding whether they

2    have a likelihood of success on the merits, one of the

3    things I should look at is what is it that they are going to

4    have to prove at trial, right?

5          MR. MOSKIN:  Yes.

6          The Titan Tire case against New Holland, which they

7    themselves have cited, we cited additional authority that

8    this point says that as long as a question has been raised

9    as to validity for the purpose of a preliminary injunction

10   motion, the burden shifts back to the patentee.  So, again,

11   I --

12         THE COURT:   That is true.

13         MR. MOSKIN:  -- the -- we have raised substantial

14   questions of validity, and I would concede -- I don't want

15   to muddle the record -- Mr. Sheikh is correct that some of

16   these games were launched more recently, or we don't know

17   the exact dates, but those that we cited for an additional

18   reason, not just to contest validity, but to point out that

19   the plaintiff is unable to show irreparable injury.

20         There are dozens of games out there --

21         THE COURT:   Let's make you wear a different hat

22   now.  How would you be able to prove damages, if you were

23   the plaintiff in this case, that are quantifiable?

24         MR. MOSKIN:  Well, I am not a damages expert.  I

25   will say a few things.  I want to try to answer your

1          question.

2                    First, we have put a number on the social media

3          games.  Contrary to what Mr. Sheikh said, Mr. Marks'

4          declaration said that he can identify a million dollars

5          worth of profit from the social media website for these

6          oversized symbol games, which is -- and by contrast,

7          they have not given us any numbers as to their actual sales.

8                    In fact, they are in default in responding to

9          discovery in this case to tell us what their sales are, what

10         their profits are, to produce the license agreements with

11         Bally or IGT, that they did say in their objections, that's

12         the only way for them to value -- they know of to value what

13         the significance, the commercial significance of this patent

14         is.

15                   So the first answer to your question, I would say

16         to your Honor, take them at face value.  Look at -- they

17         said in their answer, I think it's to Document Request 11,

18         that the only way that they know of to value their patents

19         is to look at the license agreements with Bally and IGT.

20                   But even though we asked for those in discovery in

21         May, we still haven't seen them, and they have not been

22         offered to your Honor in support of this motion.

23                   Another factor, though, that has to be considered,

24         and the Federal Circuit has been making it vastly more

25         difficult for plaintiffs to prove damages and including to

1    prove irreparable injury, we cited to your Honor one of the

2    more notorious or famous cases in the past year, patent

3    cases -- past two years, Apple against Samsung.  The

4    District Court in California granted a preliminary

5    injunction on a search feature.

6          The Federal Circuit reversed because Apple failed

7    to show a nexus, and this is something they will ultimately

8    have to do for any damages award, but they also have not

9    even attempted to do for purposes of this motion.

10         There is a nexus between the feature they claim is

11   so important and the sale of the game.  So if you were to go

12   to the social media website, Jackpot Dreams, that like

13   Aristocrat and Gimmie Games has had since January, it is

14   nothing new, by the way, and I want to come back to address

15   that, but if you go to that site, you will see there are

16   several games.

17         Since January they have had games with these

18   oversized symbols, and it is going to be their burden to

19   have an expert to say that what drives the sales on the

20   website, on the Facebook site, are these oversized symbols

21   as distinct from, and they're going have to -- it's going to

22   be their burden to show that it is not the Aristocrat itself

23   and trademark, the recognition that that provides, the art

24   content in those games, the other substantive content in the

25   games.

```
 1                 The other game mechanics that they have not even
 2      addressed, there are -- again, I am not an expert nor is Mr.
 3      Sheikh, nor have they offered at this point any damages
 4      expert to show how they would meet their burden of proving
 5      damages at trial, much less to show than they are suffering
 6      any harm now, and, again, partly because there are dozens of
 7      other games, and even though there may be some modest
 8      distinction between a game with an oversized symbol in the
 9      middle reel as opposed to a side reel, it's going to be
10      their burden to show as a matter of damages that being
11      positioned in the middle reel is something that consumers
12      care about and would drive traffic to their games as opposed
13      to any of these dozens of other games, including the
14      Aristocrat's own prior Fire Light game that predated their
15      own game.
16                 I would refer your Honor to I think it's Paragraph
17      2 of Mr. Marks' declaration, where he explains how the game
18      mechanics of the Aristocrat Fire Light game, which preceded
19      as a matter of prior art dating back to 2009, it's the
20      identical game mechanics.  Even though the symbols appear in
21      four symbol positions, they have a patent on cloning of
22      reels, so, again, which predates the High 5 patent.  As a
23      matter of validity, if you look at Paragraph 2, I believe
24      it's of Mr. Marks' declaration, he explains the game
25      mechanics show that it's the same game mechanics that are at
```

1       work now in the accused games with oversized symbols.

2               I don't know if that sufficiently answers your

3       question, but frankly, I would rather I think to raise

4       questions and ultimately an expert will have to answer.  Mr.

5       Sheikh is not an expert.  I am not an economics or damages

6       expert.  They have not offered a damages or economic expert.

7               The only form of harm they pointed to would be two

8       things.  One is sort of a trademark type of harm.  There is

9       no trademark claim in this case.  They have not shown any

10      reason to think that -- particularly given the dozens of

11      other games out there that people are going to associate an

12      Aristocrat website with them, although they argue in their

13      papers that they may suffered a loss of market share, and I

14      think Mr. Sheikh hinted at that in saying, you know, that

15      the market may overtake them, and they will lose their

16      market share in the meantime.

17              The Millipore Corp. Case in this district, which we

18      cited, Millipore against W.L. Gore, says loss of market

19      share as a matter of law is not a sufficient basis for a

20      preliminary injunction.  That is something that can be

21      compensated with damages at the end of the trial.

22              I do really want to focus on what I think is one of

23      the really basic flaws in the argument here is that going

24      back to the point I made earlier that the trade secret for

25      oversized symbols is identical to the patent for oversized

```
 1        symbols.

 2               Your Honor asked the question, and I don't believe

 3        Mr. Sheikh answered it, well, why didn't they sue in

 4        September, a year ago, when they saw at this G2E conference

 5        that Aristocrat and Gimmie Games were selling the games that

 6        are now accused of patent infringement.

 7               We don't know why not.

 8               THE COURT:  Well, they couldn't have sued you for

 9        patent infringement at the time because they didn't have a

10        patent, but they could have sued, I suppose, for a

11        misappropriation of trade secrets --

12               MR. MOSKIN:  Exactly right, but they didn't.

13               In fact, most of Mr. Sheikh's arguments at the last

14        part of his arguments to your Honor was an allegation, which

15        he admitted was unfounded that simply because Dan Marks had

16        once worked at High 5 Games, that he should be suspected of

17        having stolen of trade secrets.

18               In fact, he left in 2010, a year before these games

19        were developed.  And what he did not say, the key elements

20        of Mr. Masci's and Mr. Kavanagh's declarations were that by

21        the time they got to Gimmie Games in 2012 or 2013, the game

22        mechanics of these accused games were already complete.

23        They had nothing to do with the development of these games,

24        even if as artists they had access, and you know, we don't

25        need to argue that point, I think one of them at least did
```

1      say, he did know they were developing these games, but he

2      was simply an artist.

3              But the more important point, which is unrebutted,

4      is that by the time they got to work at the defendant,

5      Gimmie Games, the game mechanics were already complete, so

6      they had no input into the accused games, but that would go

7      to the trade secret claim, for which they have not sought a

8      preliminary injunction.

9              So there is no reason we are aware of why they

10     could not have sought a preliminary junction back in

11     September.  It's the identical facts that they get.

12             If you look at the Answer to Interrogatory 8, and

13     in their complaint itself, I think it is Paragraphs 24 and

14     25, they concede that the trade secret for Super Symbols is

15     identical to the patent for Super Symbols, and to then shift

16     to the distribution on social media, now that began in

17     January of 2000.  The fact there was a notice --

18             THE COURT:  In "January of 2000"?

19             MR. MOSKIN:  -- excuse me.  2014, 2014, so it has

20     been -- I apologize --it's been, so ten months --

21             THE COURT:  Would you agree with their assertion

22     that once you begin to market your game and make it

23     available via the social media, that the ability to quantify

24     damages becomes more difficult?

25             MR. MOSKIN:  Well, we've put a number on the sales,

1    a million dollars from social media.  It is in Mr. Marks'

2    declaration.  By contrast, they have not told us how at all,

3    if they have been harmed.

4         So we have given your Honor specific numbers.

5    We've told your Honor, it's filed under seal, but we told

6    your Honor they sold roughly $15 million of the machines,

7    the physical machines, and have made about a million dollars

8    in sales on social media.  You can very easily --

9         THE COURT:  What about their argument that once the

10   people come in to play that game, and they are in your

11   social casino or virtual casino, they can go to other places

12   to play, and there is no way to quantify the profit you made

13   by luring what they claim is their people to your site?

14        MR. MOSKIN:  Well, they would need a damages expert

15   to say there is a theory under patent law, convoyed sales.

16   They have not even made that argument here, and again, they

17   have not offered any damages expert in support of this

18   motion.

19        But the fact that the contrary to what Mr. Sheikh

20   was suggesting, these games of oversized symbols, as

21   testified to in the declaration by Mr. Marks, they were on

22   the website in January.  Not only were they on the website,

23   but Mr. Fallon and a total of 11 people from the plaintiff's

24   company visited the website before -- long before they say

25   in the Nadooshan declaration in Paragraph 20, that the

1       company first learned about this website a week before they
2       filed the motion.
3               Exhibits 1 and 2 to our reply papers supported by
4       the declaration of Andrew Gracie, who is the web master
5       effectively of the Facebook site, it's unrebutted.  They had
6       almost a dozen people from January through July who --
7               THE COURT:  Visited the website?
8               MR. MOSKIN:  Excuse me?
9               THE COURT:  Visited the website?
10              MR. MOSKIN:  Visited the Jackpot Dreams website and
11      they have not explained why they have not moved sooner.
12              Even a more fundamental question, besides the
13      arguable issues of candor with the Court, they have not even
14      attempted to show how the social media website is
15      infringing.
16              As your Honor knows, there is a pending motion to
17      dismiss the amended complaint.  One of the grounds there is
18      they have not even properly alleged contributory
19      infringement on the social media website.  The analysis of
20      infringement is fundamentally different.
21              One of the things just to put it in very obvious,
22      just terms or clear terms, one of the elements or
23      limitations of the subject patent is that the symbols have
24      to rotate on and off of a display device.  On Facebook, that
25      display device is going to be the personal computer.

1      Presumably it is not a defined term, which we have

2      objections to as well, but it's either going to be a

3      personal computer, a cell phone, a smart phone or something

4      of the sort of the individual user.

5          There's not even an allegation or an attempt in

6      this motion how the fact that individuals may be going to

7      Facebook and on their own display devices playing these

8      games are -- that would be an argument for induced

9      infringement.  It's not even into that how they could show

10     that, and we have a pending motion to dismiss the complaint

11     that it, too, fails to lay out any grounds to allege that

12     Aristocrat or Gimmie Games had sufficient control over what

13     the individuals do or have actively induced them, all

14     elements -- required elements of making a claim, not even

15     supported -- not even mentioned anywhere in their own

16     motion.

17         So if the argument is that the land based games,

18     the physical slot machines infringe, that is a motion for

19     preliminary injunction that could have been made last

20     September.

21         If it's an argument that the social media website

22     is infringing, that is an argument that could have been

23     made, and they had actual knowledge in January of 2014, not

24     2000, and they have not addressed it.  They have not even

25     raised the argument.  So there is -- again, if that is the

 1    heart of their argument, your Honor has no basis even to

 2    consider an injunction.

 3         The delay factor, as your Honor noted, in one of

 4    your own decisions, Ultimate Trading against Daus, it is the

 5    immediacy, and there's no explanation of what the immediacy

 6    of the harm is, or if indeed they are suffering any harm.

 7         Again, they have not given this Court any

 8    information at all to support a claim that they have lost a

 9    penny as a result of the launch of these games, not that

10    economic harm would be itself a basis for an injunction.

11         Instead what Mr. Nadooshan says in his declaration

12    to support a showing of irreparable harm is, and I think

13    it's Paragraph 24 of his declaration, that he says that the

14    way you get customers on social media is when you launch a

15    new game and that creates some sort of excitement, and so

16    that the time when you get those new customers is at the

17    time of the launch of a new game.

18         Based on his own declaration, his own -- even

19    though he's not an economics expert and --

20         THE COURT:  You are saying the damages occurred

21    then?

22         MR. MOSKIN:  Any harm would have occurred back in

23    January when they launched the site.  So on their own, I

24    think -- I don't want to be too cute about it, but he said

25    there's some hoist on their own petard, his own arguments,

1      and they have not been supplemented by the arguments of a

2      qualified economics expert.

3              I do want to mention a couple of other things about

4      the likelihood of success on the merits.  We've identified

5      several claim terms that we think are ambiguous.  I won't go

6      through all of them, because I don't think it's -- it may

7      not be -- I will, if you wish, but just the two that we

8      focused on as going to the question of infringement, of

9      direct infringement as opposed to the induced infringement,

10     I mean, they apply to both, but the argument of direct

11     infringement that the slot machine games that have been on

12     sale for over a year now infringe.

13             Mr. Sheikh pointed to the fact that the patent

14     language requires that there be a static oversized symbol.

15     That term is not defined by Mr. Ballone, who by the way

16     himself --

17             THE COURT:  Which term, static oversized symbol?

18             MR. MOSKIN:  Static oversized symbol.

19             Mr. Ballone, the only thing he said in his

20     declaration, he said, your Honor, you should look to the

21     ordinary language meaning of these terms.

22             "Static," as I understand the term, is that it

23     doesn't move.  As you can see from those videos, which by

24     the way, those videos themselves are not part of the record

25     on this motion, so we have a concern about that.

1          Those symbols in all of those games were moving, so
2     the most obvious definition of static means not moving.
3     they all move.
4          Mr. Sheikh is free to argue that in the context of
5     the patent, something else was meant, but I would point out
6     that if you look at the specification of the patent, it
7     doesn't purport to define "static" in any way other than the
8     ordinary English language.
9          Also the plurality of symbols and a plurality
10    symbol positions, it is another key element of the patent
11    that we've focused on as a clear way in which we do not
12    infringe and can't be alleged to have infringed.
13       In the static symbols, the Exhibit C to Mr. Ballone's
14        declaration, he has reproduced screen shots of one
15    of the accused games.  You can see in every one of those
16    screen shots, there is only one symbol, at most one symbol
17    at each of the symbol positions.
18         The patent has to be read on its face in context,
19    not by reference to some other patents, which also were not
20    in the record that Mr. Marks may have obtained that also
21    used the term "reel."  You have to look at the patent itself
22    and construe it.  If they wanted to, they could have been
23    their own, as the law says, they could have been their own
24    lexicographers in putting a different definition, but they
25    didn't.  So a plurality of symbol position -- symbols at a

1        plurality of symbol positions means that there has to be

2        more than one symbol at each -- at at least one symbol

3        position, and there are none in this game.

4                These are arguments that may ultimately be

5        elucidated by --

6                THE COURT:  When you say there are none in this

7        game --

8                MR. MOSKIN:  In the accused game.

9                THE COURT:  In your games.

10               MR. MOSKIN:  Yes, in the defendants' games.

11               THE COURT:  Okay.  Anything else?

12               MR. MOSKIN:  Just to wrap up, to say, you know, the

13       balancing of the harm, we have actually told your Honor that

14       we have made about $16 million -- at least $16 million in

15       sales, and that would be a direct injury to us to have to

16       suspend sales.

17               We have pending orders and things that would have

18       to be stopped.  By contrast, the plaintiff has told you how

19       much they have sold, if there has been any diminution in

20       sales since these games launched a year ago or 10 months ago

21       on Facebook.  If you are weighing, you know, the scales of

22       justice as it were, we have given you at least a number.

23       We could give you more.  They've given --

24               THE COURT:  How about their argument it is hard to

25       quantify it?

1          MR. MOSKIN:  But it's their burden, and I think if

2     you look at the Apple Samsung case --

3          THE COURT:  But that is their burden, and

4     ultimately it is going to be their burden at the trial.

5          But the question is now for the preliminary

6     injunction, Judge, if you let them continue to make these

7     sales, we're not going to be able to quantify a lot of those

8     sales.  We will be able to quantify some, but the rest of it

9     is not going to be compensable in monetary damages?

10          MR. MOSKIN:  Well, again, there's no claim in this

11     case for injury to reputation, which is what they've said.

12          The other thing they argued in their brief is that

13     there is a loss of market share.

14          The Millipore case says that is not a ground for

15     preliminary injunction --

16          THE COURT:  I am aware of the Millipore case.

17          MR. MOSKIN:  -- and ultimately -- look, this is

18     just a preliminary injunction motion.  The case will

19     continue no doubt, and if they want to get a damages expert

20     to explain either that he can't quantify, they should have

21     put that in as well.  If they thought it was so difficult,

22     put it in an expert declaration.  Mr. Nadooshan is not

23     qualified to opine on the difficulty or not.

24          We have given you an actual number of a million

25     dollars in sales on Facebook and $15 million on sales --

```
 1          they haven't met their burden --
 2                 THE COURT:  Well, that question is for him, not for
 3          you, because the question is whether legally in a
 4          preliminary injunction is the standard difficulty in
 5          quantifying or inability to quantify.  It is two different
 6          things.
 7                 MR. MOSKIN:  Yes.  They are different, and I don't
 8          honestly know the answer to that, but I don't think they
 9          have met either.
10                 Thank you.
11                 THE COURT:  Thank you.
12                 Counsel?
13                 MR. SHEIKH:  Your Honor, just a few, and I
14          apologize for my throat.
15                 THE COURT:  No problem.  Please, we have water,
16          feel free.
17                 Counsel, should I look at the fact that your
18          ability to quantify these damages may be difficult versus
19          but that you are still able to do it?
20                 What do you think is the appropriate standard?
21                 Is it difficulty in quantifying damages or
22          inability to quantify damages in a way that would be
23          compensable monetarily?
24                 MR. SHEIKH:  Well, I don't know the answer to that,
25          your Honor, but what I would say --
```

1          THE COURT:  Becasue I thought the standard was

2    incapable of being -- do you want some water?  We can give

3    you water.

4          MR. SHEIKH:  I think I should be okay in about five

5    seconds.

6          THE COURT:  Okay.

7          MR. SHEIKH:  I think the standard that your Honor

8    should look at is a difficulty in quantifying damages at

9    this point.

10          You know, right now, it is very difficult to

11    quantify the damages as defendants themselves say that, you

12    know, indicating the nexus between the number of users that

13    come in and the actual damages that may occur because of

14    these users playing games is very difficult, so injunctive

15    is the key remedy for exactly the point that your Honor

16    raised is to the extent that they are deploying these

17    infringing games on to the Jackpot Dreams casino site, if

18    there is no relief granted at this point, they will continue

19    to do so whether it's difficulty --

20          THE COURT:  It is going to be your burden to

21    establish a nexus between what you allege is the patented

22    feature of your game and your loss in sales, right?

23          MR. SHEIKH:  That's right, your Honor.

24          But at this point, at this point right now,

25    because -- because we are on a preliminary injunction

1        application, and that may come out during expert testimony

2        at some later date, where we can see whether it's an

3        inability or a difficulty to connect those dots, you know.

4        When defendants are talking about discovery, you know, one

5        thing to keep in mind is there has been no discovery

6        exchanged on either side here, and I can get into the

7        reasons why, but it's certainly not because we refused to

8        answer questions.

9             With respect to the actual interrogatory response

10       that they are citing about, they asked for responses to what

11       competitive advantage, you know, these other games -- that

12       our games had with these other games that are in the

13       marketplace.  You know, one of the things that I wanted to

14       make clear for your Honor, as Mr. Moskin said, that was a

15       trade secret misappropriation question.  But even further

16       and separate and apart from that, the idea of competitive

17       advantage is not relevant under the New Jersey's Trade

18       Secrets Act.

19            It is a completely different standard and it goes

20       to economic impact instead of competitive advantage, and so

21       when they asked the question in a certain way, it has no

22       relevancy to the outcome of this case, you know, we are

23       going to provide an answer that is appropriate for that.

24            What we did is we actually did provide an answer,

25       that the games that have been cited by defendants do not

1        include the unique fact features that were indicated in our

2        '223 patent application or -- or that we indicated as unique

3        in our trade secret description.  That's what we did.  That

4        is the information that we have, and that is the information

5        we provided for that time.

6               One of the questions -- one of the issues that Mr.

7        Moskin raised is all they have to do is raise a question,

8        and as the Court knows, they have to raise a substantial

9        question with respect to the likelihood of, you know, the

10       validity of the patent, and I don't think they have done

11       that here.

12              If you look at the games and the prior patents that

13       they've cited, again, none of them embody the actual

14       embodiments of the '223 patent, and none of them were

15       analogous to the actual ways that Super Symbols and/or Mega

16       Symbols are actually played in this case.

17              Going to the issue of Jackpot Dreams and when the

18       games were launched, conspicuously absent from defendants'

19       own papers were when were these Mega Symbols games then

20       launched.

21              The only thing that we have, your Honor, is the

22       website -- Gimmie's own website indicates that those games

23       were launched on June 20 of 2014.  We have no evidence at

24       all indicating, okay, well, if it wasn't June 20, 2014, when

25       was it?

1              And what specifically can they point to with

2    respect to High 5 being actually aware of those games on the

3    website prior to early August of 2014?

4              They made a great little chart as to when potential

5    users logged in to Jackpot Dreams, but just because the

6    users log into Jackpot Dreams through their Facebook account

7    doesn't mean that they're aware or even saw Mega Symbols

8    games are actually deployed on the Jackpot Dreams casino.

9              So their whole argument about, you know, this --

10   this -- this application could have been brought in January

11   of 2014, we were not aware of that deployment of those games

12   in January of 2014, and we became aware of them in early

13   August 2014.

14             THE COURT:  You mean deployment in the social

15   media?

16             MR. SHEIKH:  Deployment in the social media.

17             With respect to September 2013, we did sue Gimmie

18   Games and the individual defendants for trade secret

19   misappropriation.

20             At the time of September, what was going to be our

21   theory against Aristocrat?

22             We had no evidence that they were actually

23   misappropriating our trade secrets.  They had purchased

24   games from Gimmie Games.  They had marketed these games to

25   users of the G2E Show, but to our knowledge, the only

1    misappropriation theory was against the individual

2    defendants, the Gimmie Games, and that is why the focus of

3    the lawsuit that was filed in October was against Gimmie

4    Games and the individual defendants.

5             Just a couple of other points, your Honor.

6             Mr. Ballone does talk about the definition of

7    static in his declaration.  It specifically is listed in

8    Paragraph 12 of his declaration, where he talks about --

9             THE COURT:  Well, let me go back to something else.

10            MR. SHEIKH:  Sure.

11            THE COURT:  If the launching of the site is what

12   creates the damages, as is indicated in one of the

13   certifications, and the launching occurred a while ago, what

14   is the immediate irreparable harm then?

15            MR. SHEIKH:  It is not the launching of the site,

16   your Honor.  Jackpot -- I mean, through this application, we

17   are not seeking to enjoin Jackpot Dreams.

18            As Mr. Marks said in the application, there are

19   other games that are being played on Jackpot Dreams, the

20   social casino site.  There have been games that have been

21   added to Jackpot Dreams since January of 2014.

22            What we are here to seek is an application to

23   enjoin the Mega Symbols games being played at Jackpot

24   Dreams.

25            Now, again, the first that we became aware of that

1    was August 2014.   There has been no evidence put before the

2    Court that these actual games were deployed prior to June

3    20, 2014 when Gimmie Games put out a press release

4    indicating the fact they were on this Facebook website.

5              A couple of other points, your Honor, that I would

6    like to make.

7              Ocean's Glory, which was the first Super Symbols

8    game that was created by High 5 was actually created by Joe

9    Masci.  So, again, the fact that he is just a developer,

10   he's just an artist, he's just a creative person, that

11   doesn't hold true given the fact that he's a co-inventor to

12   previous applications --

13             THE COURT:  But according to the defendants, the

14   games you are claiming about already existed by the time you

15   got there, right?

16             MR. SHEIKH:  Well, they don't say -- see, they are

17   very careful.  They don't talk about the games actually

18   existing.  They actually don't even say the same thing.

19             If you look at Joe Masci's and Brian Kavanagh's

20   certifications, and I forget which one, your Honor, but one

21   of them talks about the math model existing prior to them

22   being there, and the other one does not.

23             One of them talks about the game play mechanic for

24   Storm Queen's games, but it is unclear whether that game

25   play mechanic is actually the same exact one we're talking

1     about today.  There may have been a game play mechanic that

2     existed at that time.  We have no way of knowing.  Given

3     their short certifications, and given the fact that they are

4     not saying exactly the same thing, and they are not even

5     talking specifically the same way about the mathematical

6     model existing, you know, I respectfully submit that the

7     Court should give little weight to their certifications.

8               THE COURT:  Isn't it your burden to come forward

9     with the Court and say, at the time they got there, none of

10    this existed, and they're the ones that created it, and it

11    is your burden, not theirs to prove the negative, right?

12              MR. SHEIKH:  Well, that's absolutely correct, your

13    Honor, and through discovery in this case what we hope to

14    show is exactly that, that they were -- we know that they

15    had access to this information at High 5 games.

16              We know that they took this information -- we know

17    they had access to this information at High 5 Games.  We

18    know Joe Masci was more technically savvy in understanding

19    about these games from mechanics than he is letting on in

20    his certification, and one of the things that we will be

21    trying to see in discovery is when did these game play

22    mechanics actually get created and by whom, and in what way,

23    and how were they changed over time.

24              Now, one thing, your Honor, is the G2E Conference

25    was held in Las Vegas this week --

```
1              THE COURT:  This week?

2              MR. SHEIKH:  -- this week, and it ended yesterday.

3               There were some indications that High 5's

4    reputation is suffering in the marketplace.

5              Mr. Fallon was there, and he is happy to talk about

6    what specifically he learned there from distributors

7    actually saying things to High 5 Games with respect to their

8    reputation, but that is one element in this case.  It's not

9    just market share.  We are talking about the reputation of

10   High 5.

11             Again, High 5 has a reputation creating unique

12   inventive games.  To the extent that there are games that

13   are knocking off the features of High 5 Games and are

14   directly infringing on a patent that High 5 has received

15   from one of its games, its reputation is suffering.

16             Would you like to hear from Mr. Fallon, your Honor?

17             THE COURT:  Counsel, the problem is this is new.

18             MR. SHEIKH:  This is new, your Honor.

19             THE COURT:  This is not in your papers.  I am not

20   going to hear about that today.  It is not fair to the

21   defendants --

22             MR. SHEIKH:  Very good.

23             THE COURT:  -- when you start bringing it in.  They

24   could have done their own investigation and bring in their

25   own witnesses, so that is not fair.
```

1         Anything else that you wanted to respond to?

2         MR. SHEIKH:  No, your Honor.

3         To the extent -- to the extent the Court has any

4    other further questions, I am happy to answer them.

5         Also to the extent that the Court believes that

6    further briefing is necessary, we are open to that idea as

7    well.

8         If there are specific issues that have been raised,

9    again, because we didn't have the opportunity to reply, and

10   I am not saying that it was anything but, you know, some of

11   these arguments were raised as a direct result of seeing

12   defendants' opposition papers, but I throw that out to your

13   Honor in case there is further briefing that is necessary or

14   desired in this matter.

15        THE COURT:  If after considering the arguments

16   today, I decide that there is any specific issue that needs

17   to be fleshed out more, I will give you both an opportunity

18   to respond, so let me address it that way.

19        What do you say about their argument that there is

20   no real expert report before this Court on the issue of the

21   damages not being quantifiable, that what we have is the

22   certification of your guy, which is not sufficient as to the

23   damages issue?

24        MR. SHEIKH:  Well, Mr. Nadooshan is certainly not

25   being offered as an independent expert.  But I mean, he has

1    been involved in the industry for, you know, I don't know

2    how many years, but, you know, close to two decades.  He's

3    aware of the types of damages that can and will occur as

4    these users are being driven into Jackpot Dreams to play

5    these Mega Symbols games.

6          So I would offer, your Honor, that, you know, Mr.

7    Nadooshan's declaration offers exactly the kind of

8    testimony, factual testimony, that is required with respect

9    to what is happening in the marketplace right now, what is

10    happening once a game gets deployed and how users behave to

11    that market.  In fact, that is exactly the kind of analysis

12    that High 5 Games -- Mr. Nadooshan uses the High 5 Games

13    when they are making business decisions exactly because they

14    understand user behavior and exactly because they understand

15    how the revenue metrics work once these users get into the

16    social casinos.

17          THE COURT:  Okay.  All right.

18          Anything else?

19          MR. SHEIKH:  No, your Honor.

20          THE COURT:  Anything else from the defense?

21          MR. MOSKIN:  Just very briefly.

22          If there is any ambiguity in Mr. Marks' declaration

23    that these oversized symbol games were on the website in

24    January, we will be happy to clarify.  I am quite certain

25    that they were, and I think his declaration says that.

1           I think also if you look at Mr. Kavanagh's and Mr.

2    Masci's declarations, they also said they used different

3    words, but the meaning I think was fairly clear.

4           Also, as to the last issue your Honor raised, the

5    Third Circuit very recently in the Ferring Pharmaceutical

6    case said that it is sort of reputational injury itself, if

7    not quantified, is not a basis for a preliminary injunction

8    motion, so it said in a Lanham Act case, which this is not

9    even a Lanham Act case, where there is an argument that

10   there is a damage to reputation, you have to quantify it.

11   You can't just have somebody, an interested witness say, you

12   know, we are suffering some harm.

13          Thank you.

14          THE COURT:  All right.

15          Counsel, I am going to take a look at the arguments

16   from today, digest it a little bit, and take another look at

17   your briefs before I render a decision on this.

18          Certainly it is too important to both of you for me

19   to rule from the bench right now, which originally I

20   intended to do, but I have to give it some thought now.

21          MR. SHEIKH:  Your Honor, if I may, one point with

22   respect to the quantum of damages.

23          THE COURT:  Go ahead.

24          MR. SHEIKH:  In Mr. Marks' declaration, they do

25   throw out the one-million-dollar number.  It is unclear from

1      the declaration itself whether that specifically tied to

2      Mega Symbols games and Jackpot Dreams' revenue.

3            It is also unclear from Mr. Marks' declaration

4      whether that's Gimmie Games' revenue, whether that's Jackpot

5      Dreams' revenue, whether that's Aristocrat's revenue, so

6      that $1 million by itself, I would say to your Honor is not

7      a quantification of damages because as your Honor pointed

8      out to Mr. Moskin, you know, the fact that these users are

9      being then sent to play other games and can play other

10     games, it is unclear what that $1 million is specifically

11     talking about when they say sales.  It may not be Gimmie's.

12     It may not be Aristocrat's.  It may not be anything.  It is

13     really unclear as to what quantification of damages that $1

14     million is supposed to represent, and I apologize.  That's

15     the only point I wanted to make for your Honor before I --

16          THE COURT:  There's no need to apologize.

17          So let me take a look at this.  Let me think about

18     it.  I may want some clarification on an issue or two, but

19     let me go over it in more detail, and then I will get back

20     to you, okay?

21          MR. SHEIKH:  Okay, your Honor.

22          THE COURT:  It is possible that I don't need

23     further argument now.

24          The opposition to the motion to dismiss has not yet

25     been filed?

1                    MR. SHEIKH:  That's correct, your Honor.  It is due

2          on Monday.

3                    THE COURT:  Okay.  I will take a look at that as

4          well.  Maybe I can decide both motions at the same time.

5                    Thank you.

6                    MR. SHEIKH:  Thank you, your Honor.

7                    MR. MOSKIN:  Thank you, your Honor.

8                    (Court adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25