1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF NEW JERSEY
2

3  PTT, LLC, a Delaware Limited  :   Civil Action No.
   Liability Company d/b/a       :   2:13-cv-07161-JLL-JAD
4  High 5 Games,                 :
                                 :
5              Plaintiff,        :
                                 :
6    vs.                         :   Newark, New Jersey
                                 :   Wednesday, October 7, 2015
7  GIMMIE GAMES, et al.,         :   9:39 a.m.
                                 :
8  _____Defendants.__:

9                 TRANSCRIPT OF STATUS CONFERENCE
              BEFORE THE HONORABLE JOSEPH A. DICKSON
10                 UNITED STATES MAGISTRATE JUDGE

11 APPEARANCES:

12 For the Plaintiff:          Mandelbaum Salsburg, P.C.
                               By:  MICHAEL A. SAFFER, ESQ.
13                                  ARLA D. CAHILL, ESQ.
                                    ELIZABETH LAI FEATHERMAN, ESQ.
14                                  KHIZAR A. SHEIKH, ESQ.
                               3 Becker Farm Road, Suite 105
15                             Roseland, NJ  07068

16                             High 5 Games, LLC
                               By:  JONATHAN A. FALLON, ESQ.
17                             One World Trade Center, Floor 58
                               New York NY 10007
18

19 For the Defendants:         Foley & Lardner, LLP
                               By:  JONATHAN E. MOSKIN, ESQ.
20                                  RAMY E. HANNA, ESQ.
                               90 Park Avenue
21                             New York, NY  10016-1314

22 Transcription Company:      KLJ Transcription Service, LLC
                               P.O. Box 8627
23                             Saddle Brook, NJ  07663
                               (201)703-1670 - Fax (201)703-5623
24

25 Proceedings recorded by electronic sound recording, transcript
   produced by transcription service.

1                          I N D E X

2

3                                                    PAGE

4    Colloquy re Request for Patent Prosecution Bar. . . . . . . 3

5    Order.. . . . . . . . . . . . . . . . . . . . . . 28

6    Colloquy re Scheduling Order. . . . . . . . . . . . 29, 38

7    Order.. . . . . . . . . . . . . . . . . . . . . . 37

8    Colloquy re Amending Caption. . . . . . . . . . . . . . 46

9    Colloquy re Rule 502(d) Order.. . . . . . . . . . . . 48

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Colloquy                                    3

1           (Conference commenced at 9:39 a.m.)

2           THE COURT:  All right.  This is PTT versus Gimmie

3    Games, Docket Number 13-7161.  May I have appearances of

4    counsel, please?

5           MR. SAFFER:  May it please the Court, Your Honor,

6    Michael A. Saffer from the firm of Mandelbaum Salsburg,

7    representing the plaintiff.  With me at counsel table are Jon

8    Fallon, Khizar Sheikh, Elizabeth Featherman and Arla Cahill.

9           THE COURT:  Okay.  Thank you.

10          MR. MOSKIN:  Good morning, Your Honor.  Jonathan

11   Moskin of Foley and Lardner for the defendants.  And with me

12   at counsel table is Ramy Hanna, also of Foley and Lardner.

13          MR. HANNA:  Good morning, Your Honor.

14          THE COURT:  Okay.  Good morning, everybody.

15          I wanted to discuss this morning, there's two pending

16   disputes.  One has to do with the discovery schedule.  And I

17   will address that one at the end.  I have basically marked it

18   up and I know what I want to do with that one.

19          But the other one is a prosecution bar.  Or the

20   application for a prosecution bar by the -- a patent

21   prosecution bar by the defendants and the opposition to that

22   bar by the plaintiffs.  And I've read the papers.  And I'm

23   somewhat familiar with it all, but I have re-read some of the

24   cases, including Deutsche -- Deutsche whatever -- Deutsche

25   Bank, and I have some questions.

1          Well, first of all, let me say this.  I think it's --

2   I also read Judge Donio's case and I read Judge Bumb's case,

3   which wasn't really that helpful.

4          My first observation is that the prosecution bar

5   proposed by defendants is too broad.  I am willing to consider

6   a prosecution bar, and but I think we need a lot more facts

7   developed under the case law.  And some of the facts we may be

8   able to stipulate to, maybe.  And I'll find that out.  And

9   some, I don't know if they could be stipulated to.  I don't

10  know whether or not we should have another hearing.  I don't

11  know whether or not we should have specific discovery.

12         I have what I think is a proposed solution which was,

13  quite frankly, right at the end of Judge Donio's case, where

14  she proposed dealing with it on a case-by-case basis.

15         But let me talk about Mr. Fallon.  He is a member of

16  your firm?  Or is he gone?  Or is out -- or is he now in-house

17  counsel for your client?

18         MR. SAFFER:  Your Honor, he is not a member of the

19  firm.  He is not of counsel to Mandelbaum and Salsburg.  He is

20  solely general counsel, not by (indiscernible) in house.

21         THE COURT:  Okay.  And he's the only one identified

22  by defendants who they think will have decision-making ability

23  in a competitive nature with their firm; correct?

24         MR. MOSKIN:  Well, two things, Your Honor.  One, Mr.

25  Fallon still has an active e-mail account at the Mandelbaum

1   Salsburg firm, as -- and until very -- at the time we

2   submitted our letters back in June, he was still on the

3   Website.  So, there is -- it's a closer link -- we don't -- I

4   don't -- really, I'd rather not go into the detail about it,

5   but --

6            THE COURT:  Well, first, I don't even know if it's

7   relevant.

8            MR. MOSKIN:  It -- well, --

9            THE COURT:  If it's general in-house counsel or in --

10  is that what you called him, general counsel in house?

11           MR. SAFFER:  General counsel.  General counsel, yes.

12           THE COURT:  To the plaintiff, I think that's all I

13  need to know.  I don't think it matters whether he has got any

14  kind of relationship with the Mandelbaum firm.  I didn't mean

15  -- I posed the question that way, but what I meant was, what

16  is his real role?

17           Well, maybe you could just tell me what exactly he

18  does.

19           MR. SAFFER:  Well, --

20           MR. MOSKIN:  If I can -- I was going to add two other

21  things.  We -- to answer your specific question, you're quite

22  right the courts look at, you know, individual-by-individual

23  basis and we think it would therefore be very helpful to us to

24  ex -- for them to explain to whom else they might want to

25  share -- with whom else they might want to share this

Colloquy                                                6

1    information.

2              And I do want to add, because this may also help cut

3    through a lot of this.  There's another case in Arizona -- in,

4    excuse me, in Nevada, in Las Vegas, Nevada, where High 5 is a

5    defendant and it has voluntary agreed to a prosecution bar.

6    And I have the order here.  Which is essentially the identical

7    language in the language that we proposed.  So, we're a little

8    unsure why there's -- we're having such difficulty here, when

9    they evidently voluntarily agreed to the same language in

10   Nevada.

11             And if you'd like, Your Honor, I'm hap -- the case is

12   Konami Gaming against PTT, Limited or LLC.

13             THE COURT:  Konami?  Did you say --

14             MR. MOSKIN:  Konami, K-O-N-A-M-I, Gaming.  And --

15             THE COURT:  K-O-N-A-M-I Gaming.  Okay.

16             MR. MOSKIN:  Correct.  And against PTT, LLC, doing

17   business as High 5 Games.  It's Case Number 2:14-cv-01483.

18   And, again, I have a copy of the protective order entered in

19   that case on April 30, which we just -- talking in all candor,

20   Marks Studios is also a defendant in a lawsuit by this Konami

21   Gaming out there, which is why it occurred to us now to check

22   to see if anything has been entered in that case.  But I'm --

23   again, I'm happy to share with counsel.

24             Mandelbaum Salsburg is not counsel in that case.

25             THE COURT:  Are you even aware of this?

1          MR. SAFFER:  Well, Your Honor, I have not seen a copy

2     of that prosecution bar, but if it pleases the Court, Mr.

3     Fallon can certainly explain the differences between this case

4     and that case and whether a prosecution bar has been entered

5     in that case or not.

6          THE COURT:  Well, give a copy to your -- did you give

7     a copy --

8          MR. SAFFER:  He just did, Judge.

9          MR. FALLON:  Your Honor, in that case, High 5 Games

10    was sued by Konami Gaming for patent infringements.  Konami

11    Gaming does not have any internal counsel.  The firm that

12    represents Konami in all aspects of this litigation is a firm

13    who represents it there, Howard and Howard.  They do both

14    prosecution, general representation and litigation.  Soup to

15    nuts, all legal representation.

16          In that case, we sought the prosecution bar to merely

17    exclude the patent preparation and prosecution people from

18    being involved in the litigation.  Which is exactly what the

19    prosecution bar was intended to do.  To ensure that there was

20    disparity of counsel in that case.

21          As we've represented in this case, and the exact

22    reason why in --

23          THE COURT:  Well, you're on the flip side in this

24    case.

25          MR. FALLON:  Exactly, Your Honor.  We haven't said --

1    and we've told Mr. Moskin from day one, you know, I'm not

2    completely against the prosecution bar.  I've said I'm not

3    completely against it.  That's fine.  Because I don't do any

4    preparation in prosecution work anymore.  At High 5 Games, I

5    oversee all legal aspects of it, but I have an IP associate

6    who handles all that work by herself.  They come into my

7    office for, basically, general review and updates and our

8    weekly meetings, but that's the extent of my involvement.

9           THE COURT:  But I don't know if that actually fully

10   will answer the question under my reading of the case law.

11   Because Judge Donio points out there's, like, three middle

12   grounds of people with low risk, medium risk and high risk.

13   And if you're the supervisor and if your people are

14   prosecuting patents, I would suggest that we at least have a

15   minimum risk here -- level here.

16          By the way, I want to make this clear that I am doing

17   this as inadvertent disclosure.  Defendants' papers don't

18   quite say that, but I'm not -- unless you have actual facts of

19   intentional disclosure of confidential proprietary

20   information, I'm not going to make a decision based on the

21   presumption that I might be reading that in your papers.  I am

22   not sure.

23          I will -- because -- and I'll tell you why there will

24   -- is at least one time when I was reading your letter this

25   morning where you said disclosure, inadvertent or otherwise.

1    Something to effect.  You used that kind of language.  You

2    don't have to defend your papers, but I want to make it clear

3    for the record I'm talking about inadvertent disclosure here.

4         I made a comment once on the record in another patent

5    case when this first came out, at least in the first time it

6    came to me, that I think it's a really interesting, yet

7    difficult area of the law to deal with for no other reason

8    that we have lay people sitting as juries who hear things and

9    then we say, hey, just disregard that and make a decision.

10        With the Federal Circuit -- and I see why they have

11   done this.  Want to be even more careful with attorneys in

12   terms of disregarding stuff they shouldn't have heard or --

13   and it's kind of different here -- that they shouldn't be

14   using that they have heard lawfully.

15        But having said all that, I agree that Mr. Fallon

16   probably -- you are in a decision-making role.

17        MR. FALLON:  Yes.  Yes, I am, Your Honor.

18        THE COURT:  If we admit we have that and we could

19   stipulate to.

20        MR. SAFFER:  Your Honor, if I may?

21        Just going back  to Deutsche Bank for a second and

22   their articulation of competitive decision making, I don't

23   believe there are any facts in the record, nor have defendants

24   pointed to any, where Mr. Fallon be involved in the decision

25   making role, but not a competitive decision-making role.  And

1  I want to make that distinction clear, because the case law

2  does talk about what role Mr. Fallon may have in actual

3  competitive decision making, whether it's (indiscernible)

4  claim mechanics, or marketing, or otherwise, and that's --

5  those are not facts that we have had a chance to drill down

6  to, nor have defendants pointed out to anything that may fit

7  under Deutsche Bank.

8          THE COURT:  I don't know how far we have to go to

9  that and I don't know how far you actually want to let that be

10  explored, for obvious reasons.  I think the case law, as I

11  understand it, and especially in Deutsche Bank and in Chiesi

12  USA, Inc. versus Sandoz, where you have someone who is -- and

13  correct me if I'm wrong -- who is as high a level as Mr.

14  Fallon.

15          You're general counsel?

16          MR. FALLON:  Yes, sir.

17          THE COURT:  Your client comes to you for advice?

18          MR. FALLON:  Yes, sir.

19          THE COURT:  I think you could have an impact on

20  competitive decision making.  If you want to somehow deny

21  that, then you have a right to do so.  I don't think you've

22  denied it yet, because you haven't discussed Mr. Fallon's role

23  in your papers.  Correct?

24          MR. SAFFER:  That's true, Your Honor.

25          THE COURT:  Okay.

Colloquy                                              11

1          MR. SAFFER:  And one of the reasons --

2          THE COURT:  If you deny that he is in a competitive

3    decision-making role, then we'll have to explore that.  Why

4    don't you -- you might want to take a moment to talk about

5    that.  You may have -- that may have broader implications for

6    Mr. Fallon in his role, in his job.  His boss may want to know

7    why he's not involved in making decisions, but that's --

8          MR. FALLON:  Your Honor, as far as legal decisions

9    are concerned, yes, I can make -- I --

10         THE COURT:  Yeah, yeah.  That's easy.

11         MR. FALLON:  -- full discretion of legal --

12         THE COURT:  And we all presume that, but --

13         MR. FALLON:  I have no role --

14         THE COURT:  I have been general counsel a long time

15   ago in my role in a company and I know what general counsels

16   do.  If you want to deny that you're in a competitive

17   decision-making role with regard to patent prosecutions, then

18   you need to do that on the record.

19         MR. FALLON:  Not with regard to patent prosecution.

20   I do play a role in decision making with regard to that.

21         THE COURT:  Say that -- I couldn't --

22         MR. FALLON:  I do make decisions regarding patent

23   prosecution, Your Honor.

24         THE COURT:  Okay.  So now we have that.  So the

25   question is, do we have the other issues that we need to talk

1   about?

2          For instance, what are the specific injuries?  None

3   of which you have identified.

4          MR. MOSKIN:  I'm sorry.  Specific --

5          THE COURT:  Specific injuries that you are concerned

6   about.  You have given me a vague generalization that they

7   have proprietary information and that -- I mean, I don't know

8   -- there has been no talk about whether or not they're

9   prosecuting any patents or have plans to prosecute any patents

10  that would be competitive to your company.  We don't know

11  that, do we?

12         MR. MOSKIN:  Well, what we do know is that, I mean,

13  that's the entire in this case, frankly, is they -- both

14  parties have games and, frankly, each has patents, some

15  patents on their games involving some, at least superficially,

16  similar features.  The stacking of symbols and --

17         THE COURT:  I'm not talking about the -- I know you

18  have a conflict with your current patents, with your current

19  games.  But, as I read the case law and as -- and I tried to

20  sort through this -- my understanding is that the patent

21  prosecution bar is concerned with future prosecution of

22  patents.

23         MR. MOSKIN:  So -- yes, I was -- I was --

24         THE COURT:  Because you want to take it out for a

25  year.

Colloquy                                    13

1          MR. MOSKIN:  So, no, and I was just saying, as a

2    premise to --

3          THE COURT:  Okay.

4          MR. MOSKIN:  -- answering your question -- so, yes,

5    we do know that -- in fact, this came out while this case was

6    pending -- that they had a pending application for the --

7    their super -- a patent application for their super stacks,

8    which had been abandoned, but there was a continuation

9    application based on that.  And what -- which was not -- which

10   had, at the time this case had begun, was not published, and

11   the -- we know that their strategy in litigating -- excuse me

12   -- in prosecuting their patents is to abandon any foreign

13   rights so that they don't have to have their pending

14   applications published.

15         So, the simple answer to your question really would

16   be I think better directed at plaintiff, because they know

17   what pending applications they have.  We don't.  But we do

18   know that their strategy in patent prosecution is to give away

19   even any foreign rights, so they can maintain the secrecy of

20   their pending -- actively pending applications.

21         So, as far as we know, there are pending, there would

22   be pending applications, --

23         THE COURT:  Well, --

24         MR. MOSKIN:  -- and I also want to say, just as a --

25         THE COURT:  Well, can I just -- I have --

1          MR. MOSKIN:  Sure.

2          THE COURT:  I've got to take -- I want to make sure I

3  don't lose something here.  I think you said that there's a

4  continuation application for super stacks; is that correct?

5  Is that what you said?

6          MR. MOSKIN:  Well, one of -- there was a continuation

7  application filed, yes.

8          THE COURT:  Do we know whether it's pending?

9          MR. MOSKIN:  Well, I guess I have to -- I should say

10  that one of the -- one patent did issue from that, but they're

11  not even asserting that patent in this case.  And the -- but

12  again, given their strategy of maintaining secrecy of their

13  patent prosecution, they know that information and they could

14  have come to us at any time and said, you know, guys, you're

15  arguing about nothing, these -- there's nothing pending.  They

16  could have certified there was nothing pending.

17          Instead, their only -- in fact, their only argument

18  to Your Honor as to why they need -- why they oppose a

19  prosecution bar is because they're concerned about third-party

20  challenges to their patents.  Why they would need in any way

21  access to our confidential information to defend third-party

22  challenges to their patents is a mystery to us.

23          And so, again, had they come forward and said, Judge,

24  we don't have any pending applications, that would be one

25  thing.  But they didn't.  Instead, they raised I think an

1    entirely -- an entire red herring of an issue that some third

2    party might challenge their patents.  And in that context, the

3    only scenario they have described to the Court why there

4    shouldn't be a prosecution bar, there is no -- absolutely no

5    need for access to our papers.

6           And, yeah, and Mr. Fallon himself is actively

7    involved, as is his colleague, whom we -- whose identity we

8    don't know, in prosecution, so clearly there is something

9    there.  There are patent applications that are pending.

10          MR. FALLON:  Well, Your Honor, talking about a red

11   herring.  I mean, it's *inter partes* reexamination issue has

12   been the key issue that has been holding up, you know, an

13   agreement with respect to a reasonable prosecution bar.  And

14   in their papers and also today, you know, Foley and Lardner

15   keep saying, well, you know, I don't understand why they need

16   access to our confidential information if -- you know, to

17   defend against a third-party reexamination proceeding.  That's

18   not how their proposed language works.  It's if they have --

19   if someone gets access to confidential information, in the

20   future they cannot be part or they cannot be -- you know,

21   assist with the defense of that third-party reexamination

22   proceeding.

23          That's where the language is specifically too broad,

24   because, specifically in a reexamination proceeding, the

25   claims are going to be narrow.  They're not ever going to be

 1   expanded.  And so this -- I am not really sure why they're

 2   arguing over this point, as to why they need this specifically

 3   in the prosecution bar.  If the Court does not -- deems that

 4   the rest of the prosecution bar is reasonable, this is one

 5   aspect of it that is way too broad and they, importantly,

 6   articulated a reason as to why it needs to be included in

 7   there, especially because the case law that we cited in our

 8   letter makes it clear that a bar of that kind, including

 9   reexamination, is much too broad a bar to include in a

10   prosecution bar.

11          MR. HANNA:  May I respond, Your Honor?

12          THE COURT:  Yes.

13          MR. HANNA:  So, the concern here, Your Honor, is

14   that, even an *inter partes* review and post-grant reviews,

15   they're actively prosecuting and they're going to get patents

16   in the future.  And these patents and post-grant reviews are

17   reissuing exams or any other mechanism can be -- in some

18   instances, the claims can change, clarify, you could argue

19   them many different ways.

20          And what we want to make sure, because there is sort

21   of between the parties negative blood, I'll say, because

22   there's a trade secret, misappropriation, the parties are

23   contending, hey, you stole my trade secrets; we disagree with

24   that.  So what we want to protect from is to -- for that

25   secret to later on morph into another claim of patent

1   infringement by saying, oh, that was the trade secrets and now

2   it became another patent or something.

3            And to add to that, Your Honor, in --

4            THE COURT:  The whole problem with this argument is

5   it's way too -- we don't want what might happen.  And I think

6   the case law says we can't just put -- issue a patent

7   prosecution bar on what might happen.

8            What -- let me drill down a little bit further into

9   some of the other issues.  Who -- is the Mandelbaum firm

10  involved in the *inter partes* review?  The current one?

11           MR. SAFFER:  No one, Your Honor.

12           MR. FALLON:  Your Honor, the reexamination that we've

13  been referring to in the papers is actually concluded in our

14  patent reissue from -- or was granted a certificate of

15  reexamination.  So the patent survived the challenge.

16           THE COURT:  All right.  But is it the normal course

17  of business that Mandelbaum represents your client in patent

18  prosecution, *inter partes* review, anything?  For just --

19           MR. FALLON:  No, Your Honor.

20           MR. SAFFER:  No, Your Honor.

21           THE COURT:  Just as a general principle.

22           MR. FALLON:  Well, they do have a patent associate

23  who occasionally -- and, again, I was a partner with that firm

24  for three years.  I took this client on when I was a partner

25  there.

1          THE COURT:  Transactional patent associate or

2    litigation patent associate?

3          MR. FALLON:  He's transactional and his sole role is

4    to occasionally help my PCO with overflow work.  It hasn't

5    been done in about 18 months.  Nothing has been --

6          THE COURT:  Okay.

7          MR. FALLON:  -- (indiscernible) there.

8          THE COURT:  All right.  So --

9          MR. SAFFER:  And, Your Honor, if I may?  You know,

10   that associate is ethically screened from this litigation

11   already.  He does not participate as part of the litigation

12   team at Mandelbaum.

13         THE COURT:  Okay.  And then, so I think we can -- if

14   I decide to issue any prosecution bar, I think it's going to

15   be a lot more limited than what you suggest.  For instance, I

16   am not going to -- if I can find your language -- you've got

17   "any person, including, without limitation, outside counsel."

18   We're not barring half the world, because that's not the way

19   these things work.  We may bar Mr. Fallon.

20         MR. HANNA:  Can I add one thing, Your Honor?  Sorry.

21   I apologize.

22         THE COURT:  No, you don't have to apologize.

23         MR. HANNA:  The concern is -- and what I want to make

24   sure -- and that's fine if Your Honor wants to say that the

25   bar doesn't apply, but at least we need their representation

Colloquy                                             19

1    from them that nobody would have access either at Mandelbaum

2    or at in-house would have access, because we don't know who

3    their other in-house counsel is.

4            THE COURT:  Well, I haven't gotten to that part.

5    Access to what?  You need to define the specific proprietary

6    information that you're concerned about they could use

7    competitively against you to come back and copy a patent.

8            MR. HANNA:  So, material we'd designate confidential,

9    Your Honor, and that's defined in the proposed protective

10   order.  Or in --

11           THE COURT:  Not in your -- not in the bar --

12           MR. HANNA:  The protective order is actually entered

13   in the case.  So, I apologize, I don't have a copy of the

14   current protective order.

15           THE COURT:  I should have that in my file.

16           MR. SAFFER:  And, Your Honor, it raises an issue that

17   we've tried to discuss with opposing counsel, is there's an

18   attorneys' eyes only provision in the confidentiality order.

19   To the extent that --

20           THE COURT:  Right.

21           MR. SAFFER:  -- Mr. Fallon or anybody else at High 5

22   in house they'd like to bar from looking at these materials,

23   they can certainly designate anything attorneys' eyes only and

24   then there would be no need for a prosecution bar at all.

25           To the extent that a reasonable --

Colloquy                                        20

1          THE COURT:  Well, we'd have to define -- that's the

2    whole point of a -- yes?

3          THE CLERK:  Do you need to look --

4          THE COURT:  No, no, no.  Sorry.  Thank you.

5          MR. SAFFER:  To the extent a prosecute -- a reasonable

6    pros --

7          THE COURT:  Wait.  Wait.  Let me -- let me finish.

8          MR. SAFFER:  Sure.

9          THE COURT:  I think -- and both sides have an

10   opportunity to correct me here.  I think the prosecution bar

11   works hand in hand with the attorneys' eyes only designation.

12   And what they're trying to do is further narrow that down, so

13   that certain proprietary information -- not all proprietary

14   information, because you -- because we need to make that

15   distinction.  Certain proprietary information would be not

16   allowed to go to people who prosecute the patents.

17          That's why I'm focusing on Mr. Fallon.  I understand

18   his role that he doesn't do the day-to-day work, but I am

19   going to have to assume, until somebody tells me I'm wrong,

20   that he certainly knows what's going on there and he would be

21   in that position of inadvertently saying, well, why don't you

22   think about doing it in this way.  You know, and I say

23   inadvertent, but that's what the whole pros -- the prosecution

24   bar, that's what it's supposed to protect against.

25          MR. HANNA:  Well, I have a proposal, Your Honor, then

Colloquy                                            21

1    potentially that might solve it.  If we add a separate tier

2    that's sort of confidential whatever prosecution bar, whatever

3    the name of it is called, and we designate the material that

4    we are worried about under that separate new tier, then nobody

5    at Mandelbaum and nobody at High 5 who would have access to

6    that information would be able to prosecute.  And that way, it

7    would address Your Honor's concern that it's the limited set

8    of information --

9         THE COURT:  Did you -- under the high standard that

10   you have to meet here, I don't think that you've got any

11   grounds for barring the Mandelbaum people.  Now, --

12        MR. HANNA:  Well, we don't know if they're involved.

13   So they -- if they give a representation that they're not

14   involved, at least, Your Honor.

15        THE COURT:  I just -- I -- well, I thought they did.

16        MR. SAFFER:  Your Honor, yes.

17        MR. HANNA:  Oh, okay.  If they did, we'll just put it

18   in the protective order and then we'll --

19        THE COURT:  It's in the -- it's on the record.

20        MR. HANNA:  Yeah.  Thank you, Your Honor.  But if

21   that changes, will they tell us, at least, Your Honor?

22        THE COURT:  Well, I think that if they didn't, they'd

23   have a problem.  Let me say that.

24        MR. FALLON:  Your Honor, I can make an affirmative

25   representation that no subject matter related to this case

1   regarding patent preparation and prosecution will be given to

2   Mandelbaum Salsburg for the duration of this trial.

3              THE COURT:  Okay.

4              MR. HANNA:  But in addition, Your Honor, as I think

5   you were maybe suggesting with your question earlier, that

6   notwithstanding the protective order, if there is inadvertent

7   disclosure, then the -- a bar would still then come into play.

8   That if that -- if a person -- this unnamed person, for

9   example, was doing patent prosecution, despite the ethical

10  screen and so forth, if that person did happen to walk into an

11  office and find -- whatever the circumstances, and find or be

12  given access to our clients' confidential information, then a

13  prosecution bar I think would then be appropriate to protect

14  us from use of that information.  That person at that point

15  becomes barred.

16             THE COURT:  I don't think that's a bad idea.  I mean,

17  you've already screened him off.  To add his name to the thing

18  here and just put him on notice, you know, if you hear

19  something, --

20             MR. SAFFER:  She said she's already been walled out

21  from the case, Your Honor, in light of this.  As soon as the

22  issue came up, we -- she's already noticed.  There's no -- the

23  only information is actually on my computer.  She would have

24  to hack my computer and go on there to see it.

25             THE COURT:  I'm not going to assume that anybody --

Colloquy                                            23

1          MR. SAFFER:  Yeah.

2          THE COURT:  -- other -- that's an improper joke.  I'm

3    not going to assume that your employees are going to be

4    hacking your computer.

5          MR. SAFFER:  I would trust not, Your Honor.

6          MR. HANNA:   By the same token, there's no reason

7    that we're not to --

8          THE COURT:  I was an associate in a big law firm, but

9    I'm not going to assume that.

10         MR. HANNA:  By the same token, there's -- then that

11   added layer of protection for us, which is very common -- and,

12   again, they agreed -- it works -- the protective order to

13   which they agreed in Nevada works against them as well.

14         THE COURT:  See, I -- I --

15         MR. HANNA:  And so it is identical --

16         THE COURT:  I understand what your concerns are.  I

17   don't think the patent prosecution bars are as common, at

18   least in New Jersey, as perhaps you'd like for them to be.

19   I'm not -- I mean, I'm -- you know, I don't see the cases and

20   it -- and we -- and I do talk to my colleagues and the -- and

21   these are issues that concern us, in terms of whether or not

22   any of us are wandering off the reservation in viewing of

23   these patent cases.  I'm not suggesting they never get

24   entered.  I know they get entered.

25         MR. HANNA:  Your Honor, could we add at least a

1   request that if they -- that whoever they dis -- they identify

2   the people whom they disclosed the information to in house at

3   High 5?  So, if it's disclosed to person X, we should know who

4   that person X is, so that we at least could have an idea who

5   it is.  And if there is a concern, we could raise it with the

6   Court at a later time.

7            MR. FALLON:  Your Honor, the issue here is that -- is

8   that none of this is working on a reciprocal now.  Now -- now,

9   if -- if -- if we're going to disclose everybody that we've

10  disclosed this information to, notwithstanding a court order

11  or whatever the Court directs, then -- then -- then every

12  defendant should be required to do the same thing.

13           And it raises another issue --

14           THE COURT:  I think we're getting -- well, I am not

15  sure I'm following you.  We already have a discovery

16  confidentiality in place.  We have an attorneys' eyes only

17  provision in place.

18           MR. FALLON:  Mm-hmm.

19           MR. HANNA:  So -- go ahead, Your Honor.

20           THE COURT:  You're going to -- what I do want you to

21  do is work a little bit on the -- be a little bit more

22  specific in your confidential -- what you're going to be

23  designating as confidential proprietary information.  And I

24  don't know if you need to put it in your order, but I do -- I

25  want to go back.  I don't want to lose sight of the fact that

1   I thought -- I'm going to read from Judge Donio's opinion.

2   "Rather" -- this is the last page and the next-to-the-last

3   sentence of the opinion:

4       "Rather, the Court concludes at this time that

5       plaintiff's proposed paragraph 6 provides an appropriate"

6       -- and I don't have that paragraph in front of me, it's an

7       attachment to her opinion -- "provides an appropriate

8       mechanism for both parties to timely object to the

9       disclosure of specific confidential information to the DCO

10      designees."  End quote.

11      In other words, I'd rather make this -- and I think,

12  if I understand the facts of this case, I think it should work

13  on a more case -- more individualized, case-by-case basis.

14  Which I think was what the Fed Circuit wants us to do, and I

15  also think that it would work here, because we don't have that

16  many people involved.

17      So, I need to know specifically more.  I mean, I can

18  ultimately approve the form of the order.  I'd -- I'm -- if

19  you want me to, I'd be happy to get into that.  But I need --

20  I think you need to be more specific about the information

21  that you want barred.

22      MR. HANNA:  Absolutely, Your Honor.  And what we'd

23  like --

24      THE COURT:  Or the people you want barred, --

25      MR. HANNA:  So, Mr. Fallon's role presumably will be

1   -- there was another lawyer from High 5 here at the last

2   hearing.  We don't know her job description, for example.

3          MR. FALLON:  She's my IP associate.  She --

4          MR. HANNA:  So she would equally be barred.  She's

5   his IP associate and we don't know --

6          THE COURT:  She'd be barred from specific inform --

7   perhaps she'd be barred from specific information that you

8   designate --

9          MR. HANNA:  Yeah.

10          THE COURT:  -- that, if they don't agree, that I

11   agree should not be given to somebody prosecuting a patent.

12          MR. HANNA:  Yeah.  Yes, Your Honor.  So --

13          MR. FALLON:  II can consent to that, Your Honor.  I

14   mean, her involvement in this litigation, she appeared here,

15   because I was traveling.  That's it.

16          MR. HANNA:  And that -- that's the kind of thing,

17   Your Honor, --

18          THE COURT:  Well, I mean, that's the other thing,

19   too.  I mean, and the Fed Circuit and other courts have

20   recognized that, too.  A lot of the -- when I say a lot of

21   attorneys, I don't know how many are involved in this case,

22   but I assume at least six and maybe seven, depending on the

23   count that I have of who I see and who you've talked about

24   from the plaintiff's side, are just no going to be touching

25   the confidential information anyway.

1              MR. HANNA:  Right.

2              THE COURT:  So, I'm not throwing the baby out with

3     the bath water.  So let's narrow this down and be more

4     specific about what information you have.

5              So you're going to come back to me.  I'm going to

6     reserve ruling.  I've told you what I think I'd like to see

7     here.

8              MR. HANNA:  We'll work with each other and hopefully --

9              THE COURT:  And I know you can do it.  I know you

10    guys can work together.  I'm going to keep -- this is my

11    project for (indiscernible) 16.

12             MR. HANNA:  This case in particular or just --

13             THE COURT:  No.  No.  This case in particular.  And I

14    mean, I -- for the record, everybody has been very

15    professional and I am not actually saying I have problems with

16    this case  I'm just saying that I'd like to see counsel --

17    I've always said this.  Meet and confer doesn't mean disagree

18    and call the judge.  It means meet and confer and try to work

19    it out.  And I know you've tried and I know you've worked out

20    some things.  But I just was half tongue-in-cheek.  Probably,

21    I shouldn't have said it on the record, but I know we're going

22    to be okay.

23             So, I -- that's what I want to do with that.

24             MR. FALLON:  Your Honor, if I man, a few things?

25             THE COURT:  Yes?

1           MR. FALLON:  One is, I assume that there's going to

2    be a proposal coming from the defendants with respect to the

3    patent prosecution bar and we'll have the opportunity to -- to

4    -- to have our comments to that.

5           The only thing I would request, Your Honor, and this

6    may dovetail with the scheduling order discussion, is that

7    there be a -- some kind of deadline or -- or a reasonable date

8    set by when, you know, we can try to meet and confer, we could

9    try to get to a yes.  And if that happens, that's fantastic.

10   I think that's what everybody is hoping for.  But if we cannot

11   reach an agreement, that that gets teed up for Your Honor,

12   once again, without causing too much delay.

13          THE COURT:  It should be very narrow.  If it comes

14   back to me, which is fine, it should be a very narrow issue,

15   frankly.  But, yeah, I don't disagree with what you said.

16          Seven days to get them the proposal?

17          MR. HANNA:  That's fine, Your Honor.

18          THE COURT:  Today is the 7th?

19          MR. HANNA:  Yes.

20          THE COURT:  So you'll get them a proposal by the

21   14th.  If I -- if there's no agreement, somebody write me a

22   letter by October 23rd.  That gives you ten days to agree or

23   write me.  Is that good?

24          MR. HANNA:  Correct.  Thank you, Your Honor.

25          MR. FALLON:  Thank you, Your Honor.

1          THE COURT:  I don't think that's too aggressive and I

2    think it's reasonable.  Okay?

3          MR. FALLON:  Thank you, Your Honor.

4          THE COURT:  Now, have a seat, everybody, while I tell

5    you what I want to do with your scheduling order.  As soon as

6    I find it.  Here it is.

7          I've just made some decisions here.  We have talked

8    about this and talk -- some of these issues we've talked about

9    a lot.  Just we're going to go with this decision; okay?

10          Paragraph 3.  I left in "super stacks," but I deleted

11   all of -- I think it's -- who -- the black lines are the

12   defendants; correct?  Or, no, tell me what -- or let me tell

13   you what I'm looking at.  I'm looking at document number 96.

14   Which is the exhibit to -- it's the joint proposed scheduling

15   order.  It's Exhibit B to plaintiff's letter.

16          So, without -- does everybody have that in front of

17   them?

18          MR. SAFFER:  Yes, sir.

19          THE COURT:  All right.  Those who need to have it in

20   front of them?

21          Okay.  In paragraph 3, un-delete "super stacks."

22   Leave that in.  The next, down where it says "the disclosure

23   must provide what precisely is asserted as a trade secret,"

24   period.  Delete "including" through "secret."  And I guess

25   delete -- I mean, delete the deletion, if you -- oh, I'm

1   sorry.  That's in addition.  Deleting "including" through

2   "secret," and I agree that you should go ahead and delete "the

3   parties cannot currently agree."  That's just language we

4   don't need.

5          Go down to paragraph 7.  I am giving you my changes

6   to this black line.  The second line in paragraph 7.

7   "Defendants collectively" -- add in the word "collectively" --

8   "shall be entitled to 25 total interrogatories."  And I'm

9   sorry.  Back up.  Instead of "three" that should be "ten."

10          Delete paragraphs 8 and 9 in their entirety.

11          MR. HANNA:  I'm sorry, Your Honor, I -- we were just

12   conferring.  If I could ask you to repeat what you said as to

13   paragraphs 8 and 9?

14          THE COURT:  Yeah.

15          MR. HANNA:  Seven.  I'm sorry.  7, we -- I know we --

16   the collectively in the 25 and 10.

17          THE COURT:  Right.  And then delete -- as I said,

18   delete 8 and 9, and -- and we'll (indiscernible) language that

19   I can give you after the hearing.  We don't have to take the

20   time to write it down, but I want you to listen.

21          RFAs, requests for admissions, shall be served after

22   the completion of written discovery.  In the event of failure

23   of the parties to agree on timing and number of RFAs, the

24   short -- the Court -- the short Court -- the Court shall

25   consider the issues at that time.

 1           In terms of the depositions, the language I want you

 2   to put in is:  "Each party shall take depositions in

 3   accordance with the now current" -- the -- you know what?  Not

 4   now.  "The current Federal Rules of Civil Procedure."  I say

 5   current, because some of these are going to change on December

 6   1st.  But we're going to follow the rules.  "Any party seeking

 7   relief from the standard ten depositions" -- and that's today

 8   -- seven -- "ten depositions, seven-hour day, shall apply to

 9   the Court accordingly."

10           In other words, it has been my experience, both when

11   I was in private practice, but even more so now, that trying

12   to decide some -- how many hours we're going to spend in a

13   deposition before we've even completed -- complete -- have

14   completed written discovery is probably not a fruitful

15   exercise.  The Court is certainly open -- and usually -- and I

16   also found that when I make the parties just talk about it,

17   they agree, if they need three more hours, five more hours,

18   whatever.  And, finally, I can easily make that call when you

19   tell me -- when somebody tells me I need more time.

20           What's going to happen is, the other side is going to

21   say, you know, well, they're just wasting a lot of time on

22   questions and they did this and they did that.  All right.  I

23   also did that to a certain extent -- I'm just giving you a

24   heads up -- but, generally, if somebody says they need more

25   time, I'm going to give them a little bit more time.  If they

1    say they need 21 hours more time, I'm probably going to give

2    them another seven.  Okay?  Those are just off the top, you

3    know, guidelines.

4           In other words, counsel, I try to make this just

5    reasonable with good attorneys doing what they should be

6    doing.  I don't suggest that you are not going to be

7    reasonable, and I certainly do not suggest you're not good

8    attorneys.  It's because I think you're good attorneys that I

9    am hopeful that these won't be issues that we have to discuss.

10          I'm done with that.  I'll give you the language that

11   you can get specifically.  Okay?  Or did you get it?

12             (Discussion among counsel, off the record.)

13          MR. HANNA:  Your Honor, just can I seek one

14   clarification on paragraph 7?

15          THE COURT:  Yep.

16          MR. HANNA:  So, the way Your Honor has it, it's 15

17   common interrogatories and 10 defendant-specific

18   interrogatories per defendant.  So that way, that they will

19   have 25 against each of the defendants and we, as a collective

20   defendant, will get 25 total?  Which gives them several -- you

21   know, ten times more than we are getting.

22          THE COURT:  Well, defendant -- the plaintiff should

23   be entitled to 15 common interrogatories to all defendants

24   and --

25          MR. HANNA:  And ten diff -- in addition to the 15, --

1           THE COURT:  -- and ten defendant-specific

2    interrogatories.  Right.  How many defendants are there?

3           MR. HANNA:  Five.

4           MR. MOSKIN:  Five.

5           MR. SAFFER:  As to each defendant; correct, Judge?

6           THE COURT:  Right, but I was kind of hopeful that

7    they wouldn't need all that many, but I didn't want to

8    restrict it now and let them -- make them come back later.

9           MR. HANNA:  Yeah, but if they get that many, we

10   should get that many by the same token, so that we're not

11   restricted to just 25 collective for all of us.

12          THE COURT:  Well, see, I don't actually always agree

13   with the -- with that logic that, because they get -- when

14   there are different sides, different numbers of parties on

15   each side, I don't think that they always should be equal, I

16   think they should be geared toward what exactly the rules

17   contemplate and what you need.

18          MR. HANNA:  Yes, --

19          THE COURT:  I mean, if you --

20          MR. HANNA:  If we ask them, for example, Your Honor,

21   what's your basis for a breach of contract claim against Brian

22   Kavanagh, Joseph Masci, and Mark -- Mark -- Dan Marks, which

23   are three defendants, they will contend -- get the three

24   defendants interrogatories, where it's one for us, really.  So

25   that's why it would count as three against us, because it's

1    going to be different subject matters.

2            THE COURT:  All right.  Well, let me say this.

3    Common questions, for lack of a better term, from you for your

4    defendants, such as that one.  That's a great example.  What

5    is the basis of your breach of contract claim against -- I

6    don't want them to get tripped up on that.  I mean, you're --

7    they're entitled to know that.  So, that will be one

8    interrogatory.

9            MR. HANNA:  Yeah, and so that that's these sorts of

10   questions that we're concerned about.  So, --

11           MR. SAFFER:  But -- but, respectfully, --

12           MR. HANNA:  -- obviously, I can't --

13           MR. SAFFER:  -- Your Honor, what we're going to be

14   dealt then with -- or confronted, rather, with -- with

15   numerous sub-parted -- so to speak, if such a word exists --

16   interrogatories, and that's really, with all due respect, I

17   think a backdoor way of increasing the number of

18   interrogatories Your Honor has contemplated.  Because, if you

19   have numerous subparts, you can have an infinite number of --

20   excuse me -- questions, and I don't think that's the intent of

21   Your Honor or the federal rules.

22           MR. HANNA:  But -- but, Your --

23           THE COURT:  Well, I'll tell you what the intent may

24   be in the very near future.  And this is totally irrelevant.

25   But I know judges and rule -- and people on the rules

1    committee are seriously thinking about obliterating

2    interrogatories.

3         MR. MOSKIN:  Well, with that in mind, though, Your

4    Honor, what Your Honor is -- if I understand correctly, they

5    are -- in effect, they're giving -- they get 65 interrogatories

6    and we get a total of 25.  So, why don't we just do -- make it

7    fair?  I agree that, frankly, practicing in New York, you're

8    not allowed basically to serve any interrogatories, and I

9    agree they're mostly just a burden and make work and the best

10   -- so, I think, if we're going to do this in a fair way --

11        Because each of the individual defendants, they left

12   -- for example, Mr. Masci -- start with Dan Marks.  He left

13   the company, I believe, in 2010 or 2011.  It was two years

14   later that Joe Masci left.  Another year later that Mr.

15   Kavanagh left.  They have very different -- they all did --

16   had very different functions within the company and they're

17   going to each have very -- on their -- the trade secret claims

18   and on their breach of contract claims, they're going to have

19   very different questions to ask that are not common.

20        So, I think, if we're going to do it one way, let's

21   just do it so that it's fair that we each get the same number

22   and I -- my -- I agree with you wholeheartedly that I think

23   interrogatories are largely just a burden and don't yield

24   nearly as much light as -- as depositions, but if we're going

25   to do it -- something like this, then I think that, you know,

Colloquy                                      36

1  it should be --

2          MR. HANNA:  And -- and --

3          MR. MOSKIN:  -- mutual.

4          MR. HANNA:  And that's why, just to add, Your Honor,

5  the 15 plus three, there was logic to that.  So, three times

6  five defendant groups is 15, and 15, that's 30, and we would

7  get 30.  We're willing to, obviously, any allocation, but as

8  long as there's parity.

9          MR. SAFFER:  Now, with the sub-parted interrogatories,

10 plus giving them more, I don't think it's fair.  I think it's

11 out of balance.  Especially because --

12         THE COURT:  Well, how many -- based on what I -- if I

13 stick with what I said about allowing subpart -- well, you

14 don't know, because you have no idea.  It's kind of --

15             (Discussion among counsel, off the record.)

16         THE COURT:  Well, you know, to push back a little bit

17 on your side.

18         MR. SAFFER:  Sure.

19         THE COURT:  You did sue five different entities.

20         MR. SAFFER:  We did.

21         THE COURT:  So, but --

22         MR. SAFFER:  Three individuals and two entities, yes.

23         THE COURT:  Right.  Five different parties.

24         MR. SAFFER:  Yes, five different parties.  Yes, sir.

25         THE COURT:  Okay.

1            MR. SAFFER:  Believe me, Your Honor, I'm not looking

2    to --

3            THE COURT:  All right.  Here's what I am going to do.

4    No one is going to be happy with whatever I do, clearly, and

5    that's why I do something.  That's my job.  Just let me do

6    some math in my head a minute and I'll tell you what -- and --

7            MR. SAFFER:  Sure.

8                          (Extended pause)

9            THE COURT:  Each side gets 40 interrogatories.  If

10   anybody thinks they need more, talk to each other, obviously,

11   and then write me a letter.

12           MR. MOSKIN:  Thank you, Your Honor.

13           MR. HANNA:  Thank you, Your Honor.

14           (Discussion among counsel, off the record.)

15           MR. MOSKIN:  And just to clarify.  I don't think this

16   needs to be said.  40 collectively on each side.  The

17   defendant --

18           THE COURT:  Each side gets 40 interrogatories.

19           MR. MOSKIN:  Right.  Yes.

20           THE COURT:  Each side gets 40 interrogatories.

21           MR. MOSKIN:  Yes.  Right.

22           THE COURT:  Not each party, not each this, every --

23           MR. MOSKIN:  Each side, as I understood --

24           THE COURT:  The --

25           MR. MOSKIN:  -- (indiscernible) clarify.

```
 1              THE COURT:  Let me put it in a different way.  This
 2     attorney, Mr. Sheikh, and this attorney shouldn't be answering
 3     any more than 40 interrogatories each.
 4              MR. MOSKIN:  No, I -- you were clear.  I didn't --
 5              THE COURT:  No, I -- all right.  Did we get any -- we
 6     got the -- the requests for admissions are going to wait until
 7     after the completion of written discovery.
 8              I also -- and from my perspective, don't -- and I'm
 9     not talking about you guys, I'm talking about in general --
10     don't think that requests for admissions have been all that
11     helpful or properly used in the mainstream.  But until you can
12     -- you might want to take that into consideration.  You might
13     not care what I think about mainstream.
14              Okay.  Anything else?
15              MR. HANNA:  Yes, Your Honor.  One --
16              MR. SAFFER:  Yes --
17              MR. HANNA:  Sorry.  One minor issue, Your Honor.
18     It's sort of when discovery -- when the local rule disclosures
19     and discovery starts.  Our -- it's in paragraph 9.  Whether it
20     starts from the scheduling order or the trade secret
21     disclosure.  And the reason we want discovery to wait --
22              THE COURT:  Oh, yeah.  Wait a minute.  What did you
23     say about paragraph 9?
24              MR. HANNA:  So that there is a dispute --
25              THE COURT:  Oh, paragraph 11?
```

1          MR. HANNA:  The para -- sorry.  Yeah.

2          THE COURT:  <u>Markman</u> hearing, case planning?

3          MR. HANNA:  Yes.

4          THE COURT:  Okay.  Yeah, I did look at that.  I'm

5    sorry.  I forgot about that.

6          MR. HANNA:  I would say, Your Honor, before --

7          THE COURT:  All right.  I know what I'm going to do

8    here.

9          MR. HANNA:  Oh, what I --

10         THE COURT:  I forgot -- I just forgot to tell you.

11         MR. HANNA:  That just, you know, we -- we didn't have

12   to have this as an issue.  In the last -- anytime in the last

13   eight months, plaintiffs could have disclosed their trade

14   secret to us.  Judge Linares's order was clear they were going

15   to have to disclose it with specificity, as now been

16   confirmed.  So, again, we don't want to be -- you know, our

17   concern is we -- we -- we don't want to be fighting over that

18   issue again.  We have spent, as Your Honor will recall,

19   several months before the preliminary injunction motion --

20         THE COURT:  Yeah.

21         MR. HANNA:  -- and they refuse -- we couldn't get

22   them in -- to agree on it.  Then, you know, when we finally

23   made a motion to dismiss, then they said, oh, no, no, no, it

24   wasn't what we said before, it was all this math and

25   algorithms and so forth.  So we, again, consistent with Judge

Colloquy                                    40

1   Linares's order, and the fact that they could have made a

2   disclosure at any time since then, we would like to get that.

3   Just it's not to delay, it's so we don't have -- you know,

4   muddy up the whole process, I'm afraid.

5          MR. SHEIKH:  Your Honor, we're prepared to make that

6   trade secret disclosure.  And we think, in paragraph 6, it

7   ought to be within 14 days of the entry of the scheduling

8   order.

9          MR. FALLON:  And, Your Honor, the reason for that --

10         THE COURT:  Well, you know, I don't need -- I'm sorry.

11  Thank you.  I didn't mean to -- let me just --

12                    (Extended pause)

13         THE COURT:  I'm not sure I follow -- this -- paragraph

14  6 is the timing on the document production; correct?

15         MR. SHEIKH:  Yes, sir.

16         THE COURT:  Okay.  And you're saying that you are

17  prepared to make the trade secret disclosure at the same time

18  or --

19         MR. SAFFER:  No, Your Honor.  So, what we contemplate

20  here is we have two different technologies at issue.  Super

21  stacks and super symbols.  The super symbols trade secret

22  description were disclosed to defendants last summer.  And so

23  what's contemplated here is, since the super symbols trade

24  secret description has already been served on defendants,

25  discovery and document production can start as soon as within

1   14 days of the scheduling order entry.  There's no reason to

2   wait.

3            With respect to super stacks, there's a provision in

4   the scheduling order that the super stacks trade secret

5   description must be disclosed by a date certain after the

6   entry of the scheduling order, and document production for

7   super stacks would start after that trade secret disclosure.

8            THE COURT:  I want -- okay.  This is what I intended.

9   This -- I hear you.  What I wanted was all discovery -- I

10  wanted all of the trade secret disclosures disclosed at the

11  same time.

12           I know that you already disclosed the one.  They're

13  complaining about that disclosure.  I'm not going to do

14  anything about the disclosure other than to say -- I mean, if

15  you want to do something differently, fine, but just disclose

16  it again.  I want both disclosed at the same time in your

17  final form, whatever you -- whatever it is, it is.  If they

18  don't like it, they can make a motion to Judge Linares about

19  that.  Or put that in the hopper for when they want to make

20  dispositive motions.  About the -- about, you know, whether or

21  not you think it's a sufficient disclosure.

22           But I want both disclosures made -- even though one

23  is being made a second time -- I want them made -- it's really

24  kind of my signal to you that, if you wanted to do something

25  different -- they've complained about it.  But I'm not

1   suggesting you should or you have to.  I'm making a rule --

2   I'm not making any rulings on whether it was insufficient the

3   first time.

4           But I want them both disclosed at the same time, and

5   then I want the written discovery to start.

6           MR. SAFFER:  And, Your Honor, it raised two ancillary

7   issues.  One, there is a claim for breach of contract under

8   competition that are separate and apart from the trade secret

9   or the patent plans.  Certainly, discovery can start on those

10  two claims --

11          THE COURT:  I want everything to start in 14 days.

12          MR. SAFFER:  Well, then -- well, then, with respect

13  to number 6, Your Honor, I would --

14          THE COURT:  Yep.

15          MR. SAFFER:  -- I would respectfully say that that --

16  that, at that paragraph, say that discovery, right, shall

17  start in a rolling basis after the entry of the scheduling

18  order.  Otherwise, discovery for breach of contract and unfair

19  competition would also have to wait for trade secret

20  disclosure, which, you know, we don't think is appropriate.

21          THE COURT:  When is trade -- well, let's back up.

22  When is trade secret disclosure?

23          MR. SAFFER:  Trade secret --

24          THE COURT:  "Within seven days of the entry of the

25  scheduling order, shall provide a description."  That's

1   paragraph 3.  If I'm reading it -- and tell me if I am missing

2   the point, but I thought that meant within seven days of me

3   signing this order, you're going to make your trade secret

4   disclosures.

5          MR. SAFFER:  You're certainly not missing the point,

6   Your Honor.  Our concern --

7          THE COURT:  All right.  Then -- then --

8          MR. SAFFER:  Well, our concern --

9          THE COURT:  -- paragraph 6 says in 14 days, seven

10  days later, you're going to start document production.

11         MR. SAFFER:  Our concern, Your Honor, and what we

12  anticipate happening is, when we re-serve these trade secret

13  descriptions, there will be a lot of objections made to those

14  trade secret descriptions.  So that the actual start of

15  discovery will not be within 14 days of today or the entry of

16  the scheduling order, it will be 14 days of when those battles

17  around trade secret descriptions finally end.  And that holds

18  up with the entirety of discovery.

19         THE COURT:  I don't want to hold up any more

20  discovery.  Why do we have to do that?

21         MR. SAFFER:  I agree, Your Honor.  We shouldn't have

22  to do that at all.

23         THE COURT:  If you object to their trade secret -- if

24  they -- if I sign this today, which I doubt I'll get time

25  today, you're going to give me a copy hopefully tomorrow or

1  whatever -- but when I sign this order, seven days later

2  they're going to give you the trade secret descriptions.  You

3  may or may not be happy with them.  But if you're unhappy with

4  them, I don't know why -- tell me why I have to hold off

5  discovery going forward in this case.

6          MR. MOSKIN:  Yes, as -- as long as they're not --

7  yeah, as long as they're not permitted later to amend their

8  trade secrets, then we can move forward with discovery.

9          THE COURT:  Well, I can't make a ruling in advance.

10 They may or may not seek to do that.  And if they do, you can

11 then say to me, what's going on, and we'll argue about it, and

12 I'll make a ruling.

13         I want to go forward with discovery.  This case has

14 been sitting around too long.  We have to move it.  Okay?

15         MR. MOSKIN:  Yeah, we -- we --

16         THE COURT:  So that's what I had in --

17         MR. MOSKIN:  We agree, Your Honor.

18         THE COURT:  That's what I had intended.  So, seven

19 days from now you'll make the trade secret disclosures.

20 You're going to do both of them.  And then, 14 days

21 thereafter, you're going to start document discovery.

22         And then I just -- let me get back to the Markman

23 hearing case plan.  Take out, on paragraph -- remove paragraph

24 11.  That's the one I'm working off of.  Delete 45 days.

25 Here's what I'm -- first of all, make -- do the easy one

Colloquy                                                    45

1  first.  Delete "and trade secret disclosure."  Because we're

2  teeing off from the signing of the discovery scheduling order.

3  But I want to make sure that these dates -- and I did not

4  research them -- are all consistent with the local rules.

5            MR. SAFFER:  They are, Your Honor.

6            MR. MOSKIN:  They are, Your Honor.

7            THE COURT:  Okay.  Then now I think I'm done with

8  this.

9            MR. SHEIKH:  Your Honor, if I may, I just -- as to

10  the -- the physical scheduling order, Roman VII on motions

11  provides for a September 1, 2015 motion --

12            THE COURT:  Well, that has to be changed.

13            MR. SHEIKH:  Yeah.  I mean, I think we're going to

14  need some discovery to determine --

15            THE COURT:  You're going to -- I -- usually what I do

16  -- I'm sorry for interrupting you.

17            MR. SHEIKH:  No, that's okay.

18            THE COURT:  I didn't -- you're going to need time.

19  Usually what I do is, I put a date 15 to 20 to 30 days beyond

20  the completion of written discovery.  So, if we start written

21  discovery in approximately three weeks, based on trying to get

22  all this done, which will be the end of October, November --

23  we're going to make it January 15th.  Wait a minute.  January

24  -- yeah, 15th.  That's a Friday.

25            Okay.  Now, are we finished?

1          MR. SHEIKH:  Almost.  Well, there are a couple of

2     housekeeping issues that I wanted to bring to Your Honor's

3     attention.  But if Your Honor says either work it out or send

4     me a letter, obviously we'll abide by the Court's directive.

5          But we want to amend the caption in two ways.  And,

6     again, I don't know if you want to -- Your Honor wants to

7     entertain this.

8          THE COURT:  Have you discussed this with --

9          MR. SHEIKH:  We have, but we don't seem to get

10    closure on it.  The two issues are, as follows:  that PTT, LLC,

11    which was the named plaintiff in this case, changed its name

12    to High 5 Games, LLC, and we want the plaintiff in this case

13    to reflect that change.

14         The second issue is that I believe the first named

15    defendant is Gimmie Games, LLC.  We believed, because of

16    various postings on the Internet and everything else, that

17    Gimmie Games, LLC was an independent existing entity.  We are

18    now made to understand that Gimmie Games is actually a trade

19    name for an entity which is already a defendant, called Marks

20    Studios, LLC.

21         What we asked the defendants to do was to have Dan

22    Marks, who has on his Website the fact that he is the owner of

23    Gimmie Games and the creator of Gimmie Games, to sign a -- I

24    think it's a two-sentence certification that Gimmie Games, LLC

25    has never been and is not currently an existing entity, and

Colloquy                                                                 47

1    it's merely a trade name for Marks Studios, LLC.

2           If we do that, we can get rid of Gimmie Games as an

3    independent party.  And I think, just for housekeeping

4    purposes, the amendment of the caption in that way makes

5    sense.

6           MR. HANNA:  Your Honor, we have obviously no

7    objection to fixing the caption.  We received their proposed

8    certification either yesterday or late the day before, I don't

9    remember exactly.  So we're in the process of sharing it with

10   Mr. Marks just to make sure that he's willing to sign his name

11   to it.  We do have -- Gimmie Games has represented in Nevada

12   that it's a trade name to Marks Studios, so that's not an

13   issue, it's just it might be an issue with the language of the

14   certifications.  So we're working with them on it.  We just

15   haven't had enough time to look at the certifications.

16          MR. MOSKIN:  And, in fact, I believe that in the

17   original answer to the complaint and in a declaration filed by

18   Mr. Marks in the preliminary injunction briefing, he explained

19   that Marks Studios is the name of the company and Gimmie Games

20   is just a d/b/a.

21          THE COURT:  And you don't have a prob --

22          MR. MOSKIN:  So, we'll work it out.

23          THE COURT:  I'm sorry.

24          MR. MOSKIN:  We'll work it out, I'm sure.

25          THE COURT:  And -- okay.  And you don't have a

1   problem with changing PTT to High 5 Games.

2           MR. MOSKIN:  No.

3           MR. HANNA:  No, Your Honor.

4           MR. MOSKIN:  None whatsoever.

5           THE COURT:  Okay.  All right.  Good.  Wonderful.

6   See?  I'm taking credit for this --

7           MR. SHEIKH:  Hope springs eternal.

8           THE COURT:  -- this newfound --

9           MR. HANNA:  So, should we submit a proposed order to

10  Your Honor once we --

11          THE COURT:  When you work it out, just give me a

12  proposed order to change the caption.

13          MR. HANNA:  Yeah.  Thank you.

14          THE COURT:  Consent order.  Anything else?

15          MR. SHEIKH:  We have a Rule 502(d) order that we

16  provided to opposing counsel.  They're looking it over.  I am

17  not pressuring them, but we want to get that issue resolved.

18  And at least from the plaintiff's side, I think, finally,

19  Judge, we're concluded from our side.

20          MR. HANNA:  Now, on the 502(d) order, we figured to --

21  obviously, we're okay with some sort of 502(d) provision, Your

22  Honor, but what we want to make sure is that we have a full

23  protective order in place that includes the motion that we had

24  pending today on the prosecution bar.  So, once we bottom out

25  on everything, we figured we'd submit one proposed order with

1   everything, instead of serially just submitting --

2           THE COURT:  Okay.

3           MR. HANNA:  -- things.  So we're working on it with

4   them as well, Your Honor.

5           THE COURT:  Okay.  What is -- when is the last time I

6   changed the fact discovery end date?  I don't remember.  The

7   original order said October 31, 2014, so we're a year, almost

8   a year past that.  But, in other words, do we need to deal

9   with that I think?

10          MR. HANNA:  Yeah.  I believe paragraph 4 of the

11  proposed order deals with that, Your Honor.

12          THE COURT:  Oh, well, wonderful.  Oh, here.

13  (Indiscernible) for a Markman opinion.  That -- that -- there's

14  nothing really wrong with that.  I don't like it, from my

15  perspective, in terms of keeping track of the case.  So what I

16  want to do is set a date, say sometime in April.  And it will

17  be a fluid date.  Nobody is going to get hurt with that date.

18  I -- it just helps me keep this calendar the correct way, from

19  my perspective.  Okay?  It's -- there's -- it's a perfectly

20  fine concept, but I'm not smart enough to stay with that kind

21  of a fluid date.

22          MR. HANNA:  Well, the -- obviously, the only sort of

23  potential with that, Your Honor, is it will trigger the expert

24  discovery dates, so those dates will --

25          THE COURT:  You know, everything will -- yeah.

1    That's easy for me to change.

2            MR. HANNA:  Yeah.

3            THE COURT:  It's easy for me to watch and easy for me

4    to change.  Okay?

5            MR. HANNA:  Thank you, Your Honor.

6            THE COURT:  So, right now when does the <u>Markman</u>

7    hearing -- <u>Markman</u> schedule take us to?  Do we have -- okay.

8    That doesn't really help.

9            Okay.  I'm just going to set a arbitrary date.  Shall

10   conclude on the --

11                        (Extended pause)

12           THE COURT:  I'm going to say May 30th right now.

13   But, as I said, that's -- in a case like this, to me it's just

14   a calendaring date.

15           Who is going to clean up the order?

16           MR. SHEIKH:  We're happy to do it, Judge.

17           THE COURT:  All right.  So you'll clean up the

18   scheduling order.  You'll propose, under our seven-day thing --

19   seven days -- seven days -- our ten days.  Okay?

20           MR. MOSKIN:  Right.  You'll submit it to us and --

21           MR. SHEIKH:  Of course.

22           MR. MOSKIN:  I understand.

23           THE COURT:  Thank you.

24           MR. SHEIKH:  Judge, thanks for your time.

25           MR. HANNA:  Thank you, Your Honor.

1          (Conference adjourned at 10:39 a.m.)

2                    * * * * * * * * * *

3              C E R T I F I C A T I O N

4          I, TERRY L. DeMARCO, court-approved transcriber,

5      certify that the foregoing is a correct transcript from the

6      electronic sound recording of the proceedings in the above-

7      entitled matter recorded on October 7, 2015 from 9:39:52 a.m.

8      to 10:39:29 a.m.

9

10

11      _____10/31/15_____          **_S / Terry L. DeMarco_**

12          Date                        Terry L. DeMarco, AD/T 566

13                                      KLJ Transcription Service

14

15

16

17

18

19

20

21

22

23

24

25