MANDELBAUM SALBURG, P.C.
3 Becker Farm Road
Roseland, New Jersey 07068
973.736.4600
Fax: 973.325.7467
*Attorneys for Plaintiff High 5 Games, LLC*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

-------------------------------------------------------- X

HIGH 5 GAMES, LLC, a Delaware Limited
Liability Company, f/k/a PTT, LLC,

                   Plaintiff,

        -v.-

DANIEL MARKS, an individual; JOSEPH
MASCI, an individual; BRIAN KAVANAGH,
an individual; MARKS STUDIOS, LLC, an
entity d/b/a GIMMIE GAMES; ARISTOCRAT
TECHNOLOGIES, INC., an entity; JOHN
SMITH(s) 1 - 7, individuals; and XYZ
COMPANIES 1 – 7,

                 Defendants.

-------------------------------------------------------- X

**2:13-CV-07161--JMV-MF**

**ECF CASE**

**SECOND AMENDED COMPLAINT AND
DEMAND FOR JURY TRIAL**

Plaintiff High 5 Games, LLC ("H5G"), hereby submits this Second Amended Complaint and Demand for Jury Trial against Daniel Marks ("Marks"), Joseph Masci ("Masci"), Brian Kavanagh ("Kavanagh"), Marks Studios, LLC ("Marks Studios"), Aristocrat Technologies, Inc. ("Aristocrat"), John Smith(s) 1 – 7 and XYZ Companies 1 – 7, and allege upon knowledge as to itself and otherwise upon information and belief as follows:

## NATURE OF THE ACTION

1.     This is an action for: (a) Misappropriation under the New Jersey Trade Secret Act; (b) Unfair Competition under 15 U.S.C. § 1125(a); (c) Unfair Competition under New

Jersey Common Law; (d) Breach of Contract; (e) Direct Patent Infringement; (f) Breach of the Covenant of Good Faith and Fair Dealing; (g) Tortious Interference with Contractual Relations; (h) Tortious Interference with Prospective Economic Advantage; (i) Misappropriation under New Jersey Common Law; and (j) Violation of the Defend Trade Secrets Act under 18 U.S.C. § 1832.

## JURISDICTION AND VENUE

2.     This Court has subject matter jurisdiction over all causes of actions set forth herein based upon 15 U.S.C. § 1121, 28 U.S.C. §§ 1331, 1338(a) and 1338(b) and, pursuant to the supplemental jurisdiction of this Court, for all non-federal causes of action under 28 U.S.C. § 1367.

3.     This Court has personal jurisdiction over defendants by virtue of, *inter alia*, (a) Defendants having numerous business relations within the State of New Jersey and conducting regular and continuous business transactions therewith, giving it the requisite minimum contacts with the State required to be subject to jurisdiction therein; (b) the commission of tortious acts by all defendants within the State of New Jersey and within this Judicial District; and (c) regular and continuous transaction of business, including the tortious acts complained of herein, within the State of New Jersey and within this Judicial District.

4.     Venue is proper in this judicial district and division pursuant to 28 U.S.C. § 1391(b) and (c).

## IDENTIFICATION OF THE PARTIES TO THE COMPLAINT

5.     H5G is a Delaware Limited Liability Company with a corporate office at 1200 MacArthur Boulevard, Mahwah, New Jersey 07430.

2

6.      Defendant Marks Studios is believed to be a Georgia entity and the formal corporate identity for Gimmie Games ("Gimmie"), having an office at 160 Clairemont Avenue, Suite 340, Decatur, GA 30030.

7.      Defendant Marks is a former employee and member of H5G, and is currently believed to be Marks Studios' founder and Chief Executive Office, reachable at Marks Studios' corporate address, as well as an employee of Aristocrat.

8.      Defendant Masci is a former employee of H5G, and is Marks Studios' Chief Creative Officer. Masci resides at 8 High Road, Montrose, NY 10548.

9.      Defendant Kavanagh is a former employee of H5G, and is be Marks Studios' Director of Motion Graphics, reachable at Marks Studios' corporate address.

10.      Defendant Aristocrat is a Nevada corporation, having a business address at 7230 Amigo Street, Las Vegas, NV 89119.

11.      Defendants John Smith(s) 1–7 are fictitious persons or entities whose present identity and address are unknown, who have also violated H5G's rights as set forth herein, or who assisted, conspired, or otherwise cooperated with the other defendants in the acts complained of herein.

12.      Defendants XYZ Companies 1–7 are fictitious entities whose present identity and address is unknown, who have also violated H5G's rights as set forth herein, or who assisted, conspired, or otherwise cooperated with the other defendants in the acts complained of herein.

## BACKGROUND FACTS

A.    *Intellectual Property Creations*

**SUBSTITUTION METHOD – SUPER STACKS**

13.    In or around summer 2009, H5G created a new concept of unique functional experience, also called a game play mechanic, for the player of a slot machine game. The functional experience involved the appearance of slot machine reels having the identical symbol shown in every symbol position on top of one another into perpetuity.

14.    The concept of putting identical symbols on top of one another in a continuous series has been known in the gaming industry and is generally called "stacks" of symbols. Such a feature is generally achieved by designing a reel having the same symbol fixed on the reel a set number of times in a row (*e.g.*, 25 times), such that when the reels are spinning the player would see the same symbol for a brief instance.

15.    H5G's game play mechanic provides a unique method of taking simple stacks and generating an experience-changing function through substituting fixed symbols on the reel with the desired stacked symbol. Thus, using H5G's proprietary methodology, the reels themselves do not have to be modified to include fixed stacks to create the appearance of an infinite symbol stack through mathematical manipulation of the appearance of the reels.  H5G named this game play mechanic feature "Super Stacks" (the "Super Stacks Feature").

16.    One unique aspect of H5G's Super Stacks Feature is that the math models (*i.e.,* algorithms) designed by H5G to create such a unique playing experience also comply with the strict regulatory restrictions utilized by various state and international regulatory agencies overseeing gaming laws. This aspect is why H5G has been very selective with whom it discloses its mathematical models, and why it does so under the strictest of confidence. Defendants Marks,

Masci, and Kavanagh, who were employed by H5G at the time of the creation of this game play mechanic, were privy to these otherwise confidential and proprietary formulations.

17.     H5G filed US Patent Application serial no. 13/432,140 disclosing an invention having embodiments, one of which includes the Super Stacks feature (the "'140 Application") on March 28, 2012, as a continuation of application No. 12/896,642, filed on Oct. 1, 2010, having a priority date of October 1, 2010. On May 5, 2015, the '140 Application issued as US Patent No. 9,022,852 (the "'852 Patent").

18.     Prior to the "'852 Patent Issuance Date" (May 5, 2015), H5G considered its method of making games utilizing its proprietary methodology to create the Super Stacks Feature to be a trade secret, and has complied with all lawful requirements to ensure its trade secrets are adequately protected (the "Super Stacks Trade Secret").

19.     H5G's Super Stacks Trade Secret description was served on Defendants in or about May 2014 and November 2015.

**SUPER SYMBOLS**

20.     One of H5G's inventions pertains to the concept of oversized symbols occupying multiple positions across multiple rows and/or columns, which H5G has termed "Super Symbols" (the "Super Symbols Feature").

21.     The concept of the Super Symbols Feature was originally conceived as early as the latter part of 2009 and, over the following couple of years after a substantial investment of time and resources by H5G, the feature was successfully built into a game prototype that would meet the high quality standards of H5G and would satisfy regulatory requirements.  Shortly after such achievement was reached, H5G filed US Provisional Patent Application serial no. 61/522,120, on August 16, 2011, and within one year, filed US Patent Application serial no.

13/572,589, disclosing an invention having embodiments, one of which includes the Super Symbols feature (the "'589 Application"). On July 18, 2013 (the "'589 Publication Date"), the '589 Application was published by the US Patent and Trademark Office ("USPTO") as US Patent Application Publication No. 2013/0184050. On May 27, 2014, the '589 Application issued as US Patent No. 8,734,223 (the "'223 Patent").

22.     Prior to the '589 Publication Date, H5G considered its method of making games utilizing its methodology to create the Super Symbols feature to be a trade secret, and had complied with all lawful requirements to ensure its trade secrets are adequately protected (the "Super Symbols Trade Secret").

23.     H5G's Super Symbols Trade Secret description was served on Defendants in or about May 2014 and November 2015.

24.     H5G built its first game using the Super Symbols Trade Secret in 2011, entitled "Ocean's Glory," and the Super Symbols Feature was a prominent aspect of the game. Masci, as H5G's Art Director at that time, was in charge of creating and/or overseeing all art for the Ocean's Glory game, including the creation of the Super Symbols artwork.

25.     H5G subsequently created numerous games incorporating the Super Symbols feature. Many of such games were sold to one of H5G's licensees, Bally Technologies ("Bally"), under the premise that such feature was unique to the games H5G was creating for Bally as such feature was unknown outside of H5G at the time of creation of such games.

26.     As H5G and Bally both believed the Super Symbols Feature to be a likely industry hit, they agreed to keep the games utilizing that feature confidential until making such games publicly known at an industry trade show, G2E, which occurred September 24–26, 2013,

in Las Vegas, Nevada ("G2E"). Bally and H5G spent significant resources and efforts in promoting its new line of games with such Super Symbols feature at the trade show.

> **B.**     ***Marks', Masci's and Kavanagh's Employment with H5G***

27.     In or around September 1998, Marks, who possesses considerable technology expertise, became a member of H5G and commenced his employment as H5G's legal counsel. During his tenure at H5G, Marks worked closely under H5G's CEO, Anthony Singer, as well with and under other H5G employees, to devise and develop casino game software, namely, slot machine-type game software. Marks' efforts in game software development, including his efforts in contributing to the conception of various game feature ideas to be utilized within the game software, were noteworthy during his tenure at H5G.  In addition, as an equity member of H5G, Marks had numerous contractual and fiduciary obligations to H5G with regard to preserving confidentiality and trade secrets of the company.

28.     After a long relationship with H5G, and for numerous reasons arising from disagreement among management, Marks elected to resign from H5G effective February 4, 2010, on which date H5G and Marks entered into a Separation, Severance and Transition Services Agreement (the "Marks Agreement"). *See* Exhibit 1, including all relevant agreements. The Marks Agreement, *inter alia*, provides that:

a.     Marks was obligated to return any and all H5G Confidential Information (as defined therein) to H5G (Section 5);

b.     Marks was required to forever maintain the confidentiality of H5G's Confidential Information and not to use such Confidential Information for any purpose other than to benefit H5G (Section 9);

c.      H5G would be entitled to injunctive relief if there is a breach of Sections 5 and 9 (Section 11(a)); and

d.      Marks was obligated to honor a "Restricted Period" (Section 7). During the Restricted Period, Marks could not: "interfere with business of Company by soliciting or inducing any customer, employee, or independent contractor to terminate or breach an employment, contractual, or other pre-existing relationship with Company or to accept any employment with any third party, including any company owned by Marks. Marks agrees not to interfere with any existing or prospective contracts of the Company," (the "Non-Solicitation Provision) (Section 7) and not to "participate in any business which engages, wholly or in part, directly or indirectly, in the business of inventing, developing, licensing and/or distributing computer casino games and related peripheral equipment in the United States of America (a "Competitive Business")" (the "Non-Compete Provision") (Section 8).

29.      The Super Stacks Trade Secret and the Super Symbols Trade Secret, separately and jointly, satisfy the definition of "Confidential Information" in the Marks Agreement.

30.      H5G and Marks agreed to amend the Marks Agreement in or about October 2011 (the "Amendment to Separation, Severance and Transition Services Agreement," or "Marks Amendment"). *See* Exhibit 1. Pursuant to the Marks Amendment, the "Restricted Period" was extended to August 4, 2013 for purposes of the Non-Solicitation Provision, and remained to expire August 4, 2012 for purposes of the Non-Compete Provision. Thus, Marks explicitly agreed to the terms of the Restricted Period twice: at the time he signed the Marks Agreement (February 2010), and at the time he signed the Marks Amendment (October 2011).

31.      Masci began his employment at H5G in or around August 1999. After nearly 13 years with H5G, on June 7, 2012, Masci's employment with H5G was terminated, subject to a

Separation Agreement between Masci and H5G, which incorporated several of Masci's other contracts with H5G (the "Masci Agreements"). *See* Exhibit 2, including all relevant agreements. In exchange for Masci's ongoing obligations related to confidentiality, non-competition, and non-solicitation, Masci was granted a severance payment equal to one-year's salary and his stock appreciation rights, originally granted in November 2011, were accelerated and fully vested upon his separation from H5G.

32.     The Super Stacks Trade Secret and the Super Symbols Trade Secret, separately and jointly, satisfy the definition of "Confidential Information" in the Masci Agreements.

33.     Kavanagh began his employment with H5G in or around January 2009 as a Motion Graphics Designer. As a condition of his employment, Kavanagh executed numerous contracts with H5G regarding confidentiality, noncompetition, assignment of IP, and similar obligations (the "Kavanaugh Agreements"). *See* Exhibit 3, including all relevant agreements. In August 2010, Kavanagh was promoted to a new position of Animation Manager at H5G. Kavanagh's employment with H5G ended in October 2011.

34.     The Super Stacks Trade Secret and the Super Symbols Trade Secret, separately and jointly, satisfy the definition of "Confidential Information" in the Masci Agreements.

35.     During their collective employments at H5G, Marks, Masci and Kavanagh were privy, and had access, to many, if not all, of H5G's confidential and proprietary methods of making games, as well as many of H5G's features in development, including the methodologies behind the Super Stacks Feature and Super Symbols Feature. In fact, Marks, Masci and/or Kavanagh contributed to and/or were involved with the conception, reduction to practice, and/or proprietary testing and development of such features.

C.     *Gimmie Games, Aristocrat and G2E*

36.     After he left H5G, Marks created and became Managing Partner of Marks Studios, and became the Chief Operating Officer of Spooky Cool Labs LLC ("Spooky Cool Labs").

37.     Upon information and belief, both Marks Studios and Spooky Cool Labs were Competitive Businesses during all or part of the time that Marks participated in these companies.

38.     As early as October 2012, the gaming industry was aware that H5G's former employee, Marks, had entered into an agreement with one of the larger game distributors in the gaming industry, Aristocrat, as a third-party game content provider, under Marks Studios, with which he was affiliated. Aristocrat had a pre-existing relationship with H5G, was a prospective customer, and was also a Competitive Business. Prior to the conclusion of the Restricted Period, Marks negotiated with, and entered into an agreement with, Aristocrat for the purpose of developing and creating games and game technology for the benefit of Aristocrat, and served as an intermediary for an agreement between Aristocrat and a Competitive Business.

39.     Shortly after he founded Marks Studios, around December 2012, Marks hired Kavanagh as Gimme's Director of Motion Graphics. Masci began discussions with Marks regarding Masci's potential involvement with Marks Studios as early as late 2012, during Masci's non-compete period, which did not expire until June 2013. Masci executed an agreement in June 2013. Masci publicly announced his role at Gimmie in July 2013, as its Chief Creative Officer.

40.     Upon information and belief, since October 2012, Marks Studios has attempted to solicit several additional current employees of H5G by virtue of the efforts of Marks, Masci,

and/or Kavanagh, and has been successful in at least in one instance. One additional former H5G employee joined Marks Studios.

41.     Upon information and belief, Gimme's first games to make a public appearance were featured at Aristocrat's booth at G2E, the themes of which were utilized by Aristocrat as a part of a major marketing program at G2E, including banners, postcards, floor mats, and the like, with such games featured thereon.

42.     Gimmie's games featured at G2E comprised several features, including features named Mega Symbols (the "Mega Symbols Feature") and Max Stacks (the "Max Stacks Feature").

43.     The Mega Symbols Feature, when embodied within a slot machine game, is a result of misappropriated information derived from H5G's Super Symbols Trade Secret.

44.     The Max Stacks Feature, when embodied within a slot machine game, is a result of misappropriated information derived from H5G's Super Stacks Trade Secret.

45.     At least the following games made by Gimmie incorporate the Mega Symbols Feature: Storm Queens: Thunder Queen; Storm Queens: Frost Queen; Storm Queens: Flame Queen; and Storm Queens: Sand Queen (collectively "Mega Symbols Games").

46.     Each of the Mega Symbols Games embody "a game comprising: a plurality of reels on a display device, each of the reels including a plurality of symbol positions; a plurality of symbols at the plurality of symbol positions on the reels, the plurality of symbols including at least one statically-positioned, non-expanding oversized symbol occupying at least a plurality of symbol positions over at least a plurality of reels, wherein at least one reel of the plurality of reels has other sized symbols thereon; and a predetermined winning symbol combination of a plurality of winning symbol combinations including the oversized symbol, wherein the

predetermined winning symbol combination is associated with an award[;] wherein mixed sized reels contain both regular sized symbols each occupying one symbol position and said oversized symbols and when said mixed sized symbol reels spin said regular sized symbols and oversized symbols rotate on and off the display device at the same rate," as recited by at least Claim 10 of the '223 Patent.

47.     Upon information and belief, Marks, Masci, and Kavanagh worked collectively to create each of the Mega Symbols Games with the actual knowledge of the origination of such features and trade secrets associated therewith at H5G, and with knowledge that such games would be covered by a H5G patent, which subsequently issued as the '223 Patent.

48.     At least the following games made by Gimmie incorporate the Max Stacks Feature: Sky Rider; Sky Rider 2; Sky Rider:  Golden Amulet;  Sky Rider:  Silver Treasures; Temple of the Tiger; Temple of the Tiger:  Tiger King; Temple of the Tiger: Tiger Queen; Storm Queens; Storm Queens: Thunder Queen; Storm Queens: Frost Queen; Storm Queens: Flame Queen; and Storm Queens: Sand Queen; Coyote Queen; Dream Rose; Flowers of Babylon; Goddess Sisters; Gold Star – Diamond Edition; Gold Star – Multigame; Gold Star – Ruby Edition; Moon Maidens; Mythos; Pearl Warriors; Rainbow Warriors, Red Moon; Romance of Fire and Rain; Sacred Guardians; Songs of Eros; and Sweet Skulls (collectively "Max Stacks Games").

49.     Upon information and belief, Marks, Masci, and Kavanagh worked collectively to create each of the Max Stacks Games with the actual knowledge of the origination of such features and trade secrets associated therewith at H5G, and with knowledge that such games would be covered by a H5G patent, which subsequently issued as the '852 Patent.

50.     At G2E, H5G placed Aristocrat on written notice of its intellectual property rights and a demand to cease all promotion and sales of the Max Stacks Games and the Mega Symbols Games, in light thereof.

51.     After no response at G2E, or several weeks thereafter, H5G sent a follow-up letter to Aristocrat, and demand notices to Gimmie, Marks, Masci and Kavanagh, again notifying them of H5G's intellectual property rights.

52.     With actual knowledge of H5G's intellectual property rights, and with willful disregard for the same, Marks Studios and Aristocrat elected to move forward with making, using, offering for sale, selling and potentially importing, the Max Stacks Games and the Mega Symbols Games in the United States.

## FIRST CAUSE OF ACTION

## MISAPPROPRIATION UNDER THE NEW JERSEY TRADE SECRETS ACT

### (Against All Defendants)

53.     Paragraphs 1 through 52 are re-alleged and incorporated herein by reference.

54.     H5G possesses numerous trade secrets, including many of its methods, techniques, programs, inventions or the like, including those regarding its Super Stacks Trade Secret and its Super Symbols Trade Secret (collectively, hereinafter "H5G Trade Secrets").

55.     The H5G Trade Secrets derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by others in the slot gaming industry.

56.     H5G implemented reasonable commercial restrictions to ensure the H5G Trade Secrets would maintain their secrecy by requiring all of those who would access the H5G Trade Secrets be under terms of confidentiality.

13

57.     Marks, Masci and Kavanagh, by working individually or collectively under the guise of Marks Studios and/or Aristocrat, acquired, disclosed, and/or used the H5G Trade Secrets without express or implied consent of H5G.

58.     Marks, Masci and Kavanagh, by working individually or collectively under the guise of Marks Studios and/or Aristocrat acquired, disclosed, and/or distributed the H5G Trade Secrets with actual or imputed knowledge that such trade secrets were acquired, disclosed, and/or distributed through improper means by way of theft, bribery, misrepresentation, breach or inducement of a breach of an express or implied duty to maintain the secrecy of, or to limit the use or disclosure of, the H5G Trade Secrets.

59.     Marks Studios and Aristocrat acquired and/or used, and continue to acquire and/or use, the H5G Trade Secrets, without the express or implied consent of H5G, and knew or had reason to know that the H5G Trade Secrets were acquired by improper means, including because H5G placed Aristocrat on written notice of its intellectual property rights and demanded to cease all promotion and sales of the Max Stacks Games and the Mega Symbols Games.

60.     The aforementioned collective acts of the Defendants constitute misappropriation under the New Jersey Trade Secrets Act.

61.     Defendants will, if not preliminarily and permanently enjoined by the Court, continue the acts and benefits of the misappropriation, causing H5G immediate and irreparable harm, damage and injury.

62.     As a result of the Defendants' collective actions, H5G has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

14

## SECOND CAUSE OF ACTION

## UNFAIR COMPETITION UNDER 15 U.S.C. § 1125(a)

### (Against All Defendants)

63.     Paragraphs 1 through 62 are re-alleged and incorporated herein by reference.

64.     H5G has expended significant resources developing, using and benefiting from the H5G Trade Secrets, and the confidential and proprietary nature thereof. In particular, H5G relied upon the confidential nature of the H5G Trade Secrets in confidentially promoting its capabilities to make games for sale embodying such H5G Trade Secrets, and offering its prospective customers a unique and proprietary feature which is likely to impress and sell well in the gaming industry upon launch.

65.     H5G has also expended significant resources inventing and protecting the subject matter of the claims of the '223 and '852 Patents, and has relied upon the exclusive rights granted by the nature of the '223 and '852 Patents in pursuing the manufacture and development of games embodying the same.

66.     Defendants' collective actions regarding the use of the H5G Trade Secrets, as well as the claimed subject matter of the '223 and '852 Patents, as described herein, have misled, and will continue to mislead many persons in the slot gaming industry to believe the Defendants have received permission, license, or other consent from H5G to make, use, sell, offer for sale, or otherwise utilize the H5G Trade Secrets or patented functionality in their games.

67.     Defendants' use of the games having the Mega Symbols and/or Max Stacks Features, through sale, offering for sale, and the like, is likely to deceive relevant consumers in the slot gaming industry as to the Defendants' affiliation with H5G, or as to a sponsorship or an approval of its games by H5G.

15

68.     Defendants will, if not preliminarily and permanently enjoined by the Court, continue its acts of unfair competition as set forth in the Lanham Act, thereby deceiving the public by trading on the confidential and proprietary nature of the H5G Trade Secrets at the time they were misappropriated by Defendants.

69.     As a result of the Defendants' collective actions, H5G has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

## THIRD CAUSE OF ACTION

## UNFAIR COMPETITION UNDER NEW JERSEY COMMON LAW

### (Against All Defendants)

70.     Paragraphs 1 through 69 are re-alleged and incorporated herein by reference.

71.     The aforementioned collective acts of the Defendants constitute unfair competition and unfair business practices contrary to the common laws of New Jersey.

72.     Defendants will, if not preliminarily and permanently enjoined by the Court, continue its acts of unfair competition as defined by the common laws of New Jersey, thereby deceiving the public, trading on the exclusive rights granted in the form of the '223 and '852 Patents, and causing H5G immediate and irreparable harm, damage and injury.

73.     As a result of the Defendants' collective actions, H5G has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

## FOURTH CAUSE OF ACTION

### BREACH OF CONTRACT

#### (Against Defendants Marks, Masci, and Kavanagh)

74.     Paragraphs 1 through 73 are re-alleged and incorporated herein by reference.

75.     Marks, by virtue of his actions set forth herein, has violated his agreements with H5G, and in particular, Sections 5, 7, 8, and 9 of the Marks Agreement and Section 2 of the Marks Amendment.

76.     Masci, by virtue of his actions set forth herein, has violated his agreements with H5G, and in particular, Sections 7, 8 and 9 of the Masci Agreement.

77.     Kavanagh, by virtue of his actions set forth herein, has violated his agreements with H5G, and in particular, Section 4, of the Kavanagh Agreement.

78.     As a result of the Defendants' collective actions, H5G has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

## FIFTH CAUSE OF ACTION

### DIRECT PATENT INFRINGEMENT UNDER 35 U.S.C. § 271(a)

#### (Against Defendants Aristocrat and Marks Studios)

79.     Paragraphs 1 through 78 are re-alleged and incorporated herein by reference.

80.     On May 27, 2014, the '223 Patent was issued to H5G, entitled "Gaming Device Having Oversized Symbols in the Play Matrix." H5G owned the '223 Patent throughout the period of the Defendants' infringing acts and still owns the '223 Patent. A true and correct copy of the '223 Patent is attached as Exhibit 4.

81.     The claims of the '223 Patent are presumed valid pursuant to 35 U.S.C. § 282, and are valid.

82.     Defendants Marks Studios and Aristocrat, in violation of 35 U.S.C. § 271(a), have infringed and are currently infringing, contributorily infringing and/or inducing a third party to infringe, at least one or more of the claims of the '223 Patent, either literally or under the Doctrine of Equivalents, by causing to be made, using, offering to sell, selling and/or importing into the United States, without license or authority, within this Judicial District and elsewhere, games covered by at least one of the claims of the '223 Patent as set forth herein (the "Infringing Mega Symbols Games," which includes games marketed under the name or trademark "Mega Symbols" and also other infringing games that may be marketed under a different name or trademark), and/or contributing towards and/or inducing a third party to do the same.

83.     Defendants intentionally caused to be made, used, offered to sell, sold and/or imported into the United States the Infringing Mega Symbols Games, with actual knowledge, and/or knowledge imputed to it by others, that such products embody at least one of the claims of the '223 Patent.

84.     Pursuant to L. Civ. R. 9.3(3.1), H5G served Defendants with its Disclosure of Asserted Claims and Infringement Contentions on November 19, 2015.

85.     Defendants have willfully infringed, and upon information and belief, will continue to infringe, the claims of the '223 Patent by the use, manufacture, offer for sale, sale, and/or importation of the Infringing Mega Symbols Games.

86.     As a result of the Defendants' collective actions, H5G has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other

damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

## SIXTH CAUSE OF ACTION

## DIRECT PATENT INFRINGEMENT UNDER 35 U.S.C. § 271(a)

### (Against Defendants Aristocrat and Marks Studios)

87.     Paragraphs 1 through 86 are re-alleged and incorporated herein by reference.

88.     On May 5, 2015, the '852 Patent was issued to H5G, entitled "Symbol and Reel Substitution Methods for Multi-Line Slot Machines." H5G owned the '852 Patent throughout the period of the Defendants' infringing acts and still owns the '852 Patent. A true and correct copy of the '852 Patent is attached as Exhibit 5.

89.     The claims of the '852 Patent are presumed valid pursuant to 35 U.S.C. § 282, and are valid.

90.     Without authority or license from H5G, Defendants Marks Studios and Aristocrat have directly infringed and are still infringing, contributorily infringing, and/or inducing a third party to infringe, at least one or more of the claims of the '852 Patent, specifically Claims 1-20 (the "Asserted Claims"), either literally or under the Doctrine of Equivalents, by making, causing to be made, using, offering to sell, selling and/or importing into the United States, without license or authority, within this Judicial District and elsewhere, games covered by at least one of the Asserted Claims of the '852 Patent (the "Infringing Max Stacks Games," which includes games marketed under the name or trademark "Max Stacks" and also other infringing games that may be marketed under a different name or trademark"), and/or contributing towards and/or inducing a third party to do the same.

91.     The Infringing Max Stacks Games practicing the claimed methods of the '852 Patent include at least the following games owned, made, used, offered to be sold, sold, or imported by Defendants Marks Studios and/or Aristocrat that employs game features commercially marketed under the "Max Stacks" name or trademark: Sky Rider; Sky Rider 2; Sky Rider: Golden Amulet; Sky Rider: Silver Treasures; Temple of the Tiger; Temple of the Tiger: Tiger King; Temple of the Tiger: Tiger Queen; Storm Queens; Storm Queens: Thunder Queen; Storm Queens: Frost Queen; Storm Queens: Flame Queen; and Storm Queens: Sand Queen; Coyote Queen; Dream Rose; Flowers of Babylon; Goddess Sisters; Gold Star – Diamond Edition; Gold Star – Multigame; Gold Star – Ruby Edition; Moon Maidens; Mythos; Pearl Warriors; Rainbow Warriors, Red Moon; Romance of Fire and Rain; Sacred Guardians; Songs of Eros; and Sweet Skulls.

92.     The Infringing Max Stacks games include symbol substitution game features covered by claims 1–20 of the '852 patent. Specifically, as just one example, the Max Stacks Games practice each and every element of claim 1 through making, using, and selling/offering for sale, infringing games including the following limitations: "A method of operating a slot machine comprising: providing a slot machine, the slot machine comprising: a plurality of reels, each of the reels including a plurality of symbol positions; a plurality of symbols, at least one of the plurality of symbols located at each of the plurality of symbol positions on each of the reels, wherein the plurality of symbols comprises a reserved symbol being designated for substitution; a set of symbol replacement schemas, each symbol replacement schema identifying one replacement symbol for replacing the reserved symbol, for each of the plurality of reels, and at least one processor for executing instructions stored on a memory to play a slot machine game comprising the steps: receiving a command from a player through an input device and relayed to

the processor to initiate game play; selecting, by the at least one processor, a symbol replacement schema; replacing the reserved symbol on each of the reels with replacement symbols in accordance with the selected symbol replacement schema displaying a portion of the reels after the replacement on a visual display device; giving an award to the player if a winning combination of symbols appears on the visual display device; and wherein the step of replacing the plurality of symbols occurs after, or substantially simultaneously with, the step of receiving the command from the player and before the step of displaying the reels on the visual display device."

93.     One such example of a Max Stacks game that practices each and every element of claim 1 of the '852 patent is sold under the commercial name "Sky Rider." Sky Rider is a slot machine game that includes a plurality of reels, which each includes a plurality of symbols positions. It also includes a plurality of symbols, at least one of the plurality of symbols located at each of the plurality of symbol positions on each of the reels. This includes reserved symbols being designated for substitution. Sky Rider also includes a set of symbol replacement schemas, each symbol replacement schema identifying one replacement symbol for replacing the reserved symbol, for each of the plurality of reels. In operation, when playing Sky Rider, the player activates play and a processor that executes instructions stored in memory to play the slot machine game, and selects a symbol replacement schema. The processor then executes instructions to replace the reserved symbol on each of the reels with replacement symbols in accordance with the selected symbol replacement schema displaying a portion of the reels after the replacement on a visual display device. The processor executes instructions to give an award to the player if a winning combination of symbols appears on the visual display device. Lastly, in the game Sky Rider, the step of replacing the plurality of symbols occurs after, or substantially

simultaneously with, the step of receiving the command from the player and before the step of displaying the reels on the visual display device.

94.     Defendants Marks Studios and Aristocrat made, caused to be made, used, offered to sell, sold and/or imported into the United States the Infringing Max Stacks Games, and are making, causing to be made, using, offering to sell, selling and/or importing into the United States, the Infringing Max Stacks Games with actual knowledge, and/or knowledge imputed to it by others, that such products embody at least one of the Asserted Claims.

95.     Pursuant to L. Civ. R. 9.3(3.1), within fourteen (14) days after the initial Scheduling Conference, H5G must serve to Defendants its Disclosure of Asserted Claims and Infringement Contentions regarding the '852 Patent, which shall include, *inter alia*, each claim of the '852 Patent that is allegedly infringed; each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality"); and a claims chart.

96.     Defendants Marks Studios and Aristocrat have made and will continue to make unlawful gains and profits from their infringement of the '852 Patent.

97.     Defendants Marks Studios and Aristocrat have willfully, deliberately, and/or intentionally infringed with full knowledge of the '852 Patent, and upon information and belief, will continue to infringe, the claims of the '852 Patent by the use, manufacture, offer for sale, sale, and/or importation of the Max Stacks Games. The actions of Defendants Marks Studios and Aristocrat are, at a minimum, done with reckless disregard of H5G's rights under the '852 patent.

98.     As a result of the Defendants' collective actions, H5G has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

99.     This case is exceptional and, therefore, H5G is entitled to an award of attorneys' fees.

### SEVENTH CAUSE OF ACTION

### BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

### (Against Defendant Marks)

100.    Paragraphs 1 through 99 are re-alleged and incorporated herein by reference.

101.    In New Jersey, every contract implies a requirement of good faith and fair dealing by the parties in its performance and enforcement.

102.    The Marks Agreement and Marks Amendment are to be governed by and construed in accordance with the laws of the State of New Jersey.

103.    The Marks Agreement and Marks Amendment imply a requirement of good faith and fair dealing by Marks in their performance and enforcement.

104.    Prior to the conclusion of the Restricted Period, and full knowledge of the same, Marks solicited, negotiated with, and entered into an agreement with, Aristocrat for the purpose of developing and creating games and game technology for the benefit of Aristocrat, and served as an intermediary for an agreement between Aristocrat and a Competitive Business. Marks acted with ill motives and without any legitimate purpose.

105.    Marks' actions had the effect of destroying or injuring the right of H5G to receive the fruits of the Marks Agreement and Marks Amendment, and H5G's reasonable expectations that Marks not interfere with, or compete with, the business of H5G were destroyed.

106.    As a result of the Marks' actions, H5G has suffered injury and other damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

<u>EIGHTH CAUSE OF ACTION</u>

**TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS**

<u>(Against Defendant Aristocrat)</u>

107.    Paragraphs 1 through 106 are re-alleged and incorporated herein by reference.

108.    H5G has the right to pursue its business free from undue influence or molestation by Aristocrat.

109.    The Marks Agreement was an existing contract between H5G and Marks.

110.    Upon information and belief, Aristocrat knew of the Marks Agreement, including knowing about the Non-Compete Provision contained within the Marks Agreement.

111.    Pursuant to the Marks Agreement, Marks could not "participate in any business which engages, wholly or in part, directly or indirectly, in the business of inventing, developing, licensing and/or distributing computer casino games and related peripheral equipment in the United States of America (a 'Competitive Business')" until the expiration of the Restricted Period.

112.    Aristocrat is a business which engages, wholly or in part, directly or indirectly, in the business of inventing, developing, licensing and/or distributing computer casino games and related peripheral equipment in the United States of America.

113.    Aristocrat is a Competitive Business, as that term is defined in the Marks Agreement.

114.    Prior to the expiration of the Restricted Period, Aristocrat wrongfully and intentionally interfered with the Marks Agreement by soliciting, discussing, negotiating, encouraging, and/or entering into an agreement with Marks about his participation in or with a Competitive Business, specifically Aristocrat.

115.   But for Aristocrat's interference, Marks would not have breached the Marks Agreement, H5G would have received the fruits of the Marks Agreement, and/or H5G's reasonable expectations that Marks not interfere with, or compete with, the business of H5G would not have been destroyed.

116.   As a result of the Aristocrat's actions, H5G has suffered injury and other damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

## NINTH CAUSE OF ACTION

## TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE

## (Against Marks)

117.   Paragraphs 1 through 116 are re-alleged and incorporated herein by reference.

118.   Aristocrat had a pre-existing relationship with H5G.

119.   H5G was negotiating with Aristocrat to develop and create games and game technology for the benefit of Aristocrat. In mid-2012, term sheets were exchanged between the companies and, to H5G's belief, a deal and/or agreement between H5G and Aristocrat was proceeding and to be finalized.

120.   Upon information and belief, Marks knew that H5G and Aristocrat were negotiating an agreement and, to H5G's belief, a deal and/or agreement between H5G and Aristocrat was proceeding and to be finalized.

121.   Marks wrongfully and intentionally interfered with a deal and/or agreement between H5G and Aristocrat by soliciting, negotiating with, and entering into an agreement with, Aristocrat for the purpose of developing and creating games and game technology for the benefit of Aristocrat, and served as an intermediary for an agreement between Aristocrat and a Competitive Business.

25

122.    But for Marks' interference, it is reasonably probable that H5G and Aristocrat would have entered into a deal and/or agreement.

123.    As a result of the Marks' actions, H5G has suffered injury and other damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

## TENTH CAUSE OF ACTION

## TRADE SECRET MISAPPROPRIATION UNDER NEW JERSEY COMMON LAW

### (Against All Defendants)

124.    Paragraphs 1 through 123 are re-alleged and incorporated herein by reference.

125.    As a formula, device, business information, and/or new products ideas that H5G used in its business and which gave H5G an opportunity to obtain an advantage over competitors who did not know or use it, the H5G Trade Secrets were trade secrets under New Jersey common law prior to the "'852 Patent Issuance Date" (for the "Super Stacks Feature") and the '589 Publication Date (for the "Super Symbols Feature").

126.    H5G implemented reasonable commercial restrictions to ensure the H5G Trade Secrets would maintain their secrecy by requiring all of those who would access the H5G Trade Secrets be under terms of confidentiality.

127.    The H5G Trade Secrets were communicated in confidence by H5G to Marks, Masci, and Kavanagh while they were employed by H5G.

128.    The H5G Trade Secrets were disclosed by Marks, Masci, and/or Kavanagh in breach of that confidence.

129.    The H5G Trade Secrets were acquired by Marks Studios and/or Aristocrat through improper means with knowledge of the breach of confidence by Marks, Masci, and/or Kavanagh.

130.    The H5G Trade Secrets was used by Marks Studios and Aristocrat to the detriment of H5G.

131.    As a result of the Defendants' collective actions, H5G has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

**ELEVENTH CAUSE OF ACTION**

**DEFEND TRADE SECRETS ACT OF 2016, 18 U.S.C. § 1832**

**(Against All Defendants)**

132.    Paragraphs 1 through 131 are re-alleged and incorporated herein by reference.

133.    The actions of Defendants, as set forth herein, constitute misappropriation under the Defend Trade Secrets Act, 18 U.S.C. § 1839.

134.    The H5G Trade Secrets derived independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by others in the slot gaming industry because such information is extremely valuable to H5G, crucial to the operation of H5G's business, and if available to others, would enable them to compete with H5G to H5G's detriment.

135.    The H5G Trade Secrets were used in connection with H5G's products and services.

136.    H5G implemented reasonable commercial restrictions to ensure the H5G Trade Secrets would maintain their secrecy by requiring all of those who would access the H5G Trade Secrets be under terms of confidentiality.

137.   Marks, Masci and Kavanagh were subject to such terms and had a duty to maintain confidentiality and not to use for any of their own purposes the confidential trade secrets to which they had access pursuant to their relationship with H5G.

138.   Marks, Masci and Kavanagh, by working individually or collectively under the guise of Marks Studios and/or Aristocrat, acquired, disclosed, and/or used the H5G Trade Secrets without express or implied consent of H5G.

139.   Marks, Masci and Kavanagh, by working individually or collectively under the guise of Marks Studios and/or Aristocrat acquired, disclosed, and/or distributed the H5G Trade Secrets with actual or imputed knowledge that such trade secrets were acquired, disclosed, and/or distributed through improper means by way of theft, bribery, misrepresentation, breach or inducement of a breach of an express or implied duty to maintain the secrecy of, or to limit the use or disclosure of, the H5G Trade Secrets.

140.   Marks Studios and Aristocrat acquired and/or used, and continue to acquire and/or use, the H5G Trade Secrets, without the express or implied consent of H5G, and knew or had reason to know that the H5G Trade Secrets were acquired by improper means, including because H5G placed Aristocrat on written notice of its intellectual property rights and demanded to cease all promotion and sales of the Max Stacks Games and the Mega Symbols Games.

141.   The aforementioned collective acts of the Defendants constitute misappropriation under the Defend Trade Secrets Act.

142.   Defendants will, if not preliminarily and permanently enjoined by the Court, continue the acts and benefits of the misappropriation, causing H5G immediate and irreparable harm, damage and injury.

143.    As a result of the Defendants' collective actions, H5G has suffered injury, including irreparable injury, and damages, including lost profits, reasonable royalties, and other damages as set forth herein, in an amount that cannot be presently determined to be proven at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, H5G demands judgment against each of the defendants as follows:

A.     a preliminary and permanent injunction restraining Defendants, their respective officers, agents, servants, employees, attorneys, and those in active concert or participation with them, or any of them who receive actual notice of the order by personal service or otherwise, from:

1.     making, using, selling, offering for sale, or importing into the United States, any game embodying any of the Max Stacks Feature, the Mega Symbols Feature, and any derivative or equivalent functional feature thereof, regardless of how branded;

2.     assisting or inducing others to make, use, sell, offer for sale, or import into the United States, any game embodying any of the Max Stacks Feature, the Mega Symbols Feature, and any derivative or equivalent functional feature thereof, regardless of how branded;

3.     making, using, selling, offering for sale, or importing into the United States, the Infringing Games; and

4.     assisting or inducing others to make, use, sell, offer for sale, or import into the United States, the Infringing Games.

B.     an award of damages for Defendants' acts of liability under 35 U.S.C. § 271, in accordance 35 U.S.C. § 284, and in particular, an award of damages adequate to compensate for

the infringement but in no event less than a reasonable royalty for the use made of the Infringing Products, together with interest and costs as fixed by the Court;

C.      an award of increased damages under 35 U.S.C. § 284, including three times the amount found or assessed in paragraph (B) above;

D.      an award of damages inclusive of any actual damages suffered by H5G as a result of Defendants' liability stated hereinabove, including arising out of Defendants' liability arising out of the above Causes of Action, and other Causes of Action that may be added at a later date once additional information is obtained;

E.      an award of damages from Defendants for their liability under § 43(a) of the Lanham Act, including any profits made by Defendants in connection with its unlawful activity, any damages sustained by H5G as a result of Defendants' unlawful activity, and any costs incurred with pursuing this Action, including Court costs, attorney's fees, and additional costs related thereto, pursuant to 15 U.S.C. § 1117(a);

F.      an award of all damages incurred, directly or indirectly, as a result of Defendants' unlawful acts set forth herein, said damages to be trebled at the discretion of the Court pursuant to N.J.S.A. 56:4-2;

G.      an award of all damages under the New Jersey Trade Secrets Act, N.J.S.A 56:15-1, *et seq.* and Defend Trade Secrets Act of 2016, 18 U.S.C. § 1832, including injunctive relief, monetary damages, twice such monetary damages for the willful and malicious acts of Defendants, and all reasonable costs and attorneys' fees;

H.      an order requiring specific performance by each Defendant of their respective contracts alleged as breached herein;

I.      an order permitting H5G to terminate its obligations under such agreements, including, in part, removal of any equity interests or stock appreciation interests of any of the Defendants, or any outstanding payments remaining on such a prior interest;

J.      a determination by the Court that Defendants' unlawful actions set forth herein are exceptional, warranting an award of damages to H5G for all reasonable attorney's fees incurred by H5G, pursuant to 15 U.S.C. § 1117(a);

K.      an award of prejudgment and post-judgment interest and costs of suit;

L.      an award of punitive damages in an amount to be determined by the Court, but not less than $10,000,000.00, for Defendants' deliberate and willful acts;

M.      an award of actual and compensatory damages in an amount not presently known, but to be computed during the pendency of this action; and

N.      an award of any such other and further relief as this Court deems just and equitable.

Respectfully submitted,

Dated:  January 30, 2017          By:      /s/ Michael A. Saffer, Esq.
                                           MANDELBAUM SALBURG, P.C.
                                           3 Becker Farm Road
                                           Roseland, New Jersey 07068
                                           973.736.4600
                                           Fax: 973.325.7467
                                           *Attorneys for Plaintiff High 5 Games, LLC*