**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| HIGH 5 GAMES, LLC, a Delaware Limited Liability Company, f/k/a PTT, LLC,<br><br>Plaintiff/Counterclaim Defendant,<br><br>vs.<br><br>DANIEL MARKS, an individual; JOSEPH MASCI, an individual; BRIAN KAVANAGH, an individual; MARKS STUDIOS, LLC, an entity d/b/a GIMME GAMES; ARISTOCRAT TECHNOLOGIES, INC., an entity; ARISTOCRAT TECHNOLOGIES AUSTRALIA PTY LIMITED, an entity; ARISTOCRAT LEISURE LIMITED, an entity; PRODUCT MADNESS, INC., an entity; GRANT BOLLING, an individual; JOHN SMITH(s) 1-7; and XYZ COMPANIES 1-7,<br><br>Defendants/Counterclaim Plaintiffs. | Case No.: 2:13-CV-07161-JMV-MF<br><br>**ORDER & OPINION OF THE SPECIAL MASTER** |

This matter comes before the Special Master upon a motion by defendants Daniel Marks, Joseph Masci, Brian Kavanagh, Grant Bolling, Marks Studios, LLC ("Marks Studios"), Aristocrat Technologies, Inc. ("ATI"), Aristocrat Technologies Australia Pty Ltd. ("ATA"), Aristocrat Leisure Limited ("ALL"), and Product Madness, Inc. ("Product Madness")(collectively, "Defendants") for reconsideration of portions the Special Master's May 15, 2019 Order & Opinion. After considering the submissions of Defendants and Plaintiff High 5 Games, LLC ("H5G"), Defendants' motion is **Denied in part** and **Granted in part**.

1

# DISCUSSION

## I. Background

During a February 21, 2018 status conference, the Special Master discussed the issue of H5G's backup tapes with the parties. The Special Master made clear that if Defendants wanted the tapes to be repaired, Defendants would be required to pay for it. Thereafter, the Special Master issued his March 16, 2018 Order, which states:

> By March 9, 2018, H5G shall furnish its damaged back-up tapes that it has located to eMag Solutions LLC to perform an analysis as to the cost to repair and restore the back-up tapes in a readable and searchable form. Defendants shall have the right to repair, at their sole expense, the back-up tapes but will not review any portion of such back-up tapes until Defendants notify H5G's attorney's in writing, that such back-up tapes have been restored and until the further Order of the Special Master or Court. The parties shall work in good faith to choose and retain, by March 1, 2018, a neutral third party forensic consultant to repair and restore the damaged back-up tapes of H5G. If the parties can agree upon such a consultant, that consultant shall, by March 15, 2018 produce a quotation for the work of repairing and restoring the damaged back-up tapes of H5G to a condition wherein they can be further processed as if such tapes were never damaged.

Following another disagreement between the parties related to the backup tapes, the Special Master issued an Order on May 15, 2019, which held that if Defendants wanted the tapes restored they would bear the cost associated with any repair. The Special Master further ordered that Defendants are responsible for all costs and fees associated with obtaining estimates for the repair of restoring the back-up tapes, including any storage fees charged.

In the May 15, 2019 Order the Special Master also denied Defendants' request to compel H5G to provide a 30(b)(6) witness to sit with Defendants and go through the documents H5G produced and identify whether each of the 13,000 documents identified by H5G concerns development of the game Golden Goddess or Aphrodite. The Special Master did not believe this would serve any purpose in the furtherance of discovery in this matter. At that time, the parties

were arguing over the relevancy of the 13,000 documents H5G produced and the Special Master did not believe that the question of relevancy could be resolved by the production of a corporate witness who would merely be able to opine on his or her own thoughts as to the relevancy of a particular document. Accordingly, Defendants' request that H5G produce a 30(b)(6) witness to go through the 13,000 documents was denied. Defendants now seek reconsideration of those rulings.

## II. Arguments of the Parties

### Defendants' Arguments

Defendants seek reconsideration of the Special Master's May 15, 2019 Order & Opinion with respect to (1) Defendants' motion to compel H5G to produce a limited 30(b)(6) witness to testify regarding H5G's possible spoliation of evidence and (2) the proper party to pay certain storage fees of H5G's back-up tapes currently owed to eMag Solutions LLC (eMag). Defendants also request that H5G be ordered to restore the damaged back-up tapes.

Defendants argue that H5G has admitted that it failed to collect, review, and produce all documents relevant to this litigation and responsive to Defendants' discovery requests. Defendants continue to believe that H5G has not produced all of the relevant documents concerning its knowledge of Konami's Rawhide game. Defendants argue that the individual defendants are all former H5G employees and are thus aware that the Super Stacks concept was derived from the Rawhide game and that as such the '852 patent and Super Stacks trade secrets are likely either invalid or unenforceable. Defendants allege that H5G obtained the PAR sheet for the Rawhide game, which it referred to as "salmon recipe" and used this to make the Super Stacks game. Defendants assert that despite their best efforts, H5G has not produced all of the documents relating to Konami's Rawhide game or "salmon recipe".

3

Defendants also argue that H5G had a duty to preserve emails relevant to this litigation that predate 2011 because it was involved in unrelated threatened litigation and had already threatened Defendant Daniel Marks with litigation related to possible violation of his separation agreement. Defendants argue that the Special Master's March 2018 Order was based on incorrect unsworn representations by H5G that (1) Mr. Marks and others had somehow caused the destruction of their emails; (2) certain documents were lost when H5G was under no obligation to preserve them; and (3) H5G had already performed certain analyses of the back-up tapes and received an estimate of $1 million to recover the data. Defendants argue that it is clear that H5G failed to preserve relevant documents while it was responding to threatened litigation (concerning Witches Riches) and in the process of threatening litigation against Mr. Marks. Defendants argue they should not have to pay for H5G's negligence or deliberate misconduct and subsequent concealment.

Second, Defendants argue that had H5G properly searched and produced relevant documents, including the five emails produced by Defendants, there would be no reason for Defendants to seek restoration of the damaged backup tapes. Defendants argue that they only sought restoration of the backup tapes because they had reason to believe that H5G's production was incomplete with respect to conception and reduction to practice documents. Defendants maintain that since H5G has conceded that all relevant documents have not been produced, settled law requires that H5G should be ordered to pay eMag's costs to date. Defendants also argue that had H5G run search terms through all relevant servers in 2017, it would have located the emails in the Marks PST file.

Defendants also argue that H5G should be compelled to produce a witness to testify on its admitted spoliation of evidence. Defendants assert that their motion to compel additional

conception documents for the period between August 2008 and February 2009 or compel a related 30(b)(6) witness relies primarily on two bases: (1) H5G's failure to preserve emails and other documents relevant to this litigation, in particular certain Super Stacks conception materials; and (2) a suspicious dearth of technical documents that should have been maintained in a game folder on H5G's servers. Defendants argue that H5G has never submitted any sworn statement of anyone with actual knowledge of its document creation and retention policies at the time. Defendants argue they are entitled to know the extent of H5G's spoliation and the extent of its efforts to determine the circumstances of destruction. Defendants argue that someone from H5G should be required to investigate and testify about the extent of files deleted by H5G, including the scope of deletion and the names of relevant custodians. Defendants argue they are merely asking for an H5G employee to review the relevant game folders and confirm on the record that these materials have been produced, either in the 13,000 documents previously identified by H5G as relevant or elsewhere in the production. While Defendants acknowledge that they already conducted the deposition of Mr. Fallon on November 21, 2017, Defendants argue that his involvement with H5G did not begin until 2011 and that he did not have firsthand knowledge of what happened to the PST files at the time they were "converted."

Defendants further argue that whether or not Mr. Marks properly had the PST file has nothing to do with H5G's responsibilities to preserve and produce documents, and does not excuse H5G from producing the documents from that PST file.

### H5G's Arguments

H5G provides a detailed explanation as to the background of this dispute. H5G explains that during 2017, H5G discovered damaged back-up tapes in the basement of its facility in Mahwah, New Jersey (the "Tapes"). H5G thereafter sent the Tapes to a company called TDS. By

5

August 2017, TDS was able to restore some, but not all of the Tapes. TDS placed information from the restored Tapes onto a Network Attached Storage Unit (the "TDS NAS") and returned the Tapes and the TDS NAS to H5G. In September 2017, H5G copied the TDS NAS onto a second NAS Unit (the "Sfile NAS") and sent it to Sfile, the technology company that H5G retained to host the repository where documents relating to this litigation are stored, for an initial analysis. In September 2017, D4NX, H5G's third party technology support expert, reported back to H5G's outside counsel in this action with details regarding the back-up tape information on the Sfile NAS and Tapes.

In early October 2017, H5G learned that the Tapes and NAS drive consisted of 32 terabytes of data that had not been indexed and was not searchable. It was estimated by D4NX, that after indexing and de-duplicating, there would be approximately 7 terabytes of data. D4NX estimated that the cost of indexing, de-duplicating and processing this information would be in the range of $1,000,000. D4NX also stated that, in processing this backup material, there was a high likelihood that few, if any new documents would come from the expensive process. H5G informed Defendants' counsel of the cost and informed Defendants' counsel that if it wanted to process the duplicative information, Defendants could do so.

Defendants' counsel was unwilling to spend the $1 million necessary to restore and process the Tapes and sought to have H5G bear that cost. Because H5G believed that the information on the Tapes was largely duplicative of discovery that H5G had already produced in this action, H5G declined to pay for the restoration and processing cost. Sfile, therefore, retained the NAS Unit and Tapes.

During the early part of 2018, the parties brought their dispute to the Special Master. The Special Master's March 2018 Order then required H5G to furnish its damaged back-up tapes to

eMag Solutions, to perform an analysis as to the cost to repair and restore the back-up tapes in a readable and searchable form. The Order then provided that Defendants would "have the right to repair, at their sole expense, the back-up tapes."

H5G's counsel retrieved the NAS Unit from Sfile and sent that NAS Unit plus all the related Tapes to eMag. eMag provided an initial estimate of $13,850 to provide an initial estimate to repair, restore, process and host the data on the NAS Unit and Tapes. But eMag never provided an overall estimate to restore and process the Tapes. Consequently, the NAS Unit and Tapes were never processed and eMag continues to charge for storing the NAS Unit and Tapes.

On April 25, 2019, Defendants produced a PST file of Daniel Marks. On May 16, 2019, Defendants identified references in H5G's document production to certain files that H5G maintained and possessed in 2011. Among those referenced was a .pst named "DMMEmailthru 123108.pst" (the "Subject PST") that appears to be the same PST file Defendants produced on April 25, 2019. H5G then searched its active system for the Subject PST and was unable to find it. The email and attachment which Defendants identified were from January 2011. During the period 2010-2011, H5G converted its older email files to an archived email server without preserving those particular PST files after the conversion. H5G believed any emails within the PST files on the H: Drive (including DMM_Emailthru_123108.pst) were included in that conversion. On May 21, 2019, H5G's counsel sent an email to Defendants' counsel stating that during the 2010-2011 period, H5G converted all of its older email files to an archived email server and H5G did not preserve specific PST files. Because it was H5G's understanding that the emails within the Subject PST file were converted at that time, H5G believed there was no reason to preserve that specific PST file.

After May 21, 2019, H5G continued to investigate and search for DMMEmailthru_123108.pst. In H5G's further investigation, it determined that the emails on DMMEmail_thru_123108.pst were not included in the 2010-2011 conversion. Based on its investigation, H5G understands that the file likely was not part of the conversion because Dan Marks archived his emails. Therefore, the emails were not on the active network.

On June 5, 2019, Jon Fallon, Esq., H5G's General Counsel, reviewed a NAS unit at H5G's offices, which included some of the tapes restored by TDS. H5G there identified the PST files referenced in P000804704 - P000804708. H5G thereafter confirmed that all of the PST files listed in P000804704 - P000804708 associated with the relevant custodians Anthony Singer, Brian Kavanagh, Joseph Masci, Michael Belotti and Philip Welty were included in the document collection previously conducted in this litigation, and thus were encompassed by H5G's prior document productions as those files were on the active server.

H5G also located the PST file of Mr. Marks referenced in P000804704 - P000804708 on the TDS NAS drive. After analyzing the DMMEmail_thru123108.pst produced by the Defendant and DMMEmail_thru123108.pst on the TDS NAS drive, the version in H5G's possession did not contain any additional emails that were not present on Defendants' PST file. Thus, according to H5G, Defendants have been in possession of the exact file in H5G's possession for the last two years.

H5G also performed an analysis of the other Marks PST files referenced in P000804704 - P000804708 (i.e. archive.pst and DMM_Email_Archive 2009.pst) and identified four emails from those PST files that were not uploaded or reviewed in H5G's document repository for this litigation. After review of the emails, H5G believes they are not relevant to this litigation and therefore were not collected and reviewed earlier. However, H5G nevertheless produced them.

8

H5G identified an additional 247 files on the TDS NAS drive as possibly containing relevant information. H5G believes these files are likely duplicative of its previous production of materials stored on its source code computer, which has been available to Defendants for review and inspection, but nevertheless produced them on July 3, 2019.

H5G argues that Defendants' counsel has been is possession of the Subject PST File for two years and therefore suffered no prejudice, and in fact, gained an advantage by refusing to provide it to H5G during that time. H5G argues there is no basis for reconsideration of the Court's prior orders as there is no evidence that H5G destroyed any documents that would now shift the cost of restoring the Tapes from Defendants to H5G.

## Opinion

Local Rule 7.1(i) "governs motions for reconsideration filed in New Jersey." *Byrne v. Calastro*, No. 05-cv-68, 2006 WL 2506722, at *1 (D.N.J. Aug. 28, 2006). Motions for reconsideration are proper pursuant to this District's Local Civil Rule 7.1(i) if there are "matters or controlling decisions which counsel believes the Judge ... has overlooked." L.Civ.R. 7.1(i); *Dunn v. Reed Grp., Inc.*, No. 08-1632, 2010 WL 174861, at *1 (D.N.J. Jan 13, 2010). A motion for reconsideration is inappropriate when a party merely disagrees with a court's ruling or when a party simply wishes to re-argue or re-hash its original motion. *Sch. Specialty, Inc. v. Ferrentino*, No. 14-4507, 2015 WL 4602995, *2-3 (D.N.J. July 30, 2015); see also *Florham Park Chevron, Inc. v. Chevron U.S.A.*, 680 F. Supp. 159, 162 (D.N.J. 1988).

The comments to that Rule make clear that "reconsideration is an extraordinary remedy that is granted 'very sparingly.' " L.Civ.R. 7.1(i) cmt. 6(d) (quoting *Brackett v. Ashcroft*, No. 03-3988, 2003 WL 22303078, *2 (D.N.J. Oct. 7, 2003)). The Third Circuit has held the scope of a motion for reconsideration is "extremely limited." *Blystone v. Horn*, 664 F.3d 397, 415 (3d Cir.

2011). "Such motions are not to be used as an opportunity to relitigate the case; rather, they may be used only to correct manifest errors of law or fact or to present newly discovered evidence." *Id.* A court commits clear error of law "only if the record cannot support the findings that led to the ruling." *ABS Brokerage Servs. v. Penson Fin. Servs., Inc.*, No. 09-4590, 2010 WL 3257992, at *6 (D.N.J. Aug. 16, 2010) (citing *United States v. Grape*, 549 F. 3d 591, 603-04 (3d Cir. 2008)).

"Thus, a party must . . . demonstrate that (1) the holdings on which it bases its request were without support in the record, or (2) would result in 'manifest injustice' if not addressed." *Id.* In short, "[m]ere 'disagreement with the Court's decision' does not suffice." *ABS Brokerage Servs.*, 2010 WL 3257992, at *6 (quoting *P. Schoenfeld Asset Mgmt. LLC v. Cendant Corp.*, 161 F. Supp. 2d 349, 353 (D.N.J. 2001)); see also *United States v. Compaction Sys. Corp.*, 88 F. Supp. 2d 339, 345 (D.N.J. 1999) ("Mere disagreement with a court's decision normally should be raised through the appellate process and is inappropriate on a motion for [reconsideration]."); *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, 680 F. Supp. 159, 163 (D.N.J. 1988); *Schiano v. MBNA Corp.*, No. 05-1771, 2006 WL 3831225, at *2 (D.N.J. Dec. 28, 2006) ("Mere disagreement with the Court will not suffice to show that the Court overlooked relevant facts or controlling law, ... and should be dealt with through the normal appellate process ....") (citations omitted).

Defendants have failed to demonstrate that subsequent developments regarding H5G's document collection and production efforts justify the extraordinary remedy of reconsideration. H5G has fully detailed its efforts with respect to document collection and production and nothing has been brought to the Special Master's attention that warrants reconsideration of the Special Master's prior Orders regarding the backup tapes and eMags. The Special Master therefore

10

denies Defendants' request to make H5G responsible to pay storage fees owed to eMag and denies Defendants' request to compel H5G to restore the damaged backup tapes.

With respect to Defendants' request for a 30(b)(6) witness, the Special Master notes that Defendants' current 30(b)(6) witness request is different than the 30(b)(6) witness request they sought in their priors papers and that the Special Master ruled on in his May 15, 2019 Order. The May 15, 2019 Order dealt with Defendants' request for a 30(b)(6) witness to answer two questions: "(1) other than the handful of known documents (which would be presented to the witness), can you identify any other (including in particular from the 13,000) that are responsive to Defendants' specific inquiry; and (2) if so, what are they?" Defendants now seek a 30(b)(6) witness to testify as to H5G's document collection and production efforts.

The Special Master notes that Defendants previously requested a 30(b)(6) witness to testify as to H5G's document collection and production efforts and that on November 21, 2017, Defendants took Mr. Fallon's deposition in this regard. Defendants now argue that because Mr. Fallon was not associated with H5G until April 2011, Mr. Fallon did not have first-hand knowledge of H5G's conversion of its older email files to an archived server in 2010-2011.

Because this 30(b)(6) witness request is different than the request addressed in its prior motion, the Special Master will not apply the rigid standard for a motion for reconsideration. Accordingly, the Special Master will allow Defendants to conduct a very limited 30(b)(6) deposition for the sole purpose of (1) obtaining information regarding H5G's conversion of its older email files to an archived email server and (2) H5G's document creation and retention policies prior to April 2011. Defendants are prohibited from questioning the 30(b)(6) witness about the relevancy of any documents already produced. The Special Master believes that counsel and Mr. Fallon, through his prior deposition testimony and certification in support of

11

H5G's opposition to Defendants' motion, has otherwise adequately detailed H5G's document collection and production efforts.

Date: September 23, 2019

DENNIS M. CAVANAUGH, U.S.D.J. (Ret.)
**Special Master**